STATE OF CONNECTICUT *v.* MICHAEL B. ROSS
(SC 16328)

Sullivan, C. J., and Norcott, Vertefeuille, Zarella, Lavery, Foti and Dranginis, Js.

214

Argued September 10, 2003—officially released June 1, 2004

220

*Lauren Weisfeld,* assistant public defender, with whom was *James B. Streeto,* assistant public defender, for the appellant (defendant).

*Michael A. Fitzpatrick,* special public defender, with whom was *Felix Esposito,* special public defender, for the appellant (defendant) on the proportionality review.

*Harry Weller,* supervisory assistant state's attorney, with whom were *Kevin T. Kane,* state's attorney, and, on the brief, *Peter McShane* and *Marjorie Allen Dauster,* senior assistant state's attorneys, and *Susan C. Marks,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Michael B. Ross, was charged in three cases[1] with eight counts of capital felony in violation of General Statutes § 53a-54b. The trial court dismissed two counts for lack of territorial jurisdiction and, after a jury trial, the defendant was convicted of four counts of capital felony in violation of § 53a-54b (5) and two counts of capital felony in violation of § 53a-54b (6).[2] *State* v. *Ross*, 230 Conn. 183, 188, 194–95, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (*Ross II*).[3] After a separate penalty phase hearing pursuant to General Statutes (Rev. to 1987) § 53a-46a,[4] he was

---

[1] The cases were consolidated for trial. See *State* v. *Ross*, 230 Conn. 183, 225, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) murder committed in the course of the commission of sexual assault in the first degree : . . ."

The criminal conduct in this case occurred in 1983 and 1984. Section 53a-54b has been amended several times since 1984 for purposes not relevant to this appeal. For convenience, we cite the current version of the statute although we take note of the fact that prior to the enactment of No. 01-151, § 3, of the 2001 Public Acts, the provision of the statute concerning murder committed in the course of the commission of sexual assault in the first degree had been designated subdivision (7) rather than subdivision (6).

[3] *State* v. *Ross*, 225 Conn. 559, 561, 624 A.2d 886 (1993), was referred to as *Ross I* in *State* v. *Cobb*, 234 Conn. 735, 663 A.2d 948 (1995). We therefore refer in this opinion to *State* v. *Ross*, supra, 230 Conn. 183, as *Ross II*, and to *State* v. *Ross*, 251 Conn. 579, 742 A.2d 312 (1999), as *Ross III*.

[4] Because the defendant committed the crimes that were the basis of his convictions in 1983 and 1984; *Ross II*, supra, 230 Conn. 191–92; the applicable version of § 53a-46a would normally have been the revision of 1983. In *Ross II*, supra, 280–83, however, this court concluded that Public Acts 1985, No. 85-366, § 1 (d), first codified at General Statutes (Rev. to 1987) § 53a-46a (d), applied retroactively to this case. In 1993, the legislature amended § 53a-46a for purposes not relevant to this appeal. See Public Acts 1993, No. 93-306, § 12, currently codified at § 53a-46a (i) (7). In 1995, the legislature amended the statute to include substantive provisions that are not retroactively applicable to this case. See Public Acts 1995, No. 95-19, § 1, *currently*

sentenced to death. The defendant appealed from the

codified in part at § 53a-46a (g). For convenience, uniformity and clarity, all references and citations in this opinion to § 53a-46a are to that statute as revised to 1987.

General Statutes (Rev. to 1987) § 53a-46a provides in relevant part: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, the judge . . . who presided at the trial . . . shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . . Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury . . . shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been

judgments to this court. We affirmed the defendant's convictions, but determined that certain evidentiary rulings by the trial court in the penalty phase had impaired the defendant's ability to establish a mitigating factor and, accordingly, we reversed the judgments imposing the death penalty. Ross II, supra, 286. On remand, a second penalty phase hearing was held before a jury, which found an aggravating factor for each capital felony conviction and no mitigating factor. In accordance with the jury's findings, the court, *Miano, J.*, imposed a death sentence on each count. On appeal to this court

convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury . . . finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury . . . finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

"(g) The court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds by a special verdict as provided in subsection (e) that . . . (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ."

pursuant to General Statutes § 51-199[5] and General Statutes (Rev. to 1987) § 53a-46b,[6] the defendant raises numerous challenges to the sentences of death. We affirm the judgments imposing the death penalty on each count of capital felony.

As set forth in *Ross II*, supra, 230 Conn. 191–92, the jury at the guilt phase trial reasonably could have found the following facts. "On June 13, 1984, the defendant accosted seventeen year old Wendy B. as she was walking along Route 12 in Lisbon. After a short conversation, he pulled Wendy B. over a stone wall, forcing her to go with him into a wooded area that led to an open field. There he sexually assaulted her, forced her to turn over on her stomach, and then strangled her.

"On Thanksgiving Day, 1983, the defendant accosted nineteen year old Robyn S. on the grounds of Uncas

[5] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . (4) review of a sentence of death pursuant to section 53a-46b . . . ."

[6] General Statutes (Rev. to 1987) § 53a-46b provides: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating circumstance specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and if taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

All references in this opinion to § 53a-46b are to that statute as revised to 1987, a technical change in the statute having been effected by the enactment of Public Acts 1985, No. 85-366, § 2, to reflect a change to § 53a-46a by § 1 of the same public act. See footnote 4 of this opinion.

on Thames State Hospital in Norwich. He forcefully pulled Robyn S. into a wooded area and ordered her to remove her clothing. He then sexually assaulted her and, after ordering her to turn over on her stomach, strangled her. Before leaving, he covered her body with leaves.

"On Easter Sunday, 1984, the defendant picked up fourteen year old April B. and fourteen year old Leslie S., who were hitchhiking to Jewett City on Route 138. Once the girls had entered his car, he drove them easterly on Route 165 and, over their protests, past their intended destination. When April B. tried to force the defendant to stop the car by threatening him with a knife, he disarmed her and continued to transport the girls against their will, through eastern Connecticut, to Beach Pond in Rhode Island. At Beach Pond, he parked his car and bound both girls hand and foot. He then untied April B.'s feet and forced her to walk a short distance from his car, where he assaulted her sexually, turned her over on her stomach and strangled her. Returning to the car, the defendant killed Leslie S. without sexually assaulting her. He then placed the bodies of both girls in his car and drove back to Preston, Connecticut, where he deposited their bodies in a culvert." Id.

At the second penalty phase hearing, the state sought to prove as an aggravating factor that the defendant committed all of the offenses in an especially heinous, cruel or depraved manner within the meaning of § 53a-46a (h) (4). The defendant sought to prove two statutory and fourteen nonstatutory mitigating factors.[7] The jury

---

[7] The defendant sought to prove as statutory mitigating factors under § 53a-46a (g) (2) that: (1) "[a]t the time of the offenses, [the defendant's] mental capacity was significantly impaired but not so impaired as to constitute a defense to the prosecution"; and (2) "[a]t the time of the offenses, [the defendant's] ability to conform his conduct to the requirements of the law was significantly impaired but not so impaired as to constitute a defense to the prosecution."

The defendant sought to prove as nonstatutory mitigating factors that:

found an aggravating factor and no mitigating factor for each count. Thereafter, the court imposed six sentences of death. This appeal followed.

The defendant's claims on appeal fall into ten general categories involving: (1) rulings pertaining to the jury selection phase of the penalty hearing; (2) the denial of the defendant's motion to sever the cases; (3) the denial of the defendant's motion to order a competency examination; (4) evidentiary rulings; (5) the state's alleged nondisclosure of exculpatory materials in viola-

(1) "[the defendant] has demonstrated remorse with regard to his crimes"; (2) "[the defendant] cooperated with the police, which allowed the police to solve the homicides in question"; (3) "[the defendant] gave both oral and written statements to the state police admitting his guilt, demonstrating his regret"; (4) "[the defendant] continued to be extremely cooperative with the state police, fully admitting in both oral and written statements, his participation in five other homicides, further demonstrating his regret"; (5) "[the defendant's] cooperation with police was the major factor in solving the homicides in these cases, locating the various crime scenes and his cooperation and full admission of guilt led to his convictions"; (6) "[the defendant] has adjusted well to prison over the years and is a good, productive and cooperative inmate"; (7) "[p]rior to and after his arrest, [the defendant] has maintained positive relationships with other people, the lives of them would greatly suffer if he was executed"; (8) "[the defendant] at times in his life has demonstrated responsibility as a human being and a strong work ethic"; (9) "[the defendant] voluntarily took medication to help suppress and control the recurrent unwanted sexually sadistic urges, which were the source of his mental illness"; (10) "[c]onsiderations of fairness and mercy [are reasons] for the jury to impose six consecutive life sentences, totaling 360 years"; (11) "[the defendant] is presently serving two consecutive life sentences, totaling 120 years"; (12) "[t]here exists a factor concerning the facts and circumstances of the case which has not been specifically mentioned in this list which the jury can consider in fairness and mercy as constituting a basis for imposing on [the defendant] a sentence of life imprisonment, rather than sentencing him to death"; (13) "[t]here exists a factor in [the defendant's] character, history, and/or background that has not been specifically mentioned in this list that the jury can consider in fairness and mercy as constituting a basis for a sentence of life rather than sentencing him to death"; (14) "[t]hat any of the above listed factors, either taken individually or in combination with any other factor, while not an excuse for the murders, but in fairness or mercy provides a reason for a sentence of life without the possibility of release, instead of a sentence of death."

tion of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); (6) rulings relating to the sufficiency of the evidence in support of the mitigating and aggravating factors; (7) instructions given to the jury; (8) the constitutionality of the death penalty statute; (9) the reliability of the death sentences in light of the alleged cumulative errors; and (10) the proportionality of the death sentences, which we review pursuant to § 53a-46b (b) (3). We address each of these categories in turn.

## I

## JURY SELECTION PHASE ISSUES

The defendant raises four claims pertaining to the jury selection phase of the trial. We address each claim in turn.

## A

## Denial of the Defendant's For Cause Challenges

The defendant claims that the trial court improperly denied eight of his for cause challenges, thereby forcing him to use his peremptory challenges to remove the challenged venirepersons in violation of: (1) his statutory and constitutional right to challenge jurors peremptorily, as provided by General Statutes §§ 54-82g and 54-82h[8] and guaranteed by article first, § 19, of the con-

---

[8] General Statutes § 54-82g provides: "The accused may challenge peremptorily, in any criminal trial before the Superior Court for any offense punishable by death, twenty-five jurors; for any offense punishable by imprisonment for life, fifteen jurors; for any offense the punishment for which may be imprisonment for more than one year and for less than life, six jurors; and for any other offense, three jurors. In any criminal trial in which the accused is charged with more than one count on the information or where there is more than one information, the number of challenges is determined by the count carrying the highest maximum punishment. The state, on the trial of any criminal prosecution, may challenge peremptorily the same number of jurors as the accused."

General Statutes § 54-82h (a) provides: "In any criminal prosecution to be tried to the jury in the Superior Court if it appears to the court that the trial is likely to be protracted, the court may, in its discretion, direct that,

stitution of Connecticut, as amended by article four of the amendments;[9] and (2) his state and federal constitutional right to a fair trial by an impartial jury, as guaranteed by the sixth[10] and fourteenth[11] amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments.[12] We disagree.

The following facts and procedural history are relevant to our resolution of this claim. Prior to voir dire,

---

after a jury has been selected, two or more additional jurors shall be added to the jury panel, to be known as 'alternate jurors'. Such alternate jurors shall have the same qualifications and be selected and subject to examination and challenge in the same manner and to the same extent as the jurors constituting the regular panel, provided, in any case when the court directs the selection of alternate jurors, the number of peremptory challenges allowed shall be as follows: In any criminal prosecution the state and the accused may each peremptorily challenge thirty jurors if the offense for which the accused is arraigned is punishable by death, eighteen jurors if the offense is punishable by life imprisonment, eight jurors if the offense is punishable by imprisonment for more than one year and for less than life, and four jurors in any other case."

[9] Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

[10] The sixth amendment to the United States constitution, which is made applicable to the states through the fourteenth amendment, provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

[11] The fourteenth amendment to the United States constitution § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[12] Article first, § 8, of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments, provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient

the trial court, pursuant to § 54-82h, granted thirty peremptory challenges to the state and to the defendant. After twelve jurors and one alternate had been accepted, the court granted one extra peremptory challenge to each party. At that time, the defendant had exhausted twenty-eight peremptory challenges and the state had exhausted seventeen. The defendant had exercised eight out of the twenty-eight peremptory challenges to excuse prospective jurors whom the trial court had refused to excuse for cause. The defendant exhausted all of his remaining challenges before the fourth and final alternate juror was accepted. At that time, the defendant requested, and the court denied, an additional challenge. The court indicated, however, that the defendant should renew his request on the following day. As instructed, on the following day, the defendant made a second request for a peremptory challenge and that too was denied. Neither of the defendant's requests for an additional peremptory challenge was made in connection with a specific juror. On May 27, 1999, the fourth and final alternate juror was accepted. Between the time that the defendant exhausted his peremptory challenges and the time that the fourth alternate was accepted, the defendant did not proffer any challenge for cause that was denied by the court.

After the jury had been selected, an interlocutory appeal was filed and, because of the delay occasioned

security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger."

by the appeal, the jury was not recalled until January, 2000. At that time, four regular jurors and the fourth alternate juror, who was the only juror who had been selected after the defendant had exhausted his peremptory challenges, were dismissed. With the parties' agreement, the court moved the three alternates into the seats vacated by three of the dismissed jurors so that eleven jurors and no alternates remained on the panel. When jury selection to replenish the panel began, the trial court granted each party nine peremptory challenges. The defendant used eight of his nine peremptory challenges. One juror and six alternates were accepted during the second voir dire.[13]

The defendant now claims that the trial court improperly denied his for cause challenges to the eight jurors during the first voir dire, thereby forcing him to use his peremptory challenges to remove those jurors and denying him his constitutional and statutory right to exercise his full complement of peremptory challenges. We conclude that, because the defendant did not seek an additional peremptory challenge to exercise against a specific juror who ultimately served on the jury, even if it is assumed that the trial court improperly denied one or more of the defendant's for cause challenges, any such impropriety necessarily was harmless under *State* v. *Esposito*, 223 Conn. 299, 613 A.2d 242 (1992). Accordingly, we do not review the merits of the trial court's rulings.

In *Esposito*, the defendant was required to exercise three peremptory challenges to excuse prospective jurors whom the court had refused to excuse for cause, thereby exhausting his peremptory challenges. Id., 303–304. Thereafter, "the defendant challenged another pro-

---

[13] It is not clear from the record why four alternate jurors were empaneled during the original jury selection and six alternate jurors were selected during the second jury selection.

spective juror, Richard Artkop, for cause. The trial court overruled the challenge for cause and denied the defendant's subsequent motion for an extra peremptory challenge. Consequently, Artkop became the second alternate juror. Jury selection was completed when a third alternate juror was chosen." Id., 304. Before the trial began, however, the court excused one of the twelve jurors, and Artkop, the second alternate, was randomly selected to become a member of the jury that ultimately convicted the defendant. Id., 304. The defendant appealed from the judgment of conviction.

On appeal, this court concluded that one of the three jurors against whom the defendant had been forced to exercise a peremptory challenge should have been excused for cause. Id., 312. We noted that, if the juror "had been properly removed by the court for cause, the defendant would have had one peremptory challenge remaining to remove Artkop from the jury"; id., 313; and that there was no doubt that the defendant would have done so because he had both challenged the juror for cause and asked the court for an additional peremptory challenge to exercise against him. Id., 312. Accordingly, we concluded that the defendant was entitled to a new trial. We explained that "[t]he Connecticut constitution guarantees a criminal defendant the right to exercise peremptory challenges in the selection of his jury. Conn. Const., art. I, § 19, as amended by art. IV of the amendments to the constitution; see also General Statutes §§ 54-82g and 54-82h. We conclude that the trial court's action abridged this constitutional and statutory right of the defendant. Accordingly, we agree with numerous other courts throughout the nation that 'it is reversible error for a trial court to force an accused to use peremptory challenges on persons who should have been excused for cause, *provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and*

*denied.*' " (Emphasis added.) *State* v. *Esposito,* supra, 223 Conn. 313.

The defendant argues that he has satisfied the *Esposito* conditions for raising a claim that the denial of a for cause challenge was reversible error because (1) he exhausted all of his peremptory challenges and (2) he sought, and was denied, an additional challenge. We disagree. We conclude that, under *Esposito,* the mere request for an additional peremptory challenge is not sufficient to establish that an allegedly improper denial of a for cause challenge was potentially harmful. Our determination in that case that the defendant's constitutional and statutory right to exercise his full complement of peremptory challenges was abridged turned on the facts that (1) if the defendant had had an additional peremptory challenge, *he would have used it to remove an identifiable juror* and (2) because he was unable to do so, *that juror ultimately sat on the jury.* In other words, it is implicit in *Esposito* that, in determining whether the denial of a for cause challenge was potentially harmful, this court considers whether an identifiable, objectionable juror actually served on the jury that decided the case, not whether the composition of the jury would have been different in the absence of the claimed error.[14]

---

[14] See also *State* v. *Mozell,* 36 Conn. App. 631, 633, 652 A.2d 1038 (1995) (trial court's failure to excuse two venirepersons for cause did not deprive defendant of fair and impartial jury because no juror was forced on defendant who "did not request an additional peremptory challenge to exercise against any of the seated jurors nor was there any indication that the defendant would have used a peremptory challenge against any of them if one had been available"), cert. denied, 232 Conn. 917, 655 A.2d 261 (1995); *Johnson* v. *State,* 43 S.W.3d 1, 7 (Tex. Crim. App. 2001) ("harm was shown for the erroneous denial of the appellant's challenges for cause because the record indicate[d] that the appellant (1) used a peremptory challenge to remove the venire members, (2) exhausted his peremptory challenges, (3) requested and was denied additional peremptory challenges, and (4) identified two objectionable venire members who sat on the jury and on whom the appellant would have exercised peremptory challenges had he not exhausted his peremptory challenges to correct the trial court's erroneous denial of his challenges for cause"); *State* v. *Percy,* 156 Vt. 468, 477, 595 A.2d 248 (1990)

In the present case, after exhausting his peremptory challenges, the defendant did not seek to exercise an additional peremptory challenge against a specific juror. Accordingly, we conclude that, even if it is assumed that the trial court improperly denied one or more of the defendant's for cause challenges, thereby forcing him to exercise his peremptory challenges to remove those jurors, his right to exercise the full complement of peremptory challenges was not abridged. Put another way, any improper denial of the for cause challenges necessarily was harmless because the defendant was not forced to accept an incompetent or objectionable juror after his peremptory challenges had been exhausted. Therefore, we need not consider the merits of the court's rulings on the defendant's for cause challenges.

The defendant argues, however, that, under *Gray* v. *Mississippi*, 481 U.S. 648, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987), a harmless error analysis is inappropriate when an erroneous trial court ruling may have affected the composition of the jury as a whole, regardless of whether an objectionable juror actually served on the jury. He argues that the trial court's improper denials of his challenges for cause could have affected his use of peremptory challenges and that, when he made his calculated decisions to accept or strike jurors during the first voir dire, he could not have known that there would be a second voir dire to replace jurors lost as a result of the delay occasioned by the interlocutory appeal and that he would receive additional peremptory challenges to replace those jurors. We conclude that the defendant's reliance on *Gray* is misplaced because

("the appellant must show that the challenge for cause [was] denied and all peremptory challenges [were] subsequently exhausted . . . [and] that the record reflects[s] that, had the party had an additional peremptory challenge available, the party would have used it to strike another juror" [citations omitted; internal quotation marks omitted]), cert. denied, 502 U.S. 927, 112 S. Ct. 344, 116 L. Ed. 2d 284 (1991).

the United States Supreme Court has limited *Gray*'s application to the specific issue raised in that case, i.e., whether the improper *Witherspoon-Witt*[15] exclusion of a prospective juror is subject to harmless error review.

In *Gray*, the trial court, by its own admission, improperly denied the state's request to remove for cause at least five prospective jurors who unequivocally had stated that they could never vote to impose the death penalty, thereby forcing the state to use peremptory challenges to strike those prospective jurors from the panel. Id., 653–54. The state ultimately exhausted all of its peremptory challenges. Id., 653. When the next prospective juror was called to the jury box, she expressed reservations about imposing the death penalty but ultimately stated that she could vote for it in the appropriate case. Id. At that point, the prosecutor requested an additional peremptory challenge. Id., 654. He argued that the court erroneously had denied five or six of the state's for cause challenges and thereby had compelled the state to use its peremptory challenges against those venire members. Id. He also claimed that, if he had another challenge, he would use it to remove the prospective juror. Id. The court denied the state's request, but excused the venireperson for cause. Id., 654–55. The jury ultimately convicted the defendant of capital murder and sentenced him to death. Id., 656. The defendant appealed, claiming that the exclusion

---

[15] In *Witherspoon* v. *Illinois*, 391 U.S. 510, 521–23, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), the United States Supreme Court concluded that it was unconstitutional to exclude a prospective juror who expressed scruples against the death penalty but who could, nevertheless, be impartial. See *Gray* v. *Mississippi*, supra, 481 U.S. 657–58. In *Wainwright* v. *Witt*, 469 U.S. 412, 420, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), the court clarified that the relevant inquiry in determining whether exclusion of a prospective juror was improper is whether "[the juror's] views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (Internal quotation marks omitted.) See *Gray* v. *Mississippi*, supra, 658.

of the prospective juror was unconstitutional under *Witherspoon* v. *Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). *Gray* v. *Mississippi*, supra, 481 U.S. 656.

The Mississippi Supreme Court concluded that the defendant had not been prejudiced by the trial court's exclusion of the venireperson. It explained that "[t]he force and effect of the trial court's ruling was to correct an error he had committed in refusing to dismiss other jurors for cause after they had unequivocally stated that they could not vote to impose the death penalty in any circumstance." (Internal quotation marks omitted.) Id., 657. Consequently, it explained, "the trial court was correct when it recognized the error in its prior rulings and took affirmative action to correct that error." (Internal quotation marks omitted.) Id. It then affirmed both the conviction and the death sentence. Id., 656.

On appeal, the United States Supreme Court reversed the death sentence. The court explained that "[t]he efforts to apply a harmless-error determination to *Witherspoon* violations have suggested two analyses. . . . The first is to consider the state's retention of unexercised peremptory challenges at the end of jury selection as an indication that the erroneous for-cause exclusion was harmless. This approach relies on a representation by the state that it would have removed the venire member by peremptory challenge if the court had denied its for-cause motion. The second is to treat the erroneous exclusion as an isolated incident without prejudicial effect if it cannot be said that the ultimate panel did not fairly represent the community anyway. The Mississippi Supreme Court appears to have relied on a variation of the first analysis; [the] respondent urges the [c]ourt to adopt the second. We find each unpersuasive." (Citation omitted.) Id., 660–61. The court first rejected the state's argument that the improper *Witherspoon-Witt* exclusion of a juror is

harmless when the state has unexercised peremptory challenges because it assumed incorrectly that "the crucial question in harmless-error analysis is whether a particular prospective juror is excluded from the jury due to the trial court's erroneous ruling." Id., 665. The relevant inquiry, the court explained, is "whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error . . . ." (Emphasis in original; internal quotation marks omitted.) Id. The court also rejected the state's argument that the erroneous exclusion was a single technical error with no prejudicial effect. The court reasoned that "[b]ecause the *Witherspoon-Witt* standard is rooted in the constitutional right to an impartial jury . . . and because the impartiality of the adjudicator goes to the very integrity of the legal system . . . harmless-error analysis cannot apply." (Citation omitted.) Id., 668. The right to an impartial adjudicator, the court explained, is so crucial to a fair trial that its infraction can never be treated as harmless error. Id.

In *Ross* v. *Oklahoma,* 487 U.S. 81, 88–89, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988), however, the United States Supreme Court ruled that the holding of *Gray* is limited to cases involving improper *Witherspoon-Witt* exclusions. In *Ross* v. *Oklahoma,* supra, 88, the court considered whether the defendant's forced use of peremptory challenges to correct the trial court's refusal to dismiss a juror for cause was a constitutional violation. During jury selection, a prospective juror had indicated initially that he could vote to recommend a life sentence under the appropriate circumstances. Id., 83. Upon further examination by defense counsel, however, he stated that, if the jury found the defendant guilty, he would vote to impose the death penalty automatically. Id., 83–84. Defense counsel then moved to have the prospective juror dismissed for cause, and the trial court denied the motion. Id., 84. Consequently, the defendant

was forced to exercise his sixth peremptory challenge to remove the prospective juror. The defendant ultimately exhausted all nine of his peremptory challenges. The defendant had not challenged for cause any of the twelve jurors who actually served on the jury and decided his fate, however. The jury ultimately found the defendant guilty of first degree murder and sentenced him to death. Id.

On appeal, the Oklahoma Court of Criminal Appeals rejected the defendant's claim that the trial court's refusal to excuse the objectionable juror was reversible error because the record did not establish that an objectionable juror actually served on the jury. Id., 84–85. Accordingly, it affirmed the sentence of death. Id. The United States Supreme Court granted certiorari and affirmed the judgment. Id. The court held that, although the trial court improperly had denied the defendant's for cause challenge, his sixth and fourteenth amendment rights to an impartial jury and his fourteenth amendment right to due process had not been violated. Id., 85. The court explained that when defense counsel exercises a peremptory challenge to remove a prospective juror who should have been removed for cause, any claim that the jury was not impartial should focus *not* on the juror that was excluded, but rather, on the jurors who ultimately served. Id., 86. The court recognized that the failure to remove the potential juror could have resulted in a jury panel different from that which otherwise would have decided the case, but concluded that that possibility did not mandate reversal. Id., 87. As long as the jury that decides a case is impartial, a defendant's forced use of a peremptory challenge to achieve that result does not violate the sixth amendment. Id., 88. Accordingly, the court declined "to extend the rule of *Gray* beyond its context: the erroneous '*Witherspoon* exclusion' of a qualified juror in a capital case. We think the broad language used by the *Gray*

[c]ourt is too sweeping to be applied literally, and is best understood in the context of the facts there involved." Id., 87–88.

Because *Gray* v. *Mississippi*, supra, 481 U.S. 648, applies only to erroneous *Witherspoon-Witt* exclusions, it is inapplicable here. Accordingly, we reject the defendant's claim that *Esposito* is inconsistent with *Gray* and conclude that we need not consider the merits of the trial court's rulings on the defendant's for cause challenges because any error necessarily was harmless.[16]

B

Claim that the Trial Court Improperly
Excused a Juror For Cause

The defendant claims that the trial court improperly granted the state's for cause challenge of venireperson no. 16886 in violation of his state constitutional and sixth amendment right to an impartial jury. The state counters that any error by the court was necessarily harmless because the state used only eighteen of its thirty peremptory challenges during the 1999 jury selection process and, accordingly, would have excused the juror peremptorily if she had not been excused for cause. The state also argues that, even if the claim is not subject to harmless error review, the trial court did not abuse its discretion in excusing potential juror no. 16886. We disagree with the state that any error was necessarily harmless. We agree with the state, however, that the trial court did not abuse its discretion in granting the state's for cause challenge to venireperson no. 16886.

---

[16] Having concluded that any potential error by the trial court in denying the defendant's for cause challenges was necessarily harmless, we also decline the defendant's invitation to exercise our supervisory powers to review the merits of those rulings.

The following facts and procedural history are relevant to our resolution of this claim. During voir dire, the state's attorney asked potential juror no. 16886 if she had any feelings about sitting on a death penalty case. She responded, "I'm very strongly against the death penalty, and I think that law is [a] bad law. . . . I think that law is a bad law, and I couldn't agree to it." She also indicated that she could not return a verdict that would result in someone's death. Defense counsel then questioned the juror.[17] Thereafter, the court asked her several questions. In her responses to the court's questions, the prospective juror initially equivocated about her ability to follow the law. Ultimately, however, when the trial court reminded her that it was imperative that she keep an open mind and "be able to accept the law and apply the law . . . to the facts that you find," she stated, "I couldn't do it. I couldn't do it. . . . I couldn't." Defense counsel then asked her, "[I]f . . . you swear to uphold the law and follow the law and decide whether it is aggravation or mitigation, you're the type of person who follows the law; am I right?" The prospective juror answered, "Yes." The court then asked, "Could you follow the law in this case, the law as I've explained it?" The juror responded, "Given the worst case scenario, no, I could not." She then explained that the "worst case scenario" would be a finding, on the basis of the evidence, that the death sentence must be imposed. She reiterated that she could not follow the law in that case.

The state then asked that the prospective juror be excused for cause. The defendant objected on the ground that the prospective juror had indicated that

[17] In response to defense counsel's questions, prospective juror no. 16886 indicated that she could "follow the law to evaluate the evidence"; she "probably" could put aside her personal views and decide mitigating and aggravating factors if she were sworn in as a juror; and if sworn to uphold the law, her views on capital punishment would not prevent her from adhering to her oath.

her personal beliefs would not substantially impair or prevent her from following the law. The court granted the state's request. The defendant now claims that the trial court's exclusion of the venireperson violated his right to an impartial jury because the venireperson merely expressed a general objection to the death penalty and did not indicate that she was incapable of making an impartial decision according to the law. We disagree.

We first address the state's argument that we need not review the merits of the trial court's ruling because any error in excluding the venireperson was necessarily harmless. As we explained in part I A of this opinion, the United States Supreme Court held in *Gray* v. *Mississippi*, supra, 481 U.S. 668, that the erroneous *Witherspoon-Witt* exclusion of a prospective juror is not subject to harmless error review. Accordingly, we reject the state's argument to the contrary.

"Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine the venireperson's fitness to serve on the jury. Conn. Const., art. I, § 19;[18] General Statutes § 54-82f;[19] Practice Book

---

[18] See footnote 9 of this opinion for the text of article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments.

[19] General Statutes § 54-82f provides: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

§ [42-12].[20] After the completion of the voir dire of a particular venireperson, a party may challenge the venireperson for cause. The court must excuse that juror if the judge . . . is of the opinion from the examination that [the] juror would be unable to render a fair and impartial verdict . . . . General Statutes § 54-82f; Practice Book § [42-12]." (Internal quotation marks omitted.) *State* v. *Griffin*, 251 Conn. 671, 710, 741 A.2d 913 (1999). "The trial court is vested with wide discretion in determining the competency of jurors to serve. . . . '[T]he exercise of [the trial court's] discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted.' " (Citations omitted.) Id., 710–11.

"In *Witherspoon* [v. *Illinois*, supra, 391 U.S. 512], an Illinois statute permitted the state to excuse for cause ' "any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." ' . . . At the trial of the petitioner in *Witherspoon*, the state had used the statute to excuse for cause forty-seven venirepersons, nearly one half of the entire venire panel, who had expressed concerns about the death penalty. . . . The United States Supreme Court noted that 'the jury is given broad discretion to decide whether or not [to impose the death penalty] in a given case, and a juror's general views about capital punishment play an inevita-

---

[20] Practice Book § 42-12 provides: "Each party shall have the right to examine, personally or by counsel, each juror outside the presence of other prospective jurors as to qualifications to sit as a juror in the action, or as to interest, if any, in the subject matter of the action, or as to relations with the parties thereto. If the judicial authority before whom such examination is held is of the opinion from such examination that any juror would be unable to render a fair and impartial verdict, such juror shall be excused by the judicial authority from any further service upon the panel, or in such action, as the judicial authority determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of the trial."

ble role in any such decision.' . . . The court concluded that the jury that had been selected was 'uncommonly willing to condemn a man to die.' . . . Accordingly, the court held that 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' . . . In a footnote, the court indicated that a state may exclude for cause individuals 'who [make] unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.' . . .

"In *Wainwright* v. *Witt*, [469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)] . . . the court reexamined the question of how a prospective juror's views on the death penalty should affect that individual's eligibility to serve on a capital sentencing jury. The petitioner argued that several prospective jurors had been excluded in violation of the court's decision in *Witherspoon*. The court noted that '[d]espite *Witherspoon*'s limited holding, later opinions in this Court and the lower courts have referred to the language in footnote 21, or similar language in *Witherspoon*'s footnote 9, as setting the standard for judging the proper exclusion of a juror opposed to capital punishment.' . . . The court explained that more recent decisions had eased the rigid requirements of *Witherspoon* by establishing a standard by which a prospective juror could be excused for cause if the individual's views concerning capital punishment would prevent or substantially impair the performance of the duties of a juror in accordance with the court's instructions and the juror's oath. . . . The court con-

cluded that this test was preferable for determining juror exclusion because, as a result of the court's decisions in [*Furman* v. *Georgia*, 408 U.S. 238, 239–40, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and *Gregg* v. *Georgia*, 428 U.S. 153, 188, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)], juries could no longer possess unlimited sentencing discretion such as was held by the jury in *Witherspoon*. . . . The court reasoned that, since *Furman* and *Gregg*, capital sentencing juries generally inform the court whether the death penalty is appropriate by answering specific questions. . . . 'In such circumstances it does not make sense to require simply that a juror not "automatically" vote against the death penalty . . . [because] the [s]tate still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. To hold that *Witherspoon* requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a [s]tate must allow a venireman to sit despite the fact that he will be unable to view the case impartially.' " (Citations omitted.) *State* v. *Webb*, 238 Conn. 389, 435–37, 680 A.2d 147 (1996).

As we noted in *Webb*, this court has not yet had the opportunity to decide whether the strict *Witherspoon* standard or the more flexible *Witt* standard governs as a matter of state constitutional law. Id., 438. As in *Webb*, however, we need not decide that issue in this case because we conclude that the trial court's exclusion of venireperson no. 16886 met the more stringent *Witherspoon* standard "that a prospective juror may be excused for cause if the individual would automatically vote against the imposition of capital punishment regardless of the evidence presented, or if the individual's attitude concerning the death penalty would hinder an impartial determination of whether the defendant is guilty." Id., 438–39.

Although prospective juror no. 16886's responses to several questions pertaining to her ability to apply the law in this case were equivocal, she clearly stated that she was "very strongly against the death penalty, and [thought] that law is [a] bad law"; could not return a verdict that would result in someone's death; could not keep an open mind and accept the law and apply the law to the facts found; and could not participate in a determination that the death sentence should be imposed. The trial court reasonably could have concluded that, considered in their entirety, the prospective juror's responses unambiguously established that she automatically would have voted against the imposition of the death penalty regardless of the evidence presented to the jury during the penalty phase. Accordingly, we conclude that the trial court properly granted the state's request that she be excused for cause.

C

Claim Pertaining to the Trial Court's Inquiry into an Alleged Taint of a Venire Panel

The defendant claims that the trial court's failure to conduct an adequate inquiry into whether a venire panel had been tainted by a potentially prejudicial comment by a venireperson violated the defendant's state and federal constitutional rights to an impartial jury. We disagree.

The following facts and procedural history are relevant to our resolution of this claim. On the morning of May 17, 1999, approximately fifty venirepersons were in the jury assembly room awaiting voir dire in this case. One of the venirepersons told a court clerk, within the hearing of the other venirepersons, that the defendant had killed the venireperson's niece and he could not be an objective juror. Another court clerk immediately notified the court of what had happened. Upon being informed of this development, defense counsel

asked the court to conduct an inquiry into whether the entire panel had been tainted. The court granted the request and began its inquiry by questioning the venireperson who had made the comment. The venireperson informed the court that his niece had been murdered by the defendant[21] and admitted that he had told two venirepersons that the defendant had caused his niece's death.[22] He could not remember, however, to whom he had made the comment.

The trial court then questioned the court clerk who had notified the court of the occurrence. The clerk stated that, at approximately 9:15 or 9:20 a.m., in the main jury assembly room that contained an estimated fifty venirepersons, another clerk had approached the venireperson and handed him a juror questionnaire. The venireperson stated to the clerk that the defendant had "killed my niece [and] I don't think I can be objective." The clerk immediately directed the venireperson to go into another room where another fifteen venirepersons had assembled awaiting voir dire before another judge. While in that room, the venireperson engaged in a conversation with two venirepersons from that panel.

The defendant asked the trial court to strike the entire panel. The court assumed for the purposes of its ruling that the entire panel had heard the comment, but concluded that there could be no prejudice to the defendant because the court was going to instruct the panel before voir dire that the defendant had been convicted of murdering four women. Accordingly, the court denied the request. Ultimately, the defendant accepted four venire-

---

[21] The venireperson's niece was one of two victims killed by the defendant in Windham county. Those murders are not at issue in this case.

[22] It appears from the record that these two venirepersons were not on the panel from which the jurors in this case were selected, but were in the room where the court clerk had sent the venireperson after he stated that he could not be objective.

persons from the potentially tainted venire panel to serve on the jury. The defendant now claims that the trial court's failure to conduct a more searching inquiry into the alleged venire taint violated his constitutional right to an impartial jury.

The defendant cites *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995), in support of his claim that the trial court's inquiry was inadequate. In that case, we exercised our supervisory power to require that, whenever there is a claim of juror misconduct, the trial court is required to conduct an inquiry to determine the nature and extent of the jury taint, if any. The form and scope of the inquiry and whether the misconduct was so egregious as to require the court to declare a mistrial are left to the discretion of the court. Id., 526–32; see *State* v. *Anderson*, 255 Conn. 425, 436, 773 A.2d 287 (2001). The state argues that *Brown* is inapplicable in the present case because *Brown* dealt with alleged misconduct by jurors who were actually sitting on the jury. It argues that because the potential taint in this case arose before voir dire, voir dire itself provided a means to identify and to excuse potentially tainted venirepersons. Cf. *State* v. *Ziel*, 197 Conn. 60, 65, 495 A.2d 1050 (1985) (affirming trial court's denial of defendant's for cause challenges of two jurors who had been exposed to prejudicial comments by other jurors before voir dire). Furthermore, it argues, by accepting without challenge four jurors from the potentially tainted venire panel, the defendant waived any claim that the jurors had been tainted.

We agree with the state that *Brown* does not support the proposition that a trial court is required to hold an independent inquiry whenever an allegation has been made that a venire panel has been tainted before voir dire. In *State* v. *Ziel*, supra, 197 Conn. 60, this court considered a situation very similar to the situation in this case. In *Ziel*, it was discovered during voir dire

that members of the venire panel had discussed the case among themselves, and several of them had expressed the opinion that the defendant was probably guilty. Id., 62–63. The defendant moved to dismiss the entire panel, and the trial court denied the motion. Id., 63. Voir dire continued, and the defendant challenged two of the venirepersons for cause on the ground that they had overheard the remarks that the defendant was probably guilty. Id., 65–66. The court denied the challenges and the defendant accepted the jurors. Id. The defendant ultimately was convicted of murder and appealed to this court.

On appeal, we held that "[a]lthough it would have been proper, and perhaps more efficient, to excuse the entire panel, it was not unreasonable for the trial court to assume that the voir dire examination would disclose any prejudice upon the part of a prospective juror." (Internal quotation marks omitted.) Id., 66. Because the two venirepersons had stated repeatedly during voir dire that they had formed no opinion as to the defendant's guilt, we concluded that the trial court's denial of the for cause challenges had not deprived the defendant of a fair trial. Id., 67.[23]

Thus, *Brown* is not applicable when allegations of jury taint are made before the affected venirepersons have been subject to voir dire. In cases involving alleged

[23] See also *State* v. *Malave*, 47 Conn. App. 597, 606, 707 A.2d 307 (1998), aff'd, 250 Conn. 722, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). In *Malave*, the Appellate Court stated: "[W]e are not persuaded that the supervisory mandate of *Brown* sweeps so broadly as to require the trial court to recall, sua sponte, selected jurors for further questioning during voir dire regarding possible taint from an improper remark by someone in the venire. [*Brown*] operates in the sphere of juror misconduct claims, while the voir dire process properly allows counsel to investigate fully bias, preconceived notions and the like. The voir dire process is designed to weed out those who are unfit to serve because of prejudicial notions." Id. We agree with this analysis of *Brown* and, accordingly, conclude that *Brown* did not supersede *Ziel*.

misconduct by sitting jurors, the only mechanism by which to uncover potential jury taint is an independent inquiry by the court. When an allegation is made, however, that a venire panel has been tainted, voir dire itself provides a means to uncover bias. Therefore, such an allegation does not necessarily require an independent inquiry by the court. Although we recognize that, as in the present case, there may be circumstances in which the trial court perceives a need for an inquiry exceeding the scope of voir dire, we conclude that, as in *Brown*, the form and scope of the court's inquiry, if any, into possible taint of a venire panel before voir dire depends on the circumstances of the case and is to be determined by the trial court within the exercise of its discretion. Thus, we agree with the state that our supervisory ruling in *Brown* is not applicable here.

We reject the state's argument, however, that a party waives any claim of venire taint by accepting jurors from a potentially tainted panel. Such a rule would render unreviewable the trial court's rulings on motions involving allegations of venire taint before voir dire. Instead, we conclude that whether the failure to exercise a for cause or peremptory challenge to excuse a potentially tainted venireperson during voir dire constitutes a waiver of any taint claim depends on the circumstances of the case. For example, if the trial court's inquiry into potential taint of the venire panel does not adequately address crucial factual underpinnings of the taint claim that are not easily susceptible to being explored during voir dire, a party should not be required to challenge a juror in order to obtain review of the trial court's ruling. Similarly, if the trial court makes it clear that it will not allow *any* inquiry into the alleged taint during voir dire, failure to challenge the jurors would not constitute a waiver. Accordingly, we review the defendant's claim.

We conclude that, in the present case, the trial court's inquiry into the allegation that the venire panel had been tainted by the venireperson's comment adequately protected the defendant's right to an impartial jury. The court ascertained what the venireperson had said and assumed for purposes of ruling on the defendant's request to excuse the entire venire panel that the entire panel had heard the comment. Thus, there was no need for the court to inquire of each venireperson whether he or she had overheard it. The court also reasonably concluded that the knowledge that the defendant had killed a venireperson's niece could not be prejudicial to the defendant because the first thing that the panel was going to learn during the court's preliminary instructions before voir dire was that the defendant had been convicted of murdering four women. As to the defendant's claim that the venireperson's comment, coupled with his personal presence in the jury assembly room, could have generated undue sympathy for the families of the victims, the trial court reasonably could have concluded that the effect of the comment would be de minimis in light of the fact that the jurors were going to hear testimony from several members of the victims' immediate families. In any event, the defendant had the opportunity during voir dire to explore those matters. He makes no claim that he was prohibited from doing so or that the prospective jurors' responses during voir dire indicated that, because of the venireperson's comment, they had formed an opinion on the ultimate issue in the case. Accordingly, we reject this claim.

## D

### Claim that the Trial Court Improperly Limited Voir Dire

The defendant claims that the trial court improperly prohibited him from asking prospective jurors whether they could consider his conduct in prison to be mitigat-

ing, thereby violating his state and federal constitutional right to a fair trial by an impartial jury and his state constitutional and statutory rights to voir dire individual jurors and to exercise peremptory challenges.[24] The state counters that the defendant's claim is not reviewable because the defendant asked the question of only three jurors and (1) the court's ruling was necessarily harmless with respect to two of those jurors who ultimately did not serve on the jury and (2) the claim was waived with respect to the third juror when the defendant withdrew the question. It further argues that, even if the claim is reviewable, the trial court's ruling was not an abuse of discretion. We conclude that the claim is reviewable but agree with the state that the trial court properly refused to allow voir dire on specific mitigating evidence.

The following facts and procedural history are relevant to the resolution of this claim. On April 9, 1999, several days into the jury selection phase of the trial, the defendant asked venireperson no. 17041 whether he believed that a person "in prison for his . . . entire life can become a productive member of society within the prison . . . ." The state objected to the question and the trial court sustained the objection. The defendant ultimately exercised a peremptory challenge to excuse the venireperson.

On May 3, 1999, the defendant asked venireperson no. 19432 if she would consider "someone's behavior in prison, for instance a good prisoner, to be mitigation." When she answered that she would not, the defendant asked whether she would consider "to be mitigation . . . someone's volunteering to have himself studied . . . ." The trial court directed the defendant to "get away from these examples" because they "may be [introduced as] evidence." The court ultimately denied

---

[24] See footnotes 8, 9, 19 and 20 of this opinion.

the defendant's challenge for cause with respect to venireperson no. 19432, and the defendant exercised a peremptory challenge to remove her from the panel.

On May 25, 1999, the defendant asked venireperson no. 15365: "What about somebody's ability to adapt to life in prison. Do you have any feelings about whether that would be mitigating?" The state objected and the trial court sustained the objection. The defendant argued that the question must be allowed under *Morgan* v. *Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). The trial court reaffirmed its ruling and ordered a recess.

When court resumed, the court heard arguments on the applicability of *Morgan*. Ultimately, the court concluded that that case did not support the defendant's position. The defendant then withdrew the question. The defendant did not attempt to excuse venireperson no. 15365 from the panel, and he became the second alternate. Later that day, the defendant raised *Morgan* again, and the trial court explained that "[t]he question's been withdrawn so there's really nothing before me." The defendant responded, "That's true, and, you know, we did accept that juror, so, you know, the question is neither here nor there. It's just, you know, more jurors are coming and who knows where I will delve in questioning." The defendant did not attempt to ask the question of another venireperson.

As we have already noted, the parties have a statutory and state constitutional right to voir dire examination of prospective jurors. "Because of the wide range of cases submitted to juries and the impossibility of establishing a set pattern of questions appropriate for the voir dire examination of prospective jurors, the trial court is vested with broad discretion in determining the scope of counsel's inquiry. *State* v. *Anthony*, 172 Conn. 172, 175, 374 A.2d 156 (1976). The court has a

duty to analyze the examination of venire members and to act to prevent abuses in the voir dire process. Accord *State* v. *Haskins*, 188 Conn. 432, 450 A.2d 828 (1982). Therefore, the court's actions ordinarily will not be disturbed unless the court has clearly abused its discretion or it appears that prejudice to one of the parties has resulted." *State* v. *Dolphin*, 203 Conn. 506, 511–12, 525 A.2d 509 (1987).

"The exercise of the court's discretion, however, must be tempered to comport with the goals of the voir dire examination. We have recognized that the purpose of examining members of the venire is twofold: first, to provide information upon which the trial court may decide which prospective jurors, if any, should be excused for cause; and second, to provide information to counsel which may aid them in the exercise of their right to peremptory challenge. See *State* v. *Rogers*, [197 Conn. 314, 318, 497 A.2d 387 (1985)]; *State* v. *Hill*, 196 Conn. 667, 671, 495 A.2d 699 (1985); *State* v. *Anthony*, supra, [172 Conn.] 174–75; *Duffy* v. *Carroll*, 137 Conn. 51, 56, 75 A.2d 33 (1950). '[T]he court should grant such latitude as is reasonably necessary to fairly accomplish the purposes of the voir dire. Clearly, therefore, if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case.' *State* v. *Higgs*, [143 Conn. 138, 142, 120 A.2d 152 (1956)]." *State* v. *Dolphin*, supra, 203 Conn. 512.

In *Morgan* v. *Illinois*, supra, 504 U.S. 719, the United States Supreme Court considered the issue of "life qualification" of venirepersons in bifurcated capital felony trials. In that case, the trial court had permitted the state to ask potential jurors during voir dire whether their opposition to the death penalty would prevent

them from performing their duties as jurors. Id., 722. Over defense objection, the trial court asked each venire panel whether any member had moral or religious principles so strong that he or she could not impose the death penalty " 'regardless of the facts.' " Id. In addition, all of the jurors who were eventually empaneled were asked and responded negatively to the following question, or a slight variation thereof: " 'Would you automatically vote against the death penalty no matter what the facts of the case were?' " Id., 723. The trial court refused, however, the defendant's request to ask all prospective jurors the following question: " 'If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?' " Id. The defendant was convicted of first degree murder and sentenced to death. Id., 722. On appeal, the Illinois Supreme Court rejected the defendant's argument that, during voir dire, the trial court must grant a defendant's request to ask the " 'life qualifying' or 'reverse-*Witherspoon*' " question upon request. Id., 724.

The United States Supreme Court reversed the conviction on the ground that the federal constitution guarantees defendants in capital cases the right to question and to challenge for cause any venireperson who, upon conviction, automatically would vote to apply the death penalty regardless of the facts. Id., 729. The court explained that "[a]ny juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty." Id., 738. The court explained further that "such jurors obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty: They not only refuse to give such evidence any weight, but are also plainly

saying that mitigating evidence is not worth their consideration and that they will not consider it." Id., 736.

Thus, *Morgan* recognized the right of a defendant to ask the general question whether a prospective juror automatically will impose the death sentence upon finding an aggravating factor. Since *Morgan* was decided, however, numerous courts have concluded that that case does not entitle defendants to ask questions pertaining to specific mitigating evidence. See *United States* v. *McVeigh*, 153 F.3d 1166, 1208 (10th Cir. 1998), cert. denied, 526 U.S. 1007, 119 S. Ct. 1148, 143 L. Ed. 2d 215 (1999), citing *Sellers* v. *Ward*, 135 F.3d 1333, 1341–42 (10th Cir.), cert. denied sub nom. *Sellers* v. *Gibson*, 525 U.S. 1024, 119 S. Ct. 557, 142 L. Ed. 2d 463 (1998); *United States* v. *Tipton*, 90 F.3d 861, 879 (4th Cir. 1996), cert. denied, 520 U.S. 1253, 117 S. Ct. 2414, 138 L. Ed. 2d 179 (1997); *United States* v. *McCullah*, 76 F.3d 1087, 1114 (10th Cir. 1996), cert. denied, 520 U.S. 1213, 117 S. Ct. 1699, 137 L. Ed. 2d 825 (1997); *People* v. *Jackson*, 182 Ill. 2d 30, 61–62, 695 N.E.2d 391 (1998); *Evans* v. *State*, 333 Md. 660, 675–76, 637 A.2d 117 (1994); *Holland* v. *State*, 705 So. 2d 307, 338–39 (Miss. 1997), cert. denied, 525 U.S. 829, 119 S. Ct. 80, 142 L. Ed. 2d 63 (1998); *Witter* v. *State*, 112 Nev. 908, 915–16, 921 P.2d 886 (1996), cert. denied, 520 U.S. 1217, 117 S. Ct. 1708, 137 L. Ed. 2d 832 (1997); *State* v. *Fletcher*, 348 N.C. 292, 311–12, 500 S.E.2d 668 (1998), cert. denied, 525 U.S. 1180, 119 S. Ct. 1118, 143 L. Ed. 2d 113 (1999); *State* v. *Wilson*, 74 Ohio St. 3d 381, 386–87, 659 N.E.2d 292, cert. denied, 519 U.S. 845, 117 S. Ct. 129, 136 L. Ed. 2d 78 (1996); *State* v. *Hill*, 331 S.C. 94, 501 S.E.2d 122, cert. denied, 525 U.S. 1043, 119 S. Ct. 597, 142 L. Ed. 2d 539 (1998). Indeed, as the court in *McVeigh* noted, some courts have held not only that *Morgan* does not grant the right to ask such questions, but also that such questions are improper. See *United States* v. *McVeigh*, supra, 1208, citing *Evans* v. *State*, supra, 676

(explaining why "stake-out" questions are impermissible); *State* v. *Fletcher*, supra, 312 (same). The reasoning of these cases is the same as that applied by this court in noncapital cases involving claims that the trial court improperly limited voir dire, namely, that "[a] party has no right to . . . ascertain a juror's opinion [on the evidence] in advance." (Internal quotation marks omitted.) *State* v. *Clark*, 164 Conn. 224, 226, 319 A.2d 398 (1973). "[A]ll too frequently such inquiries represent a calculated effort on the part of counsel to ascertain . . . what the reaction of the venireman will be to certain issues of fact or law . . . . Such an effort transcends the proper limits of the voir dire and represents an abuse of the statutory right of examination." (Internal quotation marks omitted.) Id.

Before addressing the merits of the defendant's claim that the trial court abused its discretion in refusing to allow him to ask potential jurors whether they would consider postincarceration conduct "to be mitigation," we address the state's argument that the claim is not reviewable because the defendant exercised peremptory challenges against two of the prospective jurors to whom the question had been addressed and withdrew his question as to the third. The defendant counters that the trial court's ruling amounted to a blanket prohibition on questions pertaining to his conduct in prison. Accordingly, he argues, it is possible that prospective jurors who would have answered the question negatively if the defendant had been permitted to ask it may have served on the jury. Although we agree with the state that the record leaves some doubt as to whether the defendant would have questioned any jurors other than the three identified jurors on their views of the mitigating nature of the defendant's conduct in prison if not for the trial court's ruling, we assume for the purposes of this claim that the defendant believed that the trial court would not have permitted him to ask the

question of any juror and that he would have done so if permitted. Accordingly, we review the claim.

We conclude that the trial court did not abuse its discretion in barring the defendant from asking the prospective jurors whether they could consider his conduct in prison to be mitigating. We are persuaded by the great weight of authority that, as a matter of federal constitutional law, *Morgan* does not require that defendants be permitted to ask potential jurors during voir dire whether they would consider specific evidence in mitigation. "To the contrary, *Morgan* specifically directed its holding toward the end of discovering jurors for whom 'the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant.' " *People* v. *Jackson*, supra, 182 Ill. 2d 59–60, quoting *Morgan* v. *Illinois*, supra, 504 U.S. 729. *Morgan* does not suggest that a venireperson who indicates a general willingness to consider facts and circumstances in mitigation, but who believes that a specific fact or circumstance is not mitigating, should be precluded from serving on the jury.[25] A contrary conclusion would allow the defendant

---

[25] We emphasize that the defendant's claim involves an attempt to question venirepersons on their views of a *nonstatutory* mitigating factor. In determining whether such a factor exists, the jury must make both a factual finding and a moral decision whether a proved fact is mitigating in light of all of the facts and circumstances of the case. If a defendant claims, for example, that the fact that he graduated from college is mitigating, the law does not require that a juror who finds that fact must also find that the fact is mitigating. *Morgan* does not require the trial court to allow a defendant to stack the jury with jurors who would be sympathetic to such a claim. Nor does *Morgan* require the trial court to permit the defendant to ascertain the specific claims to which the jury would be sympathetic.

In contrast, jurors must consider the mitigating nature of statutory mitigating factors. Although we conclude in this case that the defendant is not entitled to ask jurors about their views on specific nonstatutory mitigating factors, the defendant may ask jurors whether they would be able to follow the law requiring them to give effect to statutorily mitigating facts. This distinction may explain the "paradox" pointed to by the defendant that the trial court in the present case allowed him to ask venirepersons about psychiatric evidence supporting his claimed statutory mitigating factor but not about other mitigating claims.

to use voir dire to form trial strategy and to select jurors sympathetic to specific mitigating claims. Accordingly, we reject the defendant's claim under the federal constitution.

We also are not persuaded by the defendant's argument that the state constitution provides greater protection than the federal constitution on this matter. "In *State* v. *Geisler*, [222 Conn. 672, 684–86, 610 A.2d 1225 (1992)], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." *City Recycling, Inc.* v. *State*, 257 Conn. 429, 444 n.12, 778 A.2d 77 (2001). The defendant concedes that state precedent,[26]

[26] The defendant concedes that the specific issue before us has not been addressed previously by this court, but states that Connecticut law makes clear that "parties must be allowed adequate exploration of subjects which could uncover bias relevant to the particular case." That, of course, is undisputed. The cases cited by the defendant do not, however, support the proposition that parties should be able to ascertain prospective jurors' opinions of any and all evidence in advance of the trial. For example, in *State* v. *Barnes*, 16 Conn. App. 333, 547 A.2d 584 (1988), the defendant was charged with stealing Christmas gifts from under a Christmas tree. The trial court prohibited voir dire on the venirepersons' views of Christmas. The defendant then asked the court to bar the state from mentioning Christmas at trial. The court denied the request. Id., 337. During trial, the state repeatedly referred to Christmas. Id., 337 n.1. On appeal, the Appellate Court held that, because there was a real risk that the fact that the defendant was charged with stealing Christmas presents could impair a juror's ability to be impartial, the trial court improperly had prohibited the line of questioning. Id., 337–38.

In *Barnes*, however, unlike the present case, the defendant sought to question prospective jurors on evidence that the *state* was certain to introduce at trial and that could have affected the jurors' ability to be impartial. There was no concern in that case that the defendant could have used the voir dire responses to develop his trial strategy or to obtain a commitment from a venireperson to vote a certain way if the defendant presented specific evidence.

federal precedent and contemporary sociological norms[27] provide no support for his specific claim. He argues, however, that the text of article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments,[28] sibling state precedent and the intent of the framers of the constitution all support the claim that he has a state constitutional right to question venirepersons about specific mitigating factors. We disagree.

With respect to the text of the state constitution and the intent of the framers, the defendant argues only that peremptory challenges "occupy a special position in this state's jurisprudence" and "the right to liberal, individual voir dire has been a fixture in Connecticut for centuries, to a degree unknown elsewhere in the nation." We have no quarrel with these propositions. They do not support the argument, however, that the defendant has a right to ascertain a juror's opinion on specific evidence in advance of trial. See *State* v. *Clark*, supra, 164 Conn. 224.

With respect to sibling state precedent, the defendant relies primarily on statements made by the Louisiana Supreme Court in an unpublished appendix to its decision in *State* v. *Comeaux*, 699 So. 2d 16 (La. 1997), cert. denied, 522 U.S. 1150, 118 S. Ct. 1169, 140 L. Ed. 2d 179 (1998), and *People* v. *Cash*, 28 Cal. 4th 703, 50 P.3d 332, 122 Cal. Rptr. 2d 545 (2002), cert. denied, 537 U.S. 1199, 123 S. Ct. 1270, 154 L. Ed. 2d 1039 (2003).[29] In the

---

[27] Indeed, the defendant states that "many citizens believe that taxpayers should not be burdened with the cost of supporting criminals for life, and that nothing such people can contribute from prison would justify the cost of their incarceration." To the extent that the defendant claims that this characterization is true of Connecticut citizenry, it would appear to undermine, not support, the defendant's position. Because the record does not support this factual allegation, however, we do not consider it.

[28] See footnote 9 of this opinion.

[29] The court in *Comeaux* stated that the defendant had raised a number of issues on appeal that involved "only settled principles of law" and that it had addressed those issues "in an unpublished appendix, which is attached

appendix to *Comeaux*, the Supreme Court of Louisiana stated that "the prosecutor properly may probe into a prospective juror's general attitude about certain mitigating circumstances, just as the defense may probe into the juror's general attitude about aggravating circumstances." *State* v. *Comeaux*, 1997 La. LEXIS 1719, *66–*67 (1997). The court also stated, however, that "hypothetical questions and questions of law which call for prejudgment of any supposed case on the facts are not permissible in voir dire examination." Id., *67.

In *Cash*, the trial court prohibited the defendant from asking prospective jurors whether they automatically would impose the death penalty if the defendant previously had committed another murder. The California Supreme Court stated that "[b]y absolutely barring any voir dire beyond facts alleged on the face of the charging document, the trial court created a risk that a juror who would automatically vote to impose the death penalty on a defendant who had previously committed murder was empanelled and acted on those views . . . ." *People* v. *Cash*, supra, 28 Cal. 4th 723. The court also stated, however, that "death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, *it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented.* . . . In deciding where to strike the balance in a particular case, trial courts have considerable discretion. . . . They may not, however, as the trial court did here, strike the balance by precluding mention of

to this opinion and is a part of the official record." *State* v. *Comeaux*, supra, 699 So. 2d 18 n.2. The appendix may be found at *State* v. *Comeaux*, 1997 La. LEXIS 1719 (1997).

any general fact or circumstance not expressly pleaded in the information." (Citations omitted; emphasis added.) Id., 721–22.

We conclude that, contrary to the defendant's claim, neither *Comeaux* nor *Cash* stands for the proposition that a defendant has a constitutional right to ascertain the opinions of prospective jurors on the mitigating nature of specific mitigating claims prior to trial. Although *Cash* suggests that the parties may voir dire prospective jurors on certain *general* facts or circumstances beyond those set forth in the information, it expressly states that questions pertaining to specific mitigating claims are not allowed. Accordingly, we reject the defendant's claim under the state constitution.

Finally, we conclude that the foregoing analysis forecloses the defendant's claim that the trial court's ruling violated §§ 54-82f and 54-82g. Nothing in those statutes requires the trial court to permit a party to ascertain prospective jurors' views on specific evidence during voir dire. Accordingly, we reject this claim.

## II

## THE DEFENDANT'S MOTION TO SEVER

The defendant claims that the trial court improperly denied his motions to sever and his motion for reconsideration, both made prior to the penalty phase of these proceedings. We disagree.

The following procedural history is relevant to our resolution of this claim. Initially, the state brought three separate informations against the defendant, charging him, respectively, with: (1) the kidnap-murder and sexual assault-murder of Wendy B.; (2) the kidnap-murder and sexual assault-murder of Robyn S.; and (3) the

kidnap-murders of April B. and Leslie S.[30] The cases were consolidated for trial. *Ross II*, supra, 230 Conn. 225. The defendant filed a motion to sever the cases prior to the guilt phase of his trial, which the trial court denied. Id. He also filed a motion to sever prior to the first penalty phase of the proceedings, which was also denied. In *Ross II*, supra, 225–26, this court rejected the defendant's challenge to the trial court's denial of the motion to sever that he had made before the guilt phase. We did not reach his claim concerning the denial of his second motion to sever that was filed before the first penalty phase. Id., 285.

After we remanded the case for new penalty phase proceedings, the defendant again filed a motion to sever. The trial court denied the motion because the defendant had not met his burden of showing that consolidation of the cases for the penalty phase gave rise to substantial prejudice. Specifically, the trial court found that: (1) the three cases were easily distinguishable on their facts; (2) the facts of each case were equally shocking, thus reducing the risk that the facts of one case would taint the others; and (3) the duration and complexity of the trial did not warrant severance. The trial court also noted that there was no representation that the defendant wanted to testify as to only some of the charges and that there were no antagonistic or inconsistent defenses. Recognizing, however, that consolidation of the cases potentially could confuse the jury, the court ordered the state to compartmentalize its presentation of the evidence pertaining to each separate

---

[30] The state originally charged the defendant with having committed four counts of capital felony in connection with the murders of Leslie S. and April B. After a finding of probable cause on all counts, the trial court, *Hendel, J.*, dismissed the count charging the defendant with capital felony in the sexual assault and murder of April B. and the count charging the defendant with capital felony based on a double homicide committed in one transaction, for lack of territorial jurisdiction. *Ross II*, supra, 230 Conn. 188 n.2.

case. The defendant now challenges the denial of his motions to sever. The state argues that this court's opinion in *Ross II* affirming the trial court's denial of the defendant's motion to sever made prior to the guilt phase is the law of the case and is controlling here. We agree with the state.

"The law of the case doctrine provides that when a matter has previously been ruled upon interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstance." (Internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 130 n.21, 788 A.2d 83 (2002). This court follows the "well-recognized principle of law that the opinion of an appellate court, so far as it is applicable, establishes the law of the case upon a retrial, and is equally obligatory upon the parties to the action and upon the trial court. . . . The rule is that a determination once made will be treated as correct throughout all subsequent stages of the proceeding except when the question comes before a higher court . . . and [the doctrine] applies both to remands for new trial . . . and to remands for articulation." (Citations omitted; internal quotation marks omitted.) *State* v. *Daniels*, 209 Conn. 225, 237, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989).

In *Ross II*, we determined that the trial court reasonably could have concluded, under *State* v. *Boscarino*, 204 Conn. 714, 720–25, 529 A.2d 1260 (1987), that the cases should be consolidated for the guilt phase because the three incidents involved were factually discrete and easily distinguishable, the violence in each of them would not have led to jury confusion or undue prejudice and conducting the proceedings jointly would not produce such a complex and lengthy process that

the jury would be influenced to consider evidence cumulatively and not independently. *Ross II*, supra, 230 Conn. 226. The defendant now claims that the trial court's denial of his motion to sever the cases prior to the second penalty phase was improper because: (1) the crimes could not easily be separated into distinct events and, therefore, were bound to confuse the jury, thereby impairing the defendant's right to a fair and independent consideration of the evidence in each case separately; (2) the evidence concerning the double homicide was of such a brutal and violent nature that it was bound to influence the jury's view of the other homicides; and (3) the complexity and length of the trial was bound to influence the jury to consider the evidence cumulatively rather than independently. These are precisely the same issues, however, as the issues raised by the defendant before the first guilt phase and reviewed by this court in *Ross II*. Accordingly, we conclude that this claim is governed by the law of the case and that the trial court properly denied the motion to sever.[31] Cf. *State* v. *Casanova*, 255 Conn. 581, 594, 767 A.2d 1189 (2001) ("[the law of the case] doctrine is inapplicable here because the issue raised by the pretrial motion to dismiss was different from the evidentiary issue subsequently presented to the trial court").

The defendant argues, however, that the mere fact that the request to sever the cases was made at the penalty phase entitled him to a second bite at the apple.

[31] We recognize that the trial court at the second penalty phase did not expressly rely on the law of the case in ruling on the defendant's motion to sever. Instead, it considered the motion on its merits and applied the same analysis that this court applied in *Ross II*. Because we conclude that our determination in *Ross II* that the trial court did not abuse its discretion in denying the defendant's motion to sever the cases before the guilt phase is not only the law of the case but also was correct on its merits, we also conclude that the trial court's ruling at the second penalty phase, considered on its merits, was not an abuse of discretion.

We disagree. First, he has provided no authority for the proposition that the standards for consolidation that apply at a penalty phase proceeding are different from those that apply at a guilt phase proceeding. Nor has he explained, and we cannot perceive, why the risk of undue prejudice should be greater at the penalty phase than at the guilt phase. As in *Ross II*, where he presented evidence of all of the offenses at issue here, as well as two additional sexual assault-murders that he committed in Windham county (Windham county murders),[32] in support of his insanity defense, the defendant himself chose at the second penalty phase to introduce evidence of all three incidents and of other crimes in support of his claimed mitigating factor that he had a substantial mental impairment. Thus, the risk that the jury would consider the evidence cumulatively was one that the defendant chose to take, and it could not have been avoided even if the cases had been severed. Moreover, as in *Ross II*, the jury was not faced with antagonistic or confusing theories of mitigation for each separate offense, but was presented with a single theory applicable to each case. Accordingly, we see no reason that this court's holding in *Ross II* should not govern here.

The defendant also claims that, even if the trial court did not abuse its discretion in denying the motion to sever, the consolidation was prejudicial because, during the penalty phase hearing, the state failed to comply with the trial court's order to compartmentalize the evidence. He further argues that the instructions given by the trial judge were insufficient to cure the confusion produced by the state's commingling of evidence. We disagree.

---

[32] After his arrest for the offenses at issue in this case, the defendant pleaded guilty to two additional murders in Windham county. He ultimately pleaded nolo contendere to those murders and was sentenced to two consecutive life sentences.

The defendant argues that the state's presentation of evidence was confusing because the sequence in which the offenses were discussed in the defendant's audio-taped confessions was different from the sequence in which the state initially presented evidence concerning the three cases. In addition, he argues that the audiotape contained a commingled and confusing discussion of the offenses, as well as two murders and a rape not at issue in this case. The defendant also argues that the testimony given by various witnesses impermissibly commingled all three cases. Finally, he complains of the state's characterization of the three separate cases during closing argument as "this case" and "the case"; its use of the words "they," "those poor girls" and "people" and the like to refer to the victims; and the use of the phrases "the case" and "the offense" by the court during its instructions to the jury.

Thus, the defendant argues, in effect, that the trial court's order to the state to compartmentalize the evidence pertaining to the three cases required the state to conduct a separate evidentiary proceeding for each of the cases within the context of the consolidated proceeding. In other words, the defendant appears to believe that the state was required to call the same witnesses separately for each case and to edit and redact the documentary evidence and the audiotaped confessions so that they could be presented separately for each case. We disagree. Such a proceeding could only create confusion, not dispel it. Moreover, we note that, when the trial court ordered the state to compart-mentalize the evidence, it explicitly recognized that some of the evidence applied to all of the offenses, and it excepted such evidence from its order. Presumably, the cases were consolidated in part *because* much of the evidence pertained to more than one case and it was more efficient and less confusing to introduce such evidence only once. Requiring the state to present three

hermetically sealed cases would undermine the very purpose of a consolidated trial, i.e., to avoid multiplicity of litigation and to promote judicial efficiency. As the trial court properly found on two separate occasions, these cases are not inherently indistinguishable, complex or confusing. Our careful review of the record convinces us that the state's presentation of the evidence did not make them so.

With respect to the defendant's claim that the use of the words "this case," "the case" and the like by the state during closing arguments and by the trial court in its instructions to the jury, we conclude that it would have been unduly confusing, and simply impracticable, for the state and the court, in every instance in which they referred to this matter, to refer separately to each of the individual offenses. Moreover, the examples of allegedly improper instructions by the court that the defendant presented were taken almost exclusively from the court's instructions on the mitigating factor. As we have noted, it was the defendant himself who chose to claim that the circumstances of all of the offenses, i.e., "the case," showed that a mitigating factor existed as to each separate offense. Accordingly, we conclude that there is no reasonable likelihood that the jury was misled either by the state's presentation of evidence or by the court's instructions, to believe that it did not have to consider each offense with which the defendant was charged separately, especially in light of the court's repeated instructions that the jury had to consider the offenses separately. Accordingly, we reject this claim.

### III

### THE DEFENDANT'S MOTION FOR A COMPETENCY EXAMINATION

The defendant claims that the trial court improperly denied his motion for a competency examination pursu-

ant to General Statutes § 54-56d[33] in violation of his due process rights to a fair trial under the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. We disagree.

The following facts and procedural history are relevant to our resolution of this claim. In an apparent attempt to commit suicide, the defendant ingested an overdose of prescription sedatives on November 2, 1998. As a result of the suicide attempt, the defendant was hospitalized. Defense counsel visited the defendant in the hospital on November 4, 1998, and observed that he was suffering from hallucinations. The defendant refused to see one of his attorneys on November 10, 1998.

Shortly after the suicide attempt, the defendant requested that the trial court order a competency examination. A hearing on the request was held on November 20, 1998. At the hearing, defense counsel indicated that the defendant was limiting his claim that he was incom-

[33] General Statutes § 54-56d provides in relevant part: "(a) A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense.

"(b) Presumption of competency. A defendant is presumed to be competent. The burden of proving that the defendant is not competent by a preponderance of the evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry.

"(c) Request for examination. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency.

"(d) Examination of defendant. Report. If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the Superior Court, there is probable cause to believe that the defendant has committed the crime for which he is charged, the court shall order an examination of the defendant as to his competency. . . ."

petent to the second prong of § 54-56d, i.e., that he was unable to assist in his own defense. Defense counsel indicated that the defendant was suffering from severe depression and made repeated representations to the effect that he was "unable to rationally have discussion with regard to choices in his case at this time." She also informed the court of the defendant's suicide attempt and of his continuing desire to waive the penalty hearing and to stipulate to the death penalty. The defendant presented no testimony, exhibits or medical reports in support of his claimed incompetence, however. The trial court canvassed the defendant on his understanding of the nature of the proceedings.[34]

---

[34] The transcript of the hearing contains the following exchanges:

"The Court: What are the issues for the jury in the upcoming hearing?

"[The Defendant]: They will be fact finders to determine whether an aggravating factor exists. And whether or not a mitigating factor exists.

"The Court: And how would you define an aggravating factor?

"[The Defendant]: The aggravating factor in my particular case is especially cruel and heinous and depraved.

"The Court: And who has to prove that?

"[The Defendant]: The state.

"The Court: And what's the burden of proof on the state? What's the standard of proof?

"[The Defendant]: Beyond a reasonable doubt.

"The Court: And what's a mitigating factor?

"[The Defendant]: Basically, the main one claimed in my case would be a significant mental illness but a mitigating factor in general is anything that is a reason for less than death.

"The Court: And whose burden is it to demonstrate a mitigating factor?

"[The Defendant]: The defense.

"The Court: By what standard of proof?

"[The Defendant]: By the preponderance of the evidence.

"The Court: What result by the fact finder if no aggravating factors are proven and no mitigating factors are proven?

"[The Defendant]: In that event, the judge is bound by law to sentence me to life imprisonment on each count.

"The Court: What if the aggravating factors are proven and mitigating factors are proven?

"[The Defendant]: Then it is the same result.

"The Court: What if no aggravating factor is proven and a mitigating factor is proven, what result?

"[The Defendant]: I would have to be sentenced by law to life in prison. . . ."

The court rendered its decision on December 17, 1998. The court found that the defendant was well educated, intelligent and articulate; that he could read and was a prolific writer; that he did not suffer from any known or apparent illness or defect that would impair his ability to assist his counsel; that the medication that was prescribed for him did not interfere with his ability to participate in or to comprehend fully the nature of the proceedings; that he understood and fully comprehended the status of his case and the nature and circumstances of the pending penalty phase proceeding; that he understood and fully appreciated the duties of the fact finder at a penalty phase proceeding and the consequences of the findings of the fact finder, including the imposition of the penalty of death; and that he comprehended the respective burdens of proof and standards of proof of the parties that would apply at the penalty phase proceeding. On the basis of these findings, the court determined that the evidence did not establish that the defendant was unable to assist counsel and that any doubt on that matter was based not on the defendant's *inability* to assist counsel, but "upon a difference of opinion [between the defendant] and his counsel concerning the manner in which the case in mitigation [was] to be presented, if presented at all."[35] Accordingly, the trial court denied the defendant's

---

"The Court: Under what circumstances could the death penalty be imposed?

"[The Defendant]: Only if an aggravating factor is found and no mitigating factor is found."

The defendant originally had claimed both that he was unable to assist counsel and that he was unable to understand the nature of the proceedings, but he abandoned the latter claim at the hearing.

[35] This determination was supported by the following exchange at the November 20, 1988 hearing.

"The Court: Are you willing to cooperate with your attorneys in their efforts to get that information from you that they could perhaps use in mitigation? . . .

"[The Defendant]: Will I cooperate with them? I do what they tell me. I try to anyway as best I can.

* * *

motion for a competency examination. Over the course of the ensuing penalty phase proceeding, the trial court noted periodically on the record that the defendant was interacting appropriately with his counsel.

The defendant now claims that the trial court improperly determined that the evidence did not establish a reasonable doubt as to his competency. Specifically, the defendant points to (1) his attempted suicide, (2) his past attempt to accept the death penalty, and (3) defense counsel's representations that he was unable to assist in his own defense due to his depression. We disagree and conclude that the trial court's denial of the defendant's motion for a competency examination was within its discretion.

The sentencing of "an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. Conn. Const., art. I, § 8; U.S. Const., amend. XIV, § 1; see *Pate* v. *Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)." (Internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 20, 751 A.2d 298 (2000). General Statutes § 54-56d (a), which codifies this constitutional mandate, provides that "[a] defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section,

---

"The Court: Is there any reason that you have that you feel that you are unable to talk or communicate with your lawyers?

"[The Defendant]: I talk to them. It's just we have—they don't understand things and see things the way that I do, I don't think. They try to, but their job is to get me a life sentence no matter what, and I don't feel that way. My—sometimes the cost is too high.

"The Court: Sometimes what, sir?

"[The Defendant]: Some things—the cost of what is going to happen is just too high.

"The Court: What do you mean by that?

"[The Defendant]: I spent four years trying to accept the death penalty, Your Honor, because I don't want to hurt people any more. And it just seems like I'm in this big meat grinder and nobody gives a damn. I know they mean well, but, they just don't understand."

a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense."

"This statutory definition mirrors the federal competency standard enunciated in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam). According to *Dusky*, the test for competency must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him. . . . Id.; see also *Drope* v. *Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial. . . . *State* v. *Gonzalez*, 205 Conn. 673, 686–87, 535 A.2d 345 (1987)." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 253 Conn. 20–21.

The defendant argues that the trial court was required to order a competency examination pursuant to § 54-46d upon being presented with factual allegations that, if true, would constitute evidence of incompetence. In support of his claim, the defendant relies on *State* v. *Johnson*, supra, 253 Conn. 21, in which this court stated that "[a]s a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever he makes specific factual allegations that, if true, would constitute substantial evidence of mental impairment." (Internal quotation marks omitted.) In interpreting this language, however, it is important to distinguish between an "independent inquiry" by the court and an independent competency examination of the defendant as provided by § 54-56d (d). We recognize that this court has not

always clearly made that distinction. See e.g., id., 21 (suggesting that same standard applies to request for "competency examination" and request for "independent inquiry" by court). It is clear, however, that the "independent inquiry" required by due process whenever an allegation of incompetence has been made is a hearing before the court, not an independent psychiatric evaluation as provided by statute. See id., citing *Sanders* v. *United States*, 373 U.S. 1, 21, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963) (colorable allegation of incompetence entitles prisoner to court hearing, but court has discretion to ascertain whether claim is substantial before allowing prisoner to testify). The provisions of § 54-56d "state that if it 'appears' that the defendant is not competent, and if the trial court finds that a request for a competency evaluation is 'justified,' the court must order a competency examination. We have interpreted this standard as requiring a competency evaluation any time a reasonable doubt is raised regarding the defendant's competency." *State* v. *Johnson*, supra, 24. To establish such reasonable doubt, the defendant must present substantial evidence, not merely allegations, that he is incompetent. See id., 21–25. "Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . . *Moore* v. *United States*, 464 F.2d 663, 666 (9th Cir. 1972). *State* v. *Watson*, [198 Conn. 598, 605, 504 A.2d 497 (1986)]; see *Pate* v. *Robinson*, [supra, 383 U.S. 385]; *de Kaplany* v. *Enomoto*, 540 F.2d 975, 982–83 (9th Cir. 1976), cert. denied, 429 U.S. 1075, 97 S. Ct. 815, 50 L. Ed. 2d 793 (1977); *People* v. *Pennington*, 66 Cal. 2d 508, 518, 426 P.2d 942, 58 Cal. Rptr. 374 (1967)." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 21–22.

We conclude that the trial court reasonably could have determined, on the basis of its canvass of the defendant at the November 20, 1998 hearing, and the lack of any testimony, exhibits or medical reports to support the defendant's claim of incompetence, that there was no reasonable doubt that the defendant not only understood the nature of the proceedings but also was able to communicate with and assist his counsel. As the trial court noted, the facts adduced at the hearing supported, at most, an inference that the defendant was reluctant to assist counsel, not that he was *unable* to do so.

The defendant's suicide attempt, his attempt to stipulate to the imposition of the death penalty and his counsel's statements at the hearing on the motion for a competency examination do not compel a different conclusion. First, we previously have held that an attempted suicide does not automatically create a reasonable doubt as to a defendant's competency and require the trial judge to order a competency examination. See *Myers* v. *Manson*, 192 Conn. 383, 388, 472 A.2d 759 (1984) (attempted suicide does not automatically require trial judge to order competency hearing). This is so because, "[c]ompetence to stand trial . . . is not defined in terms of mental illness. An accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense . . . ." (Citations omitted.) *State* v. *DeAngelis*, 200 Conn. 224, 230, 511 A.2d 310 (1986). Similarly, the defendant's past attempts to stipulate to the imposition of the death penalty did not raise a reasonable doubt as to his competency, especially in light of the fact that he was found competent on April 9, 1998, at the time he was pursuing the stipulation.

Finally, we conclude that the defendant places undue weight on the representations made by defense counsel at the November 20, 1998 hearing. "Although . . . the

opinion of the defendant's counsel 'is unquestionably a factor which should be considered,' we note that the trial court need not accept it without question. *Drope* v. *Missouri*, [supra, 420 U.S. 177 n.13]." *State* v. *Des-Laurier*, 230 Conn. 572, 588, 646 A.2d 108 (1994). Moreover, we agree with the trial court that defense counsel's representations constituted legal conclusions, not evidence from which the trial court could make its own legal determination as to the defendant's competency. In short, the representations of defense counsel "provided no reasonable basis for the trial court to disregard its own, in-court observations about the defendant's then present competency." Id., 589.

We conclude that the trial court reasonably could have determined that there was no reasonable doubt as to the defendant's competency. Therefore, it did not abuse its discretion when it declined to order a psychological examination of the defendant.

## IV

## EVIDENTIARY ISSUES

The defendant challenges several evidentiary rulings by the trial court. We address each claim in turn.

### A

### The Admission of Prior Testimony By Psychiatrist Robert Miller

The defendant claims that the trial court's admission of guilt phase testimony given by Robert Miller, a now deceased psychiatric expert for the state, to rebut certain mitigating evidence violated the defendant's due process and confrontation rights because: (1) Miller's testimony at the guilt phase did not address the question of mental impairment, which was the issue at the penalty phase, and, therefore, there was not an identity of issues; (2) the defendant had no opportunity to cross-

examine Miller on the substance of his testimony; and (3) the testimony was more prejudicial than probative. The defendant also claims that the trial court improperly instructed the jury on the use of the testimony. We reject these claims.

This court previously has taken note of certain facts relevant to the resolution of this issue. In *State* v. *Ross*, 251 Conn. 579, 589–90, 742 A.2d 312 (1999) (*Ross III*), we stated that "[p]rior to the commencement of the defendant's trial in 1987, Miller, the psychiatric expert employed by the state, examined the defendant. Subsequent to the examination, Miller issued a report in which he diagnosed the defendant as a sexual sadist, but concluded that the defendant was not legally insane. Eight months after his examination of the defendant, however, in a letter to [C. Robert Satti, Sr.], the prosecutor handling the case, Miller expressed his doubts about 'how [he] could testify against psychopathology playing a sufficient role in [the] defendant's behavior to mitigate the type of penalty.' "[36] The state disclosed a portion of

[36] Miller's letter, dated February 15, 1987, states in its entirety:

"Dear Bob, Because of the long time since I have heard from you concerning one of the cases I saw for you, I have had a great deal of time to go over in my mind how feasible the stand we had anticipated I would take might be.

The result of all this rumination is this personal letter which I write without any copies. As you assume, it is a demurral and a reverse of my earlier intemperate stand, which was based more on emotion than reason.

After deliberation I [can't] see how I could testify against psychopathology playing a sufficient role in defendant's behavior to mitigate the type of penalty. If it had been only one or two incidents I could have held up, but the repetitive nature of the acts as well as past history of assaultive behavior make my (our) position untenable. Accordingly I must back out of the case, even if it is such a late date.

If it is of any assistance to you, I have had to see an ENT specialist several times recently, and will have to [see] him in a month again at which time I may have to enter a hospital for further tests, so you could tell the Court I have to be excused for reasons of health.

Regards to Tommy.

Bob Miller." (Internal quotation marks omitted.) *Ross II*, supra, 230 Conn. 272 n.39.

this letter to the defendant at some point before or during the guilt phase trial, including Miller's statement that "[i]f it had been only one or two incidents I could have held up, but the repetitive nature of the acts as well as past history of assaultive behavior make my (our) position untenable."

During the guilt phase of the trial, Miller testified in rebuttal of the defendant's insanity defense. Specifically, he testified about the general nature of sexual sadism, including his opinion that sexual sadists are capable of controlling their behavior. He did not testify about his diagnosis of the defendant or his opinion as to the defendant's ability to control his behavior.

On cross-examination at the guilt phase, defense counsel attempted to ask Miller about the portion of his letter to Satti that had been disclosed to the defendant. When defense counsel started to ask about Miller's statement concerning the repetitive nature of the defendant's acts, the state interrupted and objected on the ground that the question was beyond the scope of direct examination. The defendant countered that the question went to Miller's bias. After a discussion off the record, the court sustained the state's objection.

At that point, the defendant requested that, for purposes of preserving the record, he be permitted to mark for identification the item on which he had attempted to question Miller. The court then dismissed the jury and entertained argument on the defendant's request. The court first noted that Miller's letter was not part of the record and that defense counsel's question to Miller about the letter was therefore without any proper context. The state then offered to provide a copy of the letter to the court so that the court could determine whether it showed bias on Miller's part. Defense counsel agreed that he intended to use the letter only to show bias and that he did not intend to go beyond the

scope of direct examination. Upon review of the letter, the court determined that it did not demonstrate any bias that could not be otherwise brought out by questioning the witness. Accordingly, the court denied the defendant's request to read the letter and ordered that the letter be sealed. Defense counsel asked Miller one more question—whether a person must be psychotic to be mentally ill—and then ended his cross-examination. Miller was excused as a witness shortly thereafter.

The next day, the court, sua sponte, reversed its ruling denying the defendant's request to read the entire letter. The court stated that its new ruling did not necessarily "mean that there's going to be any further inquiry [regarding the letter]. Certainly, if there is, it requires Dr. Miller's presence. He resumes the same position he had at the termination yesterday." The court then provided the letter to defense counsel and granted his request to leave the courtroom to review and discuss the letter with cocounsel. Upon returning to the courtroom, defense counsel returned the letter to the court and requested that it be marked for identification. Defense counsel gave no indication that he wanted to accept the offer to resume his cross-examination of Miller. As previously noted, at the conclusion of the guilt phase, the defendant was convicted of all of the offenses with which he was charged.

Thereafter, at the first penalty phase hearing, the defendant offered Miller's report diagnosing the defendant as a sexual sadist and Miller's letter to Satti as exhibits in support of his claims in mitigation that he suffered from a significant impairment of mental capacity and lacked the ability to conform his conduct to the requirements of the law. The state objected on the ground that Miller was available as a witness and the documents were inadmissible hearsay. The defendant argued that the rules of evidence did not apply to relevant mitigating evidence. The court sustained the state's

objection. Ultimately, the jury found an aggravating factor and no mitigating factor, and the court sentenced the defendant to death on each count. *Ross II*, supra, 230 Conn. 188–90. The defendant appealed and this court determined that the trial court improperly had excluded Miller's report and letter. Id., 271. Accordingly, we reversed the death sentence and remanded the case for a second penalty hearing. Id., 273. Meanwhile, Miller had died in 1991.

At the second penalty phase, the defendant again claimed as statutory mitigating factors pursuant to § 53a-46a (g) (2) that at the time of the offense "his mental capacity was significantly impaired" and that "his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution . . . ."[37] In support of these mitigating factors, the defendant presented evidence from his own psychiatric experts that he suffered from the mental illness of sexual sadism and that that condition significantly impaired his ability to control his actions.[38] He also placed in evidence Miller's report and his letter to Satti.

In its rebuttal case, the state sought to introduce into evidence the transcript of Miller's testimony during the guilt phase. The defendant objected on the grounds that he had not been able to cross-examine Miller on the

---

[37] The defendant claims that he also sought to prove as nonstatutory mitigating factors that his mental capacity was impaired but not so impaired as to constitute a statutory mitigating factor and that his ability to conform his conduct to the requirements of the law was impaired but not so impaired as to constitute a statutory mitigating factor. We note that these were not listed in the defendant's list of proposed mitigating factors, and the trial court did not instruct the jury on them. Nevertheless, if the jury determined that the defendant had proved that he had a mental impairment that did not meet the requirements of § 53a-46a (g) (2), it was free to find such an impairment mitigating.

[38] See part VI A of this opinion for a summary of the mitigating evidence presented by the defendant.

substance of his testimony and that Miller's testimony was relevant only to the guilt phase issue of insanity, not to the mitigating factors claimed by the defendant. The state argued that the rules of evidence do not apply to evidence offered to rebut mitigation. The court, after noting that it was not strictly required to establish that Miller's testimony met the criteria for admissibility, concluded that the issues addressed by the documents introduced by the defendant and Miller's testimony were substantially similar and the testimony was otherwise admissible. The court specifically noted that the defendant had opened the door to the testimony by introducing Miller's report, which went to the issue of the defendant's insanity, and that the testimony probably would not have been admissible if the report had not been admitted. The court overruled the defendant's objection and allowed the state to read selected portions of Miller's testimony into the record. Among other things, the jury heard Miller's testimony concerning the general nature of sexual sadism and his opinion that sexual sadists are capable of controlling their behavior.[39] On surrebuttal, the defendant played for the jury videotaped interviews by defense counsel of James M. Alexander, a psychiatrist who had worked closely with Miller for several years, and Miller's wife, Shirley Miller. Alexander and Shirley Miller stated that, in their views, Miller was forthright and principled and that his letter to Satti reflected a genuine change of opinion about the defendant's case.

Immediately after Robert Miller's testimony was read to the jury, the court instructed the jury that the testimony was "relevant to sexual sadism [and was] offered

---

[39] Specifically, the following exchange was read to the jury:

"[State's Attorney Satti]: Do you have an opinion, Doctor, as to whether or not a sexual sadist can control his actions when he is doing something of a sexually sadistic nature at the time he's doing it?

\* \* \*

"[Miller]: Yes, a sexual sadist can control his behavior."

as the general criteria of sexual sadism and not offered relevant specifically to Dr. Miller's diagnosis of [the defendant]." The court also charged the jury at the conclusion of evidence that Miller's testimony had been given during the guilt phase on the issue of insanity and that insanity was not an issue in the penalty hearing.

The defendant now claims that the trial court improperly admitted Miller's prior testimony into evidence. He concedes that, under § 53a-46a (c), which allows "[a]ny information relevant to any mitigating factor [to] be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters," the rules of evidence did not apply to the testimony. See *Ross III*, supra, 251 Conn. 588–89. He argues, however, that the testimony was so unreliable and prejudicial that its admission violated his due process right to a fair trial and his rights under the confrontation clause.

We begin our analysis by addressing the appropriate standard of review. We stated in *Ross III*, supra, 251 Conn. 587–88, that, although the rules of evidence do not apply to evidence presented in rebuttal of mitigating evidence, the trial court nevertheless continues "to have the authority to preserve the integrity of the proceeding before it. That authority necessarily encompasses the duty to exclude evidence that, although relevant, is, for example, too prejudicial to be admissible or that is cumulative of evidence previously introduced. Having the authority to make such an exclusionary ruling, the trial court indubitably also has the authority to instruct the fact finder about the limited uses to which admissible evidence properly may be put. . . . [A] literal reading of [§ 53a-46a (c)] does not divest a trial court of its traditional authority and obligation to exclude unreliable and unduly prejudicial evidence." Thus, although the ordinary rules of evidence do not apply to evidence pertaining to mitigation, the trial court retains discre-

tion to rule on the reliability and prejudicial nature of such evidence. Such rulings are subject to review under an abuse of discretion standard. See *State* v. *Kirsch*, 263 Conn. 390, 399, 820 A.2d 236 (2003). "If the [evidentiary] claim is of constitutional magnitude [and an abuse of discretion is found], the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt." Id., 412.

We next review the legal standards governing the admission of testimony given at a separate proceeding. Section 8-6 (1) of the Connecticut Code of Evidence provides an exception to the hearsay rule for "[t]estimony given as a witness at another hearing of the same or a different proceeding, provided (A) the issues in the former hearing are the same or substantially similar to those in the hearing in which the testimony is being offered, and (B) the party against whom the testimony is now offered had an opportunity to develop the testimony in the former hearing." These restrictions on the hearsay exception have their roots in the confrontation clause. As we stated in *State* v. *Joyner*, 255 Conn. 477, 491 n.19, 774 A.2d 927 (2001), "[t]he confrontation clause demands that where prior testimony is admitted at a later proceeding, the party against whom the testimony is admitted must have had an opportunity to cross-examine the witness at the earlier proceeding sufficient to endow the testimony as a whole with some indicia of reliability . . . ."[40] (Internal quotation marks

[40] See also *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In *Crawford*, the United States Supreme Court held that the confrontation clause requires that, for prior testimony to be admissible, the defendant must have had an opportunity to cross-examine the witness. Id., 68. *Crawford* overruled *Ohio* v. *Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), to the extent that that case suggested that the prior testimony of an unavailable witness is admissible even if the party against whom it was admitted did not have an opportunity to cross-examine the witness if the statement either falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." (Internal quotation marks omitted.) *Crawford* v. *Washington*, supra, 60.

omitted.) See also *United States* v. *Wingate*, 520 F.2d 309, 316 (2d Cir. 1975) ("[t]estimony given at a pretrial or at a previous hearing by a presently unavailable witness is inadmissible at a subsequent trial unless the issues in the two proceedings are sufficiently similar to assure that the opposing party had a meaningful opportunity to cross-examine when the testimony was first offered").

The defendant claims that the admission of Miller's prior testimony violated his rights under the confrontation clause because the testimony did not satisfy either prong of the hearsay exception. We first address the defendant's claim that the issues at the two proceedings were not substantially similar. We conclude that the trial court properly determined that the issues at the guilt phase and at the second penalty phase were substantially similar.

At the guilt phase, the state used Miller's testimony to rebut a defense of insanity. Although the defendant did not expressly claim insanity at the second penalty phase, the jury, confronted only with Miller's report and his letter, in which he stated, among other things, that he had reversed his "earlier intemperate stand, which was based more on emotion than reason," and "the repetitive nature of the acts as well as past history of assaultive behavior make my (our) position untenable"; (internal quotation marks omitted) *Ross II*, supra, 230 Conn. 272 n.39; could have come to the conclusion that, in the letter, Miller had repudiated the opinion contained in his report, i.e., that the defendant was not insane.[41] The state used Miller's testimony to rebut that

---

[41] Contrary to the defendant's argument that insanity and mental impairment are "mutually exclusive," a finding that the defendant was insane necessarily would encompass a finding that he was mentally impaired. In an apparent attempt to forestall this argument, the defendant states in his brief that "[t]o prove mental impairment, a defendant by statute concedes that he is *not* insane." (Emphasis in original.) We recognize that the statutory mitigating factors claimed by the defendant specifically provide that the defendant's mental state and ability to conform his conduct to the require-

potential inference by showing that, although Miller's letter showed that he ultimately had concluded that he could not testify that the defendant did not suffer from some psychopathology that *impaired* his ability to control his conduct, he continued to believe that sexual sadists—and by implication the defendant—are not *incapable* of controlling their conduct. Accordingly, we conclude that, although there is merit to the defendant's claim that, as a general rule, the issue of insanity is not substantially similar to the issue of significant mental impairment and, therefore, testimony tending to show only that a defendant was not insane does not rebut evidence of significant mental impairment, under the circumstances of this case, where the defendant interjected the issue of his insanity into the penalty phase proceeding by placing Miller's report into evidence, the trial court did not abuse its discretion in determining that the issues raised at both proceedings were substantially similar.

We next address the defendant's claim that Miller's testimony should have been excluded because he did not have an adequate opportunity to cross-examine Miller on it. The defendant argues in his brief that,

ments of the law were "not so impaired . . . as to constitute a defense to prosecution"; General Statutes (Rev. to 1987) § 53a-46a (g) (2); i.e., that he was not insane. We do not read this language as *precluding* the defendant from presenting evidence that he suffered from any particular degree of mental impairment, up to and including insanity, however. Rather, we conclude that the language was intended (1) to acknowledge that, as a general rule, if the defendant could establish that he was insane, he would not be in the position of having to establish a mitigating factor and (2) to make clear that the defendant is not *required* to prove that his mental impairment would be a complete defense to the prosecution in order to establish a mitigating factor. There may be circumstances in which the defendant did not establish, or did not even attempt to establish, an insanity defense at the guilt phase but wished to introduce evidence of insanity at the penalty phase. We can perceive no legal impediment to the introduction of such evidence. Cf. *Bell* v. *Cone*, 535 U.S. 685, 691, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (defendant relied exclusively on evidence of insanity presented at guilt phase to establish mitigating factor).

"[b]ecause the scope of direct examination avoided any diagnosis of the defendant, *no* cross-examination about the defendant was possible." (Emphasis in original.) We agree that the defendant could not have cross-examined Miller on testimony that he had not given on direct examination. The defendant could have cross-examined Miller on the primary substantive issue on which he *did* testify, however, namely, that sexual sadists can control their conduct. He was not prevented from exploring whether that testimony was consistent with Miller's report, in which he had diagnosed the defendant as a sexual sadist, and his letter to Satti stating that he could not testify that the defendant's psychopathology was not mitigating. He simply made no attempt to do so. "[T]he test [for the admissibility of prior testimony] is [whether the party against whom the evidence is offered had] the opportunity for full and complete cross-examination rather than the use made of that opportunity." (Internal quotation marks omitted.) *State* v. *Joyner*, supra, 255 Conn. 491 n.19. We conclude that the trial court reasonably could have concluded that that test was met.[42]

We next consider the defendant's claim that the testimony should have been excluded because it was more

---

[42] The state argues that the defendant not only had the opportunity to cross-examine Miller at the guilt phase, but also could have called him to testify about the letter as a defense witness at the first penalty phase. It further argues that because the defendant made the tactical choice not to do so, he cannot now complain that he was prevented from confronting Miller with the letter. The defendant counters that he could not have predicted at that time that this court would order a new penalty phase or that Miller would have died before the second proceeding could be held and, therefore, that he should not be deemed to have waived forever his right to examine Miller on the letter. Because we have concluded that the issues at the guilt phase and at the second penalty phase were substantially similar and that the defendant had an opportunity to cross-examine Miller at the guilt phase so as to endow the testimony with sufficient indicia of reliability, the defendant's decision not to call Miller as a witness at the first penalty phase has no bearing on our resolution of this issue.

prejudicial than probative. The defendant argues that the testimony could have misled the jury to believe that, because Miller gave it after he wrote the letter to Satti, it was a retraction of that letter.[43] As we have noted, however, the testimony went to the issue of whether sexual sadists are insane while the letter went to the issue of the defendant's claim of mitigating mental impairment. The testimony merely tended to show that Miller continued to believe that sexual sadists are not insane, an issue that had been interjected into the proceeding when the defendant introduced Miller's report diagnosing the defendant as a sexual sadist and offering the opinion that he was not insane. We have concluded that the testimony was properly admitted for the purpose of raising this inference.

This brings us to the defendant's claim that the court's instructions on the use of Miller's testimony were improper. The defendant argues that the trial court improperly told the jury that the admission of Miller's testimony was unusual[44] and denied his requests that the court explain to the jury the differences between insanity and "significant impairment"; define "significant impairment"; explain that Miller's testimony could not be used to determine whether a mental impairment had been proven; explain that the defendant had been

---

[43] The defendant also argues that Miller's testimony was prejudicial because it was the only evidence "enabling the state to argue that the defendant's ability to control himself was not impaired, even if he is a sexual sadist." Specifically, he points to the state's statement during closing arguments that "sexual sadism doesn't prevent people from controlling their behavior." Thus, the state did not argue that the defendant's ability to control himself was not *impaired*, but that, in general, sexual sadism does not *prevent* people and, by implication, the defendant, from controlling their behavior. We have already concluded that Miller's testimony was admissible for the purpose of raising this inference.

[44] The court charged the jury that "this case was a little bit unusual, because we had statements that came before you . . . [such as] the prior testimony of Dr. Miller . . . . And [that evidence was] introduced substantively, for substantive purposes."

precluded from cross-examining Miller with his letter and report; explain that the first sentencing jury had not been permitted to see the report or letter; and instruct that, if it found that no mental impairment existed, the jury would have to find that none of the psychiatric evidence was credible.

"The standard of review for constitutional claims of improper jury instructions is well settled. In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 128, 836 A.2d 224 (2003).

With respect to the claim that the court improperly told the jury that the admission of Miller's testimony was unusual, the defendant argues that "[s]uch an influential charge could have had only one effect: to lend the court's endorsement to the reliability of Miller's damaging testimony" and that "[t]he charge made it seem that Miller's testimony was somehow particularly worthy of credence . . . ." We do not agree that the court's general characterization of the use of prior testimony as "a little bit unusual" amounted to an improper endorsement of the testimony or Miller's credibility. Accordingly, we reject this claim.

With respect to the remaining claims, we conclude that the court's instruction that Miller's testimony had

been given during the guilt phase on the issue of insanity and that insanity was not an issue in the penalty hearing adequately informed the jury that it was not required to find that the defendant was insane in order to find that he had a significant mental impairment. We are not persuaded by the defendant's argument that the court's refusal to expound on the definition of "significant impairment," to tell the jury what evidence had been presented to the previous penalty phase jury or to instruct it that a determination that there was no mitigation would be inconsistent with all of the psychiatric evidence allowed the jury to reach a verdict not sanctioned by law or supported by properly admitted evidence. Accordingly, we reject these claims.

## B

### The Exclusion of Testimony by Bishop Daniel Hart

The defendant claims that the trial court improperly excluded testimony by Daniel Hart, the Bishop of the Norwich Roman Catholic Diocese, on the concept of mercy, including the extension of mercy to those who have committed heinous crimes, and the Catholic church's position on capital punishment. The trial court concluded that the evidence was not relevant to the question of whether anything in the defendant's character, background and history warranted a sentence less than death. The defendant argues that the exclusion of the testimony violated the constitutional principle that "[s]tates cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty." *McCleskey* v. *Kemp*, 481 U.S. 279, 306, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). We disagree.

As we previously have noted in this opinion, the rules of evidence do not apply to the admission of mitigating evidence at the penalty phase. *Ross II*, supra, 230 Conn. 268. The court retains discretion to exclude irrelevant

evidence, however. See id.; see also *Ross III*, supra, 251 Conn. 587. To be relevant, evidence that the defendant seeks to introduce as mitigating must bear on the "defendant's character, background and history, or the nature and circumstances of the crime . . . ." General Statutes (Rev. to 1987) § 53a-46a (b); see also *Lockett* v. *Ohio*, 438 U.S. 586, 604 n.12, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) ("[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense").

We agree with the trial court that general ethical or religious teachings on the nature of mercy or the morality of the death penalty have no bearing on any fact pertaining to the defendant's background, character or history, or to the circumstances of the offense.[45] We therefore conclude that the court did not abuse its discretion in excluding Bishop Hart's proposed testimony as irrelevant. Moreover, the governing law of this state is that, when a defendant has been convicted of a capital felony and an aggravating factor has been found, the death sentence must be imposed unless the defendant has established a circumstance specific to himself or the case that constitutes a basis for a sentence less than death. The admission of opinion testimony on the compatibility of that law with a particular moral or religious doctrine impermissibly would encourage jury

---

[45] Several of our sister states have reached the same conclusion. See *State* v. *Rose*, 120 N.J. 61, 65, 576 A.2d 235 (1990) (testimony of clergymen regarding religious propriety of death penalty was inadmissible because "[t]he morality . . . of the death penalty . . . [does] not speak to the specific defendant or crime"); *State* v. *Clark*, 128 N.M. 119, 132, 990 P.2d 793 (1999) (personal beliefs and religious doctrine on morality of death penalty were "not relevant to [the defendant's] character, record or circumstances of his offense"); *Commonwealth* v. *Daniels*, 537 Pa. 464, 480, 644 A.2d 1175 (1994) (arguments to jury that death penalty is immoral and against religious beliefs "were not relevant to [the defendant's] background, character, or to the circumstances of the crime" and were properly restricted by trial court).

nullification of the law. Accordingly, we reject this claim.

## C

### The Admission of the Videotaped Interviews with Howard Zonana

The defendant claims that the trial court improperly allowed the state to impeach Donald Grayson, a psychiatrist retained by the defendant as an expert witness, with videotaped interviews between the defendant and Howard Zonana, another of the defendant's psychiatric experts. He argues that the admission of the videotapes violated his constitutional right to counsel, his constitutional privilege against self-incrimination and the attorney-client and psychiatrist-patient privileges. We disagree.

The following facts and procedural history are relevant to the resolution of this claim. The defendant retained Zonana to perform a psychiatric evaluation in 1985. At that time, Zonana conducted several interviews of the defendant and videotaped them. Zonana advised the defendant that the interviews were confidential and would be covered by the attorney-client privilege unless both the defendant and his attorneys agreed to disclose them.

At the first penalty phase hearing, Fred Berlin, another psychiatric expert for the defendant, testified that he had viewed the videotapes as part of his evaluation of the defendant. The state asked for copies of the videotapes. The defendant objected, claiming that disclosure would violate his fifth amendment rights and the attorney-client privilege. The court overruled the objection and the videotapes were disclosed to the state. The state did not attempt to place the videotapes into evidence.

Before the second penalty hearing, the defendant indicated that he intended to call Berlin and Grayson as psychiatric experts. The defendant never called Berlin. Grayson testified that he had reviewed Berlin's reports as part of his evaluation of the defendant. The defendant also placed into evidence a report by Grayson in which he discussed in detail several letters and reports by Berlin in which Berlin had concluded that the defendant suffered from sexual sadism, that the condition caused him personal anguish and that it might be treatable with medication. During cross-examination of Grayson, the state asked him whether he was aware that the defendant had retained Zonana. The defendant objected to the question, and the jury was excused. The state indicated to the court that it intended to offer evidence that the defendant had made statements to Zonana that were inconsistent with those that he had made to Grayson and to ask Grayson whether those statements would change his opinion.[46] The defendant argued that the statements to Zonana were covered by the psychiatrist-patient privilege and the attorney-client privilege. The state countered that any privilege had "disappeared" when the videotapes were given to Berlin and the defendant called Berlin to testify during the penalty phase. After reviewing the portions of the videotapes that the state intended to show to Grayson, the court ruled that they were relevant to the defendant's claim of mental impairment and admitted them.

Several days later, the court explained in greater depth its reasons for admitting the videotapes. The court stated that the defendant's fifth amendment privilege against self-incrimination had been waived at the guilt phase and second penalty phase when the defendant presented evidence in which he admitted that he

---

[46] Grayson's testimony and the inconsistencies between statements made by the defendant to Grayson and to Zonana are summarized in part VI A of this opinion.

had committed the offenses, but the court recognized that the videotapes were subject to the psychiatrist-patient and attorney-client privileges. The court concluded, however, that the defendant had given a qualified waiver of those privileges when he placed his mental condition in issue. The court then concluded that, on two separate occasions, the defendant specifically had waived the privilege with respect to the videotapes. The first waiver was in 1987 when he called Berlin to testify at the first penalty phase and the videotapes were disclosed to the state. The court noted that, once the videotapes had been disclosed, their confidentiality could not be reasserted. The second waiver was in 2000 when the defendant called Grayson, who had relied on Berlin's reports, to testify at the second penalty phase hearing. Accordingly, the court concluded that the videotapes were admissible. At the close of evidence, the court instructed the jury that the videotapes had been entered into evidence for the sole purpose of testing the basis of Grayson's expert opinion and could not be used to establish any fact in issue. The defendant now challenges the trial court's decision to admit the videotapes.

As a preliminary matter, we address the proper standard of review. Whether the defendant waived the attorney-client, psychiatrist-patient and fifth amendment privileges is a mixed question of law and fact over which our review is de novo. See *State* v. *Vega*, 259 Conn. 374, 387, 788 A.2d 1221 (mixed question of law and fact is subject to de novo review), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

In support of his argument that the admission of the videotapes violated the psychiatrist-patient privilege, the defendant points out that "[t]he people of this state enjoy a broad privilege in the confidentiality of their psychiatric communications and records . . . ." (Internal quotation marks omitted.) *Falco* v. *Institute of Liv-*

*ing*, 254 Conn. 321, 328, 757 A.2d 571 (2000); see also General Statutes § 52-146e.[47] Moreover, "[w]here a psychiatric expert . . . is retained by a criminal defendant or by his counsel for the sole purpose of aiding the accused and his counsel in the preparation of his defense, the attorney-client privilege bars the state from calling the expert as a witness." *State* v. *Toste*, 178 Conn. 626, 628, 424 A.2d 293 (1979).

This court has recognized, however, that "[a] defendant waives many significant rights when he chooses to assert a defense of insanity." *Ross II*, supra, 230 Conn. 213. "Specifically, a defendant's assertion of an insanity defense requires at least a partial waiver of his attorney-client privilege because, under Practice Book §§ [40-18 and 40-19], he must disclose defense psychiatric reports and submit to a court-ordered psychiatric examination on behalf of the state." Id., 214. It is also clear that such disclosure of psychiatric evidence to the state necessarily constitutes a waiver of the psychiatrist-patient privilege with respect to the disclosed materials. Moreover, the United States Supreme Court has held that a defendant who introduces psychiatric evidence has "no Fifth Amendment privilege against the introduction of [the psychiatric reports of the defendant's experts] by the prosecution." *Buchanan* v. *Kentucky*, 483 U.S. 402, 423, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987); see also *State* v. *Manfredi*, 213 Conn. 500, 513, 569 A.2d 506 (defendant waives fifth amendment privilege against self-incrimination when he places mental status in issue), cert. denied, 498 U.S. 818, 111 S.

---

[47] General Statutes § 52-146e (a) provides: "All communications [between psychiatrist and patient] and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative."

Ct. 62, 112 L. Ed. 2d 37 (1990). "[I]f a defendant . . . presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." (Internal quotation marks omitted.) *State* v. *Steiger*, 218 Conn. 349, 362–63, 590 A.2d 408 (1991), quoting *Buchanan* v. *Kentucky*, supra, 422–23.[48] Otherwise, "[the defendant's] silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case." (Internal quotation marks omitted.) *Buchanan* v. *Kentucky*, supra, 422.

In the present case, the defendant raised the claim of significant mental impairment and called Grayson to testify in support of that claim. Grayson testified that he had read Berlin's reports and he quoted those reports at length in his own written report, which was admitted into evidence. In turn, Berlin had testified at the first penalty phase that he had relied in part on the Zonana videotapes in forming his own opinion about the defendant's mental status. Thus, the reliability of Grayson's testimony was dependent in part on whether Berlin's opinion was supported by the statements made by the defendant to Zonana. Therefore, the state was entitled to test the basis of Grayson's opinion by confronting him with the videotapes. Accordingly, we agree with the trial court that the defendant implicitly waived the psychiatrist-patient privilege with respect to the videotapes when he called Grayson as a witness. A fortiori,

---

[48] In his reply brief, the defendant argues that *Steiger* is distinguishable from this case because the psychiatric materials at issue in *Steiger* had been prepared by the state's expert who, unlike Zonana, had not made any promise of confidentiality to the defendant. The defendant makes no claim, however, that Zonana's promise of confidentiality was anything more than an enunciation of the statutory psychiatrist-patient privilege which, like the fifth amendment privilege at issue in *Steiger*, is waived when the defendant places his mental status in issue. See *Ross II*, supra, 230 Conn. 214.

the defendant waived the privilege in 1987 when he called Berlin to testify.

The defendant argues, however, that there can be no implied waiver of the psychiatrist-patient privilege and, even if it is assumed that an implied waiver is permissible, the waiver in this case was not knowing and intelligent. He has cited no authority for the proposition that an express waiver of the privilege is required in cases where the defendant has raised the issue of his mental status, however, and it is clear that such a requirement would eviscerate the principle that a defendant, having chosen to place his mental status in issue, cannot selectively conceal relevant psychiatric evidence behind the shield of privilege. With respect to the defendant's claim that his waiver was not knowing and intelligent, we note that he makes no claim that his attorneys failed to advise him that a claim of mental impairment at the second penalty phase would act as a waiver of any privilege in the videotapes or that he would not have claimed mental impairment if he had known that it meant waiving any privilege.[49] In the complete absence

[49] The defendant does claim that he was never told that the videotapes could be used "against" him. The videotapes were not used "against" him, however, but were used to weaken the force of favorable psychiatric evidence presented by the defendant after he chose to place his mental status in issue. To the extent that the defendant claims that his counsel could not have known that the videotapes could be used in rebuttal until the trial court ruled that they were admissible, we conclude, on the basis of *Buchanan* v. *Kentucky*, supra, 483 U.S. 402, *Ross II*, supra, 230 Conn. 183, and *State* v. *Steiger*, supra, 218 Conn. 349, and in light of the court-ordered disclosure of the videotapes to the state at the first penalty phase, that defense counsel presumptively was aware that there was a substantial likelihood that the videotapes would be subject to disclosure at the second penalty phase if the defendant claimed mental impairment. See *Buchanan* v. *Kentucky*, supra, 438 U.S. 425 (counsel was on notice that, if he put on mental status defense, he would have to anticipate use of psychological evidence by prosecution in rebuttal). Indeed, the defendant indicated before the second penalty phase that he intended to call Berlin as a witness and conceded during arguments on the admissibility of the videotapes that if he called Berlin they would be admissible.

of any such claim, we must "assume that the defendant's experienced and highly competent counsel knew that the results of the . . . psychiatric examination could be used in rebuttal [if he raised impaired mental status as a mitigating claim] and informed the defendant of the potential nature and scope of the . . . examination"; *State* v. *Steiger*, supra, 218 Conn. 370; and that the defendant's decision to claim mental impairment was made intelligently and with full knowledge of the consequences. For the same reasons, we also reject the defendant's claim that use of the videotapes violated his sixth amendment right to counsel. See id.

The defendant also argues that a defendant's privilege against self-incrimination protects him against compulsory submission to a psychiatric evaluation unless he has placed in issue whether he "had the mental state required for the offense charged"; Practice Book § 40-18;[50] and that whether the defendant had the mental state required for the offenses was not in issue during the penalty phase. Thus, he implicitly argues that the foregoing principles apply only when a defendant has raised an insanity defense at the guilt phase and not when he has raised a claim of mental impairment at the penalty phase. We disagree. As we have noted, the state has a statutory right to rebut mitigating evidence presented by the defendant at the penalty phase. See General Statutes (Rev. to 1987) § 53a-46a (c). The defendant has provided no authority in support of his claim that the constitution prohibits the state from using otherwise admissible psychiatric evidence to rebut a mitigating claim of mental impairment at the penalty phase, and we can conceive of no reason that the waiver princi-

---

[50] Practice Book § 40-18 provides in relevant part: "If a defendant intends to introduce expert testimony relating to the affirmative defenses of mental disease or defect . . . or another condition bearing upon the issue of whether he or she had the mental state required for the offense charged, the defendant shall . . . notify the prosecuting authority in writing of such intention and file a copy of such notice with the clerk. . . ."

ples that apply at the guilt phase should not also apply at the penalty phase. Accordingly, we reject this claim.

Finally, the defendant argues that under Practice Book § 40-13 (b), which provides in relevant part that the defendant shall provide to the state "any statements of the witnesses other than the defendant," his statements are not subject to disclosure. That section of the Practice Book merely provides that certain materials are discoverable by the state as of right, however. It does not prohibit the disclosure of other materials.

We conclude that the trial court properly determined that the defendant waived his fifth amendment privilege against self-incrimination and his attorney-client and psychiatrist-patient privileges in the Zonana videotapes when he claimed significant mental impairment as a mitigating factor and called Grayson and Berlin to testify in support of that claim. Accordingly, we reject this claim.

D

The Motion to Suppress the Defendant's Confession

The defendant next claims that the trial court improperly denied his motion to suppress his confessions. We disagree.

We previously have taken note of certain facts and procedural history that are relevant to our resolution of this claim. "On June 28, 1984, while at the Lisbon town hall, the defendant made numerous inculpatory statements to the state police. He admitted, orally and in writing, that he had killed Wendy B. and Robyn S., murders that were committed in New London county. He also confessed to killing April B. and Leslie S. in Rhode Island and to other murders in Windham county.

"After an evidentiary hearing, the trial court, *Hendel*, *J.*, denied the defendant's motion to suppress his incul-

patory statements. In support of its ruling, the trial court made the following findings of fact. The defendant came to the Lisbon town hall voluntarily. He made his first incriminatory statement to detective Michael Malchik [of the Connecticut state police major crime unit] before having received *Miranda* warnings. This statement resulted from an extended conversation in a town hall conference room. During this conversation, the defendant was not physically restrained and twice had been advised that he was free to leave. It was the defendant who initiated an inquiry into the type of person who might have killed Wendy B. and whether such person might receive psychotherapy. The defendant then asked Malchik whether Malchik thought the defendant had killed Wendy B. Malchik replied in the affirmative and told the defendant that he felt that 'he [the defendant] would do it again and I thought that was the most important thing, that he didn't do it again.' Immediately thereafter, without any questioning by Malchik, the defendant admitted to having killed Wendy B. Upon hearing this incriminatory statement, Malchik terminated any further conversation with the defendant and treated him as a custodial suspect. Before asking any further questions, Malchik gave the defendant the required *Miranda* warnings; *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); and asked the defendant to sign a *Miranda* waiver, which he did. All the defendant's subsequent incriminatory statements followed repeated *Miranda* warnings and waivers.

"The trial court concluded that: (1) the police had not illegally detained or arrested the defendant; (2) the defendant had made his statements to the police voluntarily; and (3) there was no *Miranda* violation in the manner in which the police obtained statements from the defendant. Accordingly, the trial court denied the defendant's motion to suppress." *Ross II*, supra, 230

Conn. 202–204. The defendant challenged that ruling on appeal. This court affirmed the denial, stating that "[c]onsidering the record of the meeting in its entirety, we are persuaded that the trial court was not clearly erroneous in its determination that a reasonable person in the defendant's position would have felt free to leave even after Malchik had voiced his belief that the defendant had killed Wendy B." Id., 205.

At the second penalty phase, the defendant renewed his motion to suppress the confession. He argued that this court improperly had applied a deferential standard of review in *Ross II* and that legal developments since the release of that opinion had clarified that "in custody" determinations are reviewed de novo. See *Thompson* v. *Keohane*, 516 U.S. 99, 112–13, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). The trial court held that *Thompson* had not changed the standard of review and that this court's ruling in *Ross II* was controlling. Cf. *Bowman* v. *Jack's Auto Sales*, 54 Conn. App. 289, 293–94, 734 A.2d 1036 (1999) (law of the case applies in absence of overriding circumstance such as "decision of the Supreme Court after the first review that is inconsistent with the decision on review"). Accordingly, it denied the motion to suppress. The defendant now challenges that ruling.

In *Thompson*, the United States Supreme Court held that review of "in custody" determinations involves two distinct inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson* v. *Keohane*, supra, 516 U.S. 112. "The first inquiry . . . is distinctly factual. State-court findings on these scene- and action-setting questions attract a presumption of correctness . . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This

ultimate determination, we hold, presents a 'mixed question of law and fact' qualifying for independent review." Id., 112–13.

In *State* v. *Atkinson*, 235 Conn. 748, 759 n.17, 670 A.2d 276 (1996), this court concluded that the *Thompson* analysis "is similar to the one that we have always applied [to in-custody determinations]. We first examine the trial court's conclusion regarding the historical facts in order to determine whether it is clearly erroneous. We next conduct an independent review in light of the totality of the circumstances by scrupulously examining the record to determine if an application of the law to the facts leads us to conclude that the defendant was in custody. In contrast with the [United States] Supreme Court, however, we have never expressly labeled this second determination as a mixed question of law and fact." Thus, we recognized in *Atkinson* that *Thompson* applied another name to, but did not alter, the standard of review that this court always had applied to "in custody" determinations.

We recognize that, in *Ross II*, we used the phrase "the trial court was not clearly erroneous" in affirming the trial court's denial of the defendant's motion to suppress. *Ross II*, supra, 230 Conn. 205. A careful reading of our opinion in that case convinces us, however, that we in fact applied the standard of review that we traditionally have applied to "in custody determinations," as set forth in *Atkinson*, and did not merely defer to the trial court's determination. Specifically, we first set forth the governing law; id., 204; and then set forth the constitutionally relevant facts gleaned from our independent review of the entire record. Id., 205. Applying the law to the facts, we stated that "[w]e *find* it especially probative that, contrary to the facts of the cases on which the defendant relies, it was the defendant, not Malchik, who initiated the discussion of the murder of Wendy B." (Emphasis added.) Id. We did

not defer to any determination by the trial court on the constitutional significance of that fact, our independent assessment of which was central to our resolution of the claim. Accordingly, we conclude that the trial court properly determined that this court in *Ross II* had applied the proper standard of review to the trial court's denial of the motion to suppress at the guilt phase and our affirmance of that ruling is, therefore, controlling here. Therefore, the defendant's renewed motion to suppress was properly denied.

## V

## THE DEFENDANT'S *BRADY* CLAIM

The defendant claims that the court improperly denied his motion for a mistrial or a life sentence in which he claimed that the state failed to disclose exculpatory evidence in a timely manner in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83. We disagree.

The following additional facts are relevant to our resolution of this claim. On March 16, 2000, two days after the defendant had rested his case in mitigation, the state disclosed to him certain documents pertaining to the investigation of a rape, a death and an attempted rape that had occurred at Cornell University (Cornell) in Ithaca, New York, in the spring of 1981. Specifically, the documents pertained to the investigations of the rape of a woman, identified only as K.G., on May 6, 1981; the death of a woman, identified as D.N.T., on May 12, 1981; and the attempted rape of a woman, identified as T.T., on May 14, 1981. The defendant's possible involvement in these incidents had been public knowledge since 1987[51] and the defendant had confessed in 1998 to committing a rape-murder and other

---

[51] The materials disclosed by the state referred to news reports in 1987 that Walter Borden, the defendant's expert psychiatrist, had stated that the defendant had told him that he had raped and killed a Vietnamese woman at Cornell University and had raped two other women in the same time period.

offenses when he was a student at Cornell in 1981.[52] A videotape of an interview between the defendant and Zonana concerning a rape, attempted rape and rape-murder that he had committed at Cornell had been admitted as a full exhibit and played to the jury at the second penalty phase.[53]

After the disclosure of the materials, the defendant immediately claimed that the state improperly had withheld exculpatory materials and asked the court to impose a life sentence or, in the alternative, to declare a mistrial. He also asked that, if the court denied those motions, the state be precluded from using any of the evidence in rebuttal. The state acknowledged that it had had most of the materials in its possession for "an appreciable amount of time," but argued that they were not exculpatory.

The court did not rule on the defendant's requests immediately, but heard additional arguments the next

[52] The defendant claims that the investigative reports showed that he also had attacked a fourth unidentified victim. The only reference to this attack is an entry in the investigative notes made by Scott Hamilton of the Cornell University department of public safety after the defendant had been implicated in the attempted rape of T.T., the rape of K.G. and the rape and murder of D.N.T., indicating that, during his investigation, he had learned that a female student had been robbed by a white male in the same area and during the same time period as the other offenses. The record contains no evidence tying the defendant to that robbery.

[53] The defendant stated on the videotape that, while he was at Cornell, he had grabbed a woman by the side of the road, dragged her into the woods and raped her; he had grabbed another woman by the side of the road and dragged her through the woods, but let her go when she screamed and someone ran to her rescue; and he had grabbed a third woman from the side of the road, dragged her into the woods, raped her, strangled her and thrown her body into a lake. Grayson also testified at the penalty phase that the defendant had told him about a rape, an attempted rape and a rape-murder that he had committed while at Cornell. With respect to the attempted rape and the rape, Grayson testified that the defendant had told him that he had grabbed a woman from behind, dragged her into the woods and let her go when he heard voices, and that he had grabbed another woman, dragged her into some bushes, forced her to perform oral sex, raped her and let her go.

day. At that time, the defendant argued that the materials were exculpatory because they (1) showed that he was remorseful, (2) corroborated his claim that he suffered from sexual sadism and (3) undermined the state's claim that he had killed the victims to avoid detection. In support of his argument that the materials showed that he was remorseful, he pointed to a file memorandum dated May 21, 1987, authored by Scott Hamilton of Cornell's department of public safety indicating that, on March 25, 1987, Malchik had told him that the defendant was reluctant to talk about the murders that he had committed outside of Connecticut because he wanted the death penalty to be carried out as soon as possible. The defendant argued that this evidence impeached Malchik's testimony that, at the time of the defendant's arrest and confession in June, 1984, he had stated untruthfully that he had committed murders only in Connecticut. In addition, he argued that it impeached testimony by Frank Griffin, a captain with the state police, that the defendant showed no remorse at the time of his arrest and confession. With respect to his claim that the materials pertaining to the rape and attempted rape corroborated his diagnosis of sexual sadism, he argued that the materials showed the ritualistic, repetitive and progressive nature of his conduct. In support of his argument that the materials undermined the state's theory that he had killed the victims in order to avoid detection and not because of his sexual sadism, the defendant contended that the police reports, which indicated that D.N.T.'s body had been found fully clothed, and a portion of Hamilton's memorandum, which indicated that Malchik had stated to Hamilton that the defendant had redressed one of the Connecticut victims after killing her, corroborated the defendant's account given to one of his psychiatric experts that he had sexually assaulted Leslie S., whose body had been found fully clothed, and tended to show that the murder

was, therefore, sexually motivated. The defendant also argues in his brief to this court that the police reports showed that the defendant could have been identified by at least two surviving victims in addition to a woman he had confessed to raping in Connecticut, identified as Vivian S., who identified him after his arrest. Finally, he argued to the trial court that the materials had been produced too late for him to be able to make effective use of them.

On March 20, 2000, the court issued its ruling that the undisclosed materials were not material under *Brady* v. *Maryland*, supra, 373 U.S. 83, and denied the defendant's motions for a life sentence, a mistrial and exclusion of the evidence in the state's rebuttal case. The court also indicated, however, that it would entertain a request for a continuance or to recall excused witnesses. The defendant declined the offer.

Later that day, the court considered the state's offer of testimony by K.G. The state told the court that K.G. would testify, in rebuttal of the defendant's claim that he did not kill his victims to avoid detection but because of his sexual sadism, that the person who had raped her had taken steps to ensure that she could not identify him and had not attempted to degrade or humiliate her. The defendant argued that the testimony should not be admitted because it was not entirely clear that it was the defendant who had raped K.G. The court agreed that the record did not sufficiently establish that the defendant had committed the rape and excluded the testimony.

The defendant then asked that the portion of Hamilton's memorandum stating that Malchik had told Hamilton that the defendant wanted to be executed as soon as possible be introduced as a full exhibit. The court allowed it and the exhibit was read to the jury.

The defendant claims on appeal that the trial court improperly denied his motions for a life sentence or a mistrial on the ground that the undisclosed materials were not material for *Brady* purposes. "In *Brady* v. *Maryland,* supra, 373 U.S. 87, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *State* v. *Wilcox,* 254 Conn. 441, 452, 758 A.2d 824 (2000) "The United States Supreme Court . . . in *United States* v. *Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *State* v. *Wilcox,* supra, 453.

We first address the defendant's claim that Hamilton's memorandum undermined evidence presented by the state that the defendant was not remorseful. The memorandum indicated that Malchik had told Hamilton that the defendant was reluctant to talk about crimes outside of Connecticut because he wanted to be executed as soon as possible. The defendant concedes that this triple hearsay evidence of the defendant's state of mind ultimately was given to the jury, but argues that he was prejudiced by not being able to use the memorandum to cross-examine Malchik immediately on his testimony

that the defendant had lied about committing murders outside the state of Connecticut and to cross-examine Griffin on his testimony that the defendant was not remorseful. He argues that recalling Malchik and Griffin to resume cross-examination would not have been effective because the jury could have assumed that the recall was attributable to a lack of preparation by defense counsel, or could have been "too drained and exhausted by that time to give impeachment its due."

We conclude that there is no reasonable possibility that the outcome would have been different if the defendant had been able to cross-examine Malchik and Griffin on the memorandum immediately after their testimony. First, the memorandum did not impeach Malchik's testimony that the defendant deceitfully had concealed the New York offenses at the time of his arrest and confession or Griffin's testimony that the defendant exhibited no remorse at that time. It showed only that, three years later, Malchik believed, on the basis of his contacts with the defendant in the interim, that the reason for his current reluctance to talk about the New York offenses was his desire to be prosecuted in Connecticut and executed as soon as possible. Accordingly, the evidentiary value of the memorandum was not significantly reduced because the defendant could not cross-examine Malchik and Griffin on it immediately. Second, the evidence was only weakly probative. The defendant's willingness to lie about the New York offenses at the time of his arrest in order to ensure that he was executed in Connecticut as soon as possible did not necessarily indicate remorse or concern for the families of the victims. A desire to die is not the same thing as remorse. Moreover, the jury reasonably could have concluded that the defendant's expressed desire to be executed was not a genuine explanation for his previous lies.[54] Finally, if the defendant believed that it

---

[54] There is no evidence in the record that the defendant believed at the time of his arrest in Connecticut that his chances of being put to death as

was crucial to confront Malchik and Griffin with the memorandum, he could have done so. We are not persuaded by his arguments that the jury was likely either to make improper assumptions about the reasons for recalling the witnesses or to reject the evidence arbitrarily. Accordingly, we conclude that the trial court properly determined that there was no *Brady* violation with respect to the Hamilton memorandum.

We next consider the defendant's claim that the police statements and reports pertaining to the rape of K.G. and attempted rape of T.T. corroborated the defendant's claim that he suffered from sexual sadism. He argues that the evidence corroborated the ritualistic, repetitive and progressive nature of his assaultive conduct and undermined the state's theory that the defendant had learned how to fake the symptoms of sexual sadism during his incarceration after his arrest. The jury already had heard detailed descriptions of the New York offenses, however, and the state never had disputed that the defendant had a long and ghastly history of accosting vulnerable young women who happened to cross his path, dragging them to secluded spots, forcibly restraining them, forcing them to perform oral sex, raping them and, on eight occasions, strangling them to death. Rather, it contested the credibility of the defendant's claims that his ability to control this conduct was significantly impaired and that he derived sexual pleasure from the act of strangulation. The details contained in the police reports did not add appre-

soon as possible were greater in Connecticut than in New York, the other jurisdiction in which he had committed murders. Indeed, the jury viewed a videotape of an interview between the defendant and one of his expert psychiatrists that occurred in 1985 in which he stated that he had concealed the New York crimes from his psychiatrists and attorneys because he "still hope[d] to someday, maybe if [he was] really lucky, [to] be out of this slum hole." It also viewed a videotape of a July, 1994 interview given by the defendant to a British journalist in which he stated, "I just don't want to have to be transferred to New York and go through all that shit in New York."

ciably to the credibility of these claims. Moreover, the defendant himself argued that the evidence was not sufficient to establish that he had assaulted K.G. and, by implication, T.T. Accordingly, we conclude that there is no reasonable possibility that the admission of the police reports corroborating the defendant's undisputed criminal history would have resulted in a different outcome.

Finally, we address the defendant's claim that the police reports undermined the state's contention that he had killed the victims to avoid detection. First, he argues that the reports showed that he had assaulted two women in New York but did not kill them to eliminate them as witnesses. The police records show, however, that T.T. escaped from her attacker after she screamed "rape" and a bystander ran to her rescue. The records also show that the person who raped K.G. approached her from behind and pulled her sweater over her face before he raped her. He explained to her that he did not want her to "get a look at him in case there were questions or an investigation later." The rape occurred at about 10:30 p.m., when it was dark. The police complaint and report stated that K.G. "was unable to furnish [the police] with any description of the subject." She was able, however, to give a general description of the build and clothing of a man she had seen immediately before the rape and to tell the police that the rapist was tall, slender and smooth-faced. Thus, the reports contained only very weak evidence, at best, that the defendant deliberately had allowed victims who could have identified him to escape with their lives. We conclude, therefore, that there is no reasonable possibility that the evidence could have resulted in a different outcome.

The defendant also claims that the evidence showing that D.N.T.'s body had been found fully clothed and that Malchik had told Hamilton that the defendant had

redressed the body of a Connecticut victim corroborated his account that he had sexually assaulted Leslie S., whose body had been found fully clothed, and, therefore, supported his claim that he had killed her to satisfy his compulsive sexual urges and not to avoid detection. The following additional facts are relevant to this claim. Malchik testified at the second penalty phase that, immediately after the defendant was arrested in 1984, he had stated to the police on seventeen separate occasions that he had killed his victims to avoid being caught and sent to jail.[55] The defendant also specifically had denied to the police at that time that he had sexually assaulted Leslie S. and stated that he had killed her because, having killed April B., he "couldn't let her go." The defendant told Zonana in 1985 that Leslie S. had been the only murder victim whom he had not raped and that he had not raped her because he had been unable to maintain an erection. He also told Zonana that he believed that this murder was "the one that's going to hang me." Still later, after the first penalty phase, the defendant told Grayson that he had sodomized Leslie S. before killing her and had been too ashamed to admit it to the police. Grayson testified that he did not believe that that account was inconsistent with the defendant's statements to Zonana.

---

[55] For example, the defendant stated with respect to the murder of Wendy B. that, after he had raped her, he killed her because he "was scared and . . . didn't know what to do because . . . [he] had been in trouble before." He also stated that he killed her because he "knew if [he] got caught, [he] would be back in jail again." With respect to the murder of Robyn S., the defendant stated that he killed her because she told him that he was going to be caught. With respect to April B., the defendant stated that he killed her because she was very "mouthy" and had told him that she had a relative who was a policeman and, therefore, he believed that it would not be an unreported rape. The defendant also stated that he killed the victims because he "just didn't want to go back to jail," and "if they never [had seen him], if like if [he] had a mask on or something . . . and they couldn't recognize [him], then [he didn't] think [he] would have hurt them. But [he] was so afraid of getting caught."

As we previously have indicated, immediately after his arrest, the defendant had confessed to the rape and murder of two additional victims, Debby T. and Tammy W., in Windham county. Evidence introduced by the defendant at the penalty phase indicated that the bodies of these victims had been found fully clothed.

We conclude that the materials pertaining to D.N.T. were cumulative of the evidence pertaining to the Windham county murder victims, which tended to support the defendant's claim that the fact that Leslie S.'s body had been found fully clothed did not prove that she had not been raped and, therefore, undermined the state's contention that the murders were solely motivated by the desire to avoid detection. In any event, if the defendant believed that the materials were crucial to his case, he had the opportunity to place them before the jury. He declined to do so. We conclude that there is no reasonable possibility that there would have been a different outcome if the defendant had had that opportunity at an earlier time.

We conclude that the trial court properly determined that the documents disclosed by the state to the defendant on March 16, 2000, were not material for *Brady* purposes. Accordingly, we conclude that the court properly denied the defendant's request for a life sentence, a mistrial and exclusion of the evidence for rebuttal purposes.

## VI

## SUFFICIENCY CLAIMS

The defendant claims both that the evidence established a mitigating factor as a matter of law and that there was insufficient evidence to establish the aggravating factor. We address each claim in turn.

A

## The Defendant's Claim that the Evidence Established the Mitigating Factors as a Matter of Law

We first address the defendant's claim that the evidence established his claimed statutory mitigating factors that: (1) "at the time of the offenses, [the defendant's] mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution"; and (2) "at the time of the offenses, [the defendant's] ability to conform his conduct to the requirements of law was significantly impaired but not so impaired as to constitute a defense to prosecution."

Before turning to the evidence presented in support of these mitigating factors, we set forth the applicable standard of review. "Although our review of the evidence in mitigation of the death penalty is a heightened one . . . we will not substitute our judgment or opinions for that of a reasonable jury. . . . Instead, we must determine whether the defendant's proof of a mitigating factor was so clear and so compelling that the jury, in the exercise of reasoned judgment, could not have rejected it." (Citations omitted.) *State* v. *Breton*, 235 Conn. 206, 229, 663 A.2d 1026 (1995) (*Breton II*).

In support of his claimed statutory mitigating factors, the defendant presented, among other evidence, testimony by Grayson that the defendant suffered from sexual sadism[56] and that his ability to control his actions was significantly impaired; testimony by Stanley Kapuchinski, a consulting psychiatrist to the Connecti-

---

[56] The jury heard evidence that the clinical definition of sexual sadism is that the sufferer experiences, for a period of more than six months, recurrent, intense, sexual fantasies, sexual urges or behaviors involving acts that are real, not simulated, in which the psychological or physical suffering, including humiliation of the victim, is sexually exciting. The fantasies, sexual urges or behaviors must cause clinically significant distress or impairment in social, occupational or other important areas of functioning.

cut department of correction, concerning his treatment of the defendant for sexual sadism; testimony by Robert Goodwin, also a consulting psychiatrist to the Connecticut department of correction, that the defendant suffered from sexual sadism, which significantly impaired his ability to control his actions; a report by Grayson in which he stated that Berlin[57] had diagnosed the defendant as a sexual sadist and that James Merikangas, a physician specializing in neurology and psychiatry, had diagnosed him with brain abnormalities;[58] Miller's report diagnosing the defendant as a sexual sadist and his letter stating that he could not testify that the defendant's psychopathology was not mitigating; and the videotape of interviews given by the defendant to a British journalist in 1994. He also introduced testimony by James O'Brien, a pharmacologist, that Ritalin, a drug used by the defendant when he was a child, can impair development of impulse control.

Grayson testified at length about the defendant's background and history and the progression of his claimed mental impairment. Grayson was retained to evaluate the defendant in 1999. He testified that, during the course of his evaluation, he heard reports from a number of sources, including the defendant, that both of the defendant's parents had physically and emotionally

---

[57] Berlin's report suggested that sexual sadism is "driven by a powerful biological appetite" that can significantly impair the capacity to control one's actions.

[58] Grayson stated in his report that Merikangas' report stated that the defendant "suffers from a biologically based brain disease which has been successfully treated [with medications]. These have resulted in the elimination of the overpowering and irresistible sexual urges which characterize his medical and psychiatric diagnosis of sexual sadism. The episodes which resulted in his imprisonment generally would happen in the context of depression and would consist of an irresistible impulse in the context of a dissociative state . . . . On one occasion, he chased a woman and was seen by at least a dozen witnesses and yet he was unable to conform his conduct to the requirements of law as a consequence of his damaged brain . . . ."

abused him when he was a child. Specifically, Grayson heard that the defendant's father was cold and detached and beat the defendant with a board on a monthly basis. The defendant's mother was described as punitive, detached, angry, cold, manipulative and unpredictable. She spanked her children excessively and unjustifiably and locked them out of the house even during the winter. The defendant told Grayson that, when he was a young child, his mother would administer enemas to him, deprive him of access to the toilet, and then berate him when he soiled himself.[59] She was briefly hospitalized twice for mental illness during the defendant's childhood.

As a young child, the defendant had exhibited several symptoms of emotional turmoil, including bedwetting, sleepwalking, talking in his sleep, recurrent nightmares and trichotillomania, which is the compulsive desire to pull out one's hair. In early adolescence, the defendant was diagnosed with attention deficit disorder for which he was medicated with Ritalin. At that time, the defendant also started to have aggressive sexual fantasies and to engage in compulsive masturbation. At the age of fourteen, he was discovered rubbing his penis against a naked seven year old girl. He also had some form of sexual contact with his seven year old sister, for which he was hit with a board and forced to be his sister's "slave" for a day.

Grayson testified that, while the defendant was at Cornell, he had had a long-term sexual relationship with one woman during his freshman and sophomore years and with a second woman during his junior and senior years. When the second woman told him that she pre-

---

[59] Grayson acknowledged that the defendant had not reported this form of abuse to any of his other psychiatrists. When he asked the defendant why he had not reported it, the defendant explained that he had not recalled the enemas until he was stabbed in prison in 1991 and was required to have a barium enema at the hospital.

viously had been raped, he began to develop violent sexual fantasies. Eventually, he was fantasizing about raping and killing women. At that point, he started to stalk women on the Cornell campus. By the end of his senior year, he had committed the rape of K.G., attempted rape of T.T. and rape-murder of D.N.T. After the murder, the defendant became extremely depressed and contemplated killing himself. Ultimately, he convinced himself that it would not happen again. Over the next three years, however, he assaulted and raped numerous women, eight of whom, including D.N.T., he strangled to death. The defendant was arrested in connection with two of these offenses, one of which had been committed in Illinois and the other in Ohio. He was convicted of unlawful restraint in connection with the Illinois incident and was fined $500 and sentenced to two years probation. He was convicted of assault in connection with the Ohio incident and was fined $1000 and sentenced to six months imprisonment.

Grayson testified that the defendant had told him that the strangulation of the women had been the most sexually gratifying part of the assaults. He also stated that he had obtained sexual gratification from degrading and humiliating the women. Grayson testified that he believed the defendant and that his history and symptoms were consistent with all of the literature on sexual sadism that he had read. He acknowledged that the defendant appeared to be quite intelligent, that he had had fifteen years since his arrest to learn about the symptoms of sexual sadism, and that there were serious inconsistencies between what the defendant had told him and what he had told the police in 1984. He concluded, however, that the defendant's cooperation with the police, his ongoing consensual sexual relationships with a number of women during the period when he was committing the assaults, the lack of any other history of criminal activity, the fact that he had not killed Vivian

S. to avoid detection after raping her,[60] his willingness to undergo a dangerous medical treatment and his responsiveness to that treatment all tended to support the genuineness of the defendant's account of his history and his symptoms.

Grayson testified that he agreed with the portion of Merikangas' report that stated that the medications taken by the defendant had been very effective. He did not feel that he was competent to evaluate Merikangas' opinion that the defendant's compulsive conduct was the consequence of physical biological brain abnormalities. He was concerned, however, that Merikangas' conclusion seemed to be based in part on an uncritical acceptance of everything that the defendant told him.

Kapuchinski testified that he treated the defendant from 1989 through 1994. In 1989, the defendant told him that he was engaging in compulsive masturbation involving fantasies of restraining and killing women and that he wanted to get rid of these obsessive thoughts. Kapuchinski believed that the defendant's prior diagnosis of sexual sadism was appropriate. He told the defendant that his symptoms might be treatable with Depo-Provera, a medication that reduces systemic testosterone and decreases sex drive. He also advised the defendant that the medication could cause any of numerous adverse side effects. At some point in 1989, the defendant started receiving the medication and, according to him, it controlled his fantasies for a time. In January 1990, the defendant told Kapuchinski that he was again having violent fantasies, and the dosage was increased. After receiving the increased dosage, the defendant reported that the violence of the fantasies had abated

---

[60] Vivian S. ultimately was able to identify the defendant as the person who had raped her. The defendant stated to the police at the time of his arrest and confession, however, that he had not killed her because he had grabbed her from behind and he believed that she had not been able to see him.

somewhat, but the fantasies had not stopped. The dosage was increased again in April, 1990. By November, 1991, the defendant reported having no violent sexual fantasies. In 1992, routine tests showed that the defendant had developed an abnormal liver function. The Depo-Provera was discontinued at that time, and the defendant later reported that the violent sexual fantasies had returned. In 1994, the defendant started taking another medication, Depo-Lupron, and he later reported that fantasies had again abated.

Kapuchinski testified that the successful treatment of the defendant with medication confirmed the diagnosis of sexual sadism. He also testified that he believed that the defendant was genuine in his reporting of his symptoms. Finally, he testified that, based on a reasonable medical probability, the defendant's repetitive assaultive behavior was the result of a combination of some congenital biological trait and his upbringing.

Goodwin testified that he had treated the defendant at various times between 1984 and 1987 and between 1990 and 1998. He agreed with the diagnosis of sexual sadism that had been made by other psychiatrists between 1987 and 1990. His agreement was based in part on the defendant's willingness to undertake radical pharmacological treatment that amounted to chemical castration and that had unpleasant and even highly dangerous side effects. Goodwin also testified that the defendant's statements to police that he had killed his victims in order to avoid detection were not inconsistent with his claim that he had killed them to achieve sexual gratification, because he could have killed for both reasons. He testified that, in his experience, people often have difficulty discussing sexual issues. The defendant eventually told Goodwin about his obsessive sexual fantasies, however, which the defendant described as "living with a noisy rambunctious roommate twenty-four hours a day, from whom there was

no escape." Goodwin believed the defendant because of the consistency of his reports to the various psychiatrists and because of his willingness to undertake a dangerous treatment program. Goodwin also believed that there was an impulsive and compulsive aspect to the defendant's assaultive behavior that was progressive and ultimately culminated in apparent indifference to the risk of being caught. In Goodwin's opinion, within a reasonable medical probability, the defendant's sexual sadism significantly impaired his ability to control his actions.

The defendant stated in the videotaped interview with the British journalist that, when he had assaulted his victims, there had been "a gradual building up and then a coming back down" of his inability to control his acts. He did not believe that he was in control during the assaults, or that he could have stopped. His perception of what was occurring was "like watching an old film" that was spliced together and would "jump." He felt that he "wasn't a hundred percent there." It was not until the victims were dead that he fully realized that he had hurt and killed them. The defendant also stated that, when he started taking the Depo-Provera, it "was like a blind man being given eyes." The medication allowed him to get away from "the obnoxious roommate" and become "human again." When he was forced to stop taking the medication because of the abnormal liver function, it was "the toughest year [he] ever had to go through" because he started having thoughts about hurting women again. In particular, he fantasized about hurting a prison nurse who had been kind and helpful to him.

The state relied in part on its cross-examination of the defendant's witnesses to rebut the claimed statutory mitigating factors. Grayson testified on cross-examination that one of the discrepancies between the defendant's account to him of the crimes and his confession

to the police was that he did not tell Grayson that he had become angry and "blew up" at Robyn S. and Wendy B. before attacking them. He acknowledged that a rape committed out of anger was not necessarily sexually sadistic. He also acknowledged that a murder committed to avoid detection would not be consistent with sexual sadism. Grayson indicated that the defendant had told him that he had read articles about sexual sadism that he had received from Berlin. Grayson also acknowledged that a criminal defendant "may well have a very real motive [for it] to appear" that his crimes resulted from a mental disorder.

The state also confronted Grayson with the video-taped interviews of the defendant by Zonana, which Grayson had never seen before. The defendant told Zonana that he had not raped Leslie S. and stated, "That's the one that's going to hang me." The defendant also told Zonana that he "usually had an orgasm fairly quickly, and that was it. Then I strangled them and killed them. I think—I think that helped me work up to get mad too, more, because I wasn't—wasn't satisfied, like, you know, I don't think it really satisfied me. If I want sex, I sure as hell wouldn't go for something like that. I had much better sex at home." Grayson acknowledged that it was possible that the defendant killed the victims out of anger and not for sexual gratification. He also acknowledged that that conclusion was bolstered by the defendant's statement to Zonana that the rape and murder of April B. and Leslie S. had been preceded by "a hell of a fight" with his girlfriend.

The state also asked Grayson about the defendant's description to Zonana of the New York crimes and his statement that he had not told Walter Borden, a psychiatrist, about those crimes immediately because they had preceded his parents' divorce and he had "first blamed everything on the divorce." Grayson acknowledged that nothing in the defendant's description of

those crimes suggested that he had obtained sexual gratification from the act of strangulation. He also acknowledged that the defendant's lack of truthfulness about committing the crimes would justify a raised level of skepticism about his other claims. The state also asked Grayson about the defendant's statement to Zonana that he had not told his psychiatrists or lawyers about the crimes he committed in other states because he did not want to be prosecuted in those states and still hoped "someday, maybe if [he was] really lucky, [to] be out of this slum hole." Grayson acknowledged that that statement showed that the defendant could be manipulative in order to achieve his own ends.

In support of its rebuttal case, the state also presented testimony by Michael Lajoie, an officer with the department of correction, who had had frequent contact with the defendant when he was imprisoned at the Connecticut correctional institution in Somers after he was sentenced to death in the first penalty phase in 1987. The defendant was under "one-to-one" supervision for about one year and his activities were recorded in a log book every fifteen minutes. Lajoie testified that, if the defendant had masturbated during that period, a report would have been made and that he knew of no such reports.

The defendant contends that, in light of this evidence, no reasonable jury could have rejected his claimed statutory mitigating factors. He points out that the state presented no expert testimony to contradict the testimony of his expert psychiatrists that he suffered from sexual sadism and that his ability to control his conduct was significantly impaired.

We repeatedly have held, however, that the state is not required to offer independent evidence to rebut the existence of mitigating factors, but "can weaken the force of the defendant's presentation by cross-examina-

tion and by pointing to inconsistencies in the evidence. . . . Furthermore, the general rule that a [finder of fact] is free either to accept or reject, in whole or in part, the evidence presented by the defendant's witnesses . . . has particular applicability where, as here, the state has vigorously contested the force of that testimony by cross-examination. . . . [T]he credibility of the defendant's expert and lay witnesses, and the weight to be given to their testimony regarding the existence of mitigating factors, [moreover] is a matter committed to the sound judgment and common sense of the trier of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 490–91, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000) (*Cobb II*).

We conclude that, in this case, the evidence in support of the claimed statutory mitigating factors was not so compelling that the jury could not reasonably have rejected it. As the trial court aptly stated, the credibility of the defendant's representations to his psychiatric experts and others was "the crux of the case." There was ample evidence that the defendant had been deceitful and inconsistent in his accounts to the police, his lawyers and his psychiatrists. For example, the defendant originally concealed from the police the fact that he had committed two murders outside the state of Connecticut and, after those murders ultimately were revealed, gave conflicting explanations for his deception; he told the police and Zonana that he had not raped Leslie S. but, after the first penalty phase, told Grayson that he had sodomized her; he told the police that he had killed the victims to avoid detection but, again after the first penalty phase, told Grayson that strangulation was the ultimate sexual gratification for him; he told the police that he "blew up" at certain victims but did not reveal to Grayson that he had been angry with them; and he told his psychiatrists that he

compulsively masturbated but never was seen masturbating by prison personnel. The jury was not required to accept the defendant's explanations for these discrepancies and reasonably could have concluded that he had lied and selectively revealed the truth and that his motive for doing so was self-preservation.

There was also evidence that the defendant had had the motive and opportunity to educate himself about the symptoms of sexual sadism and that, as his accounts of his background and the offenses changed over the course of time, they increasingly reflected those symptoms. Moreover, even if the jury accepted the evidence that the defendant suffered from sexual sadism, it reasonably could have rejected the opinions of his experts that his ability to restrain himself from acting out his sexually sadistic fantasies was significantly impaired. Those opinions were the product of subjective judgment and were based in large part on unverifiable reports by the defendant as to his own state of mind. Accordingly, we reject the defendant's claim that his claimed statutory mitigating factors were established as a matter of law.

We next consider the defendant's claim pertaining to his claimed nonstatutory mitigating factors. Before reviewing the evidence in support of these mitigating factors, we briefly review the applicable law. Under General Statutes (Rev. to 1987) § 53a-46a (d), the sentencer must engage in a two step process to determine whether the defendant has proved a nonstatutory mitigating factor. First, it is asked to "determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence . . . ." General Statutes (Rev. to 1987) § 53a-46a (d). Then, as to any such facts proven, the sentencer "shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of

the case . . . ." General Statutes (Rev. to 1987) § 53a-46a (d). The standard for our review of both steps in this process is the same as for statutory mitigating factors, i.e., whether the proof "was so clear and so compelling that the [sentencer], in the exercise of reasoned judgment, could not have rejected it."[61] (Internal quotation marks omitted.) *State* v. *Breton,* 264 Conn. 327, 369–70, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003) (*Breton III*).

The defendant claimed fourteen nonstatutory mitigating factors. See footnote 7 of this opinion. He called several witnesses to testify as to his productive postincarceration conduct, including his good behavior in prison, his participation in a prison program to help the blind, his publication of numerous articles about sexual sadism and the death penalty, his correspondence with other people about treatment options for sexual sadism, and his willingness to be a subject of study to increase psychiatric knowledge of violent sex offenders. He also called numerous witnesses to testify that he had expressed remorse and concern for the families of his victims, he had attempted to kill himself and seemed to welcome death, and he had attempted to enter a stipulation seeking execution in order to spare the victims' families the pain of a penalty hearing. He also presented evidence in support of his claimed mitigating factors that he had worked hard throughout his life and put himself through college with his earnings, he had cooperated with police, he was serving two consecutive life sentences for the two Windham county murders, and his religious faith had grown while he was in prison.

[61] The defendant argues that we should apply a less deferential standard of review to the fact finder's determination that proved mitigating factors were not mitigating in nature. We recently rejected this same argument in *State* v. *Breton,* 264 Conn. 327, 369–70, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003), and we decline to reconsider it here.

In rebuttal, the state presented, among other evidence, testimony by Robert Bardelli, a detective with the state police, that he had escorted the defendant to court for sentencing on his plea of nolo contendere to the two Windham county murders and that the defendant appeared to be carefree, nonchalant and easygoing. The defendant asked Bardelli if he would shoot him if he tried to run away and, when Bardelli failed to answer, "smirked" at Bardelli and said, "You don't have to worry about it, I'm going to write a book and give it to my father and become a millionaire." The state also entered into evidence a newspaper article authored by the defendant in which he wrote, "Part of the reason I can't forgive myself is that I have never really felt any remorse toward the women I have killed." The defendant also wrote, however, that he recognized the pain suffered by the victims' families. The state presented testimony by Lajoie that the defendant was cunning and manipulative with the prison staff and appeared to enjoy his celebrity status.

After careful review of the record, we are persuaded that the evidence in support of the claimed nonstatutory mitigating factors was not so clear and compelling that the jury could not have rejected it. Even if it is assumed that one or more of the factors were factually proven, the evidence left ample room for the jury to determine that, "considering all the facts and circumstances of the case," any such proven facts did not "extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or . . . otherwise constitute a basis for a sentence less than death." General Statutes (Rev. to 1987) § 53a-46a (d). Accordingly, we reject this claim.

## B

### The Defendant's Claim that There Was Insufficient Evidence in Support of the Aggravating Factor

The defendant next claims that there was insufficient evidence that the capital offenses were committed in an especially cruel, heinous or depraved manner within the meaning of General Statutes (Rev. to 1987) § 53a-46a (h) (4). We disagree.

The defendant makes two arguments in support of this claim. First, he argues that, as a matter of statutory interpretation, § 53a-46a (h) (4) requires the state to prove beyond a reasonable doubt that the defendant intentionally inflicted extreme pain or torture beyond that necessarily accompanying *each of the elements* of each capital offense of which he was convicted and that it failed to do so. Second, he claims that, even if the statute does not require each element of the offense to be accompanied by intentional conduct resulting in extreme pain or torture, the evidence was not sufficient to establish that the murders were committed in an especially cruel, heinous or depraved manner.

With respect to the first claim, we note that the defendant did not submit a request to charge the jury that the state must prove that each component of each capital offense, i.e., both the kidnapping and the murder for the kidnap-murder charges and both the sexual assault and the murder for the sexual assault-murder charges, was committed in an especially cruel, heinous or depraved manner.[62] Nor has he provided any authority

---

[62] The defendant did submit the following request to charge on the aggravating factor: "[T]he state must affirmatively prove beyond a reasonable doubt that the additional conduct took place in the course of committing the murder during the kidnapping of [April B.] and [Leslie S.], as well as additional conduct took place in the course of the kidnapping/sexual assault murders of [Wendy B.] and [Robyn S.]. If the additional conduct was not part of the capital felony transaction, that is the murder and the kidnapping, then this element of the aggravating factor has not been established." We conclude that this language was not sufficient to put the trial court on notice

for the proposition that the state or federal constitution requires such a charge. Accordingly, this claim was not preserved and is not reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[63] Even if the claim were preserved, however, it is meritless. This court's decision in *State* v. *Courchesne*, 262 Conn. 537, 551–59, 816 A.2d 562 (2003), that the state need prove only that one murder in a multiple murder is aggravated, was based in large part on its interpretation of subdivision (5) and what had been subdivision (7) but is now subdivision (6) of § 53a-54b, that the state need prove only that the murder in a kidnap-murder or sexual-assault murder was aggravated in order to establish the aggravating factor.[64] Accordingly, we reject this claim.

that the defendant intended to claim that "[e]ven if the evidence had been sufficient as to the deaths, [the aggravating factor] applies not to the murders, but to the capital offenses."

[63] "Pursuant to *State* v. *Golding*, supra, 213 Conn. 233, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Santiago*, 73 Conn. App. 205, 212 n.10, 807 A.2d 1048 (2002), cert. granted on other grounds, 262 Conn. 939, 815 A.2d 673 (2003).

[64] This court in *Courchesne* specifically reserved the question of whether proof of an aggravated kidnapping or sexual assault followed by an unaggravated murder would satisfy the aggravating factor. *State* v. *Courchesne*, supra, 262 Conn. 554 n.14. Nor do we need to address that question here. A reasonable jury could have understood the trial court's instructions on the aggravating factor to mean only that it must find that each *murder* was cruel, heinous or depraved. For example, the trial court instructed the jury that "a *murder* committed in an especially heinous, cruel or depraved manner which has been proven with regard to the defendant—and this is what the state is going to have to prove—that the defendant inflicted upon each victim extreme physical or psychological pain or torture above and beyond that necessarily accompanying the *death* of that victim, of each victim. . . . The state must prove beyond a reasonable doubt that it was the intentional

We next address the defendant's claim that the evidence presented by the state was not sufficient to prove that he committed the murders in an especially cruel, heinous or depraved manner. "The standard governing our review of sufficiency of evidence claims is well established. We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts . . . impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Francis*, 228 Conn. 118, 127, 635 A.2d 762 (1993). "In a review of the sufficiency of the evidence to support the jury's finding of an aggravating factor under § 53a-46a (h) (4) . . . the focus must be on whether the state has proved, beyond a reasonable doubt, that the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain or torture on each of his victims above and beyond that necessarily accompanying the underlying killing." *Ross II*, supra, 230 Conn. 262. "[B]ecause of the seriousness of any death penalty determination, we will subject a finding of an aggravating factor to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession . . . ." (Citations omitted.) Id., 259.

The jury reasonably could have found the following facts. With respect to the murder of Wendy B., the defendant told police that she had screamed and fought after he grabbed her and that he threatened to hurt her

conduct of [the defendant] that inflicted extreme physical or psychological pain or torture on the victim, on each victim, above and beyond that necessarily accompanying the underlying *killing*." (Emphasis added.)

if she did not stop. She complied with his demand and pleaded with him not to hurt her. He then led her into the woods, raped her and told her to turn over onto her stomach. She continued to struggle as he strangled her to death.

Malchik testified that the defendant had told him that his hands had cramped as he strangled both Wendy B. and Robyn S. and that he had had to reapply his grip.[65] Both victims were "moving and writhing" as he strangled them and the defendant stated that he had found Robyn S. to be "strong." The defendant also had told police that Robyn S. had been "a hundred percent unwilling" to engage in sex but that he had been able to force her because he was "bigger and stronger" and had intimidated her.

With respect to April B. and Leslie S., the defendant stated to the police that he had picked them up while they were hitchhiking. They asked him to drive them to a certain gas station, but when they arrived there, the defendant refused to stop the car. At that point, April B. pulled a steak knife out of her pocket and threatened to stab the defendant if he did not stop. The defendant stated that he yelled at her and nearly drove off the road, at which point she "panicked" and gave him the knife. He then drove to a remote area, parked the car and told both victims to get in the backseat. He tied up Leslie S. with an elastic belt she had been wearing. He then took April B. out of the car. During the incident, April B. was "mouthy" and struggled with the defendant, but Leslie S. urged her "to do exactly everything he wanted [her] to do." He forced April B. to remove her jeans and cut the jeans into strips with the steak knife. He tied her hands and feet with the strips

---

[65] In a videotaped interview with a journalist after the first penalty phase, which was introduced into evidence at the second penalty phase, the defendant denied having told the police that his fingers had cramped during the strangulations or that he had had to reapply his grip.

and then returned to Leslie S. and tied her feet. The jury heard evidence that he then placed Leslie S. in the trunk of the car. At that point, he raped April B. and then strangled her to death. The jury heard evidence that the defendant did not tell Leslie S. that he had killed April B. It also saw a videotape in which the defendant told a journalist that he put April B.'s body in the front seat of the car after killing her. He then took Leslie S. out of the car, placed her on the ground and strangled her.

The jury also heard evidence that the defendant's intention was to degrade, to humiliate and to subjugate his victims when he forced them to disrobe and sexually assaulted them and that he derived satisfaction from the act of strangulation. Grayson reported that the defendant had told him: "If I shot them in the head or stabbed them it would've been out of character with the power and degradation. . . . Also, shooting them would be too quick." The jury also heard evidence that the defendant had acknowledged that all of his victims had suffered and that he had "sadistically brutalized and murdered" them.

We conclude that the jury reasonably could have determined that the cumulative effect of this evidence established beyond a reasonable doubt the existence of an aggravating factor as defined by § 53a-46a (h) (4) for each of the six capital felony counts with which the defendant was charged. As we noted in *Ross II*, supra, 230 Conn. 262–63, "[t]he jury reasonably could have found, for each of the defendant's four victims in the circumstances of these cases, that their manual strangulation by the defendant was an especially cruel way of inflicting death." The jury also could have inferred that the defendant chose that method of killing for that very

reason.[66] The jury also reasonably could have found that, "[i]n the cases of Wendy B. and Robyn S., the defendant's cruelty was exacerbated when their strangulation was prolonged by the cramping of the defendant's hands, which caused him to stop before resuming the strangulation." Id., 263. Although the jury heard evidence at the second penalty phase that the defendant had denied stopping mid-killing and then reapplying his grip, the jury was not required to credit that evidence.

Moreover, from the evidence presented at the second penalty phase hearing, the jury reasonably could have inferred that the defendant sexually assaulted all of the victims, including Leslie S. As we stated in *Ross II*, "the jury reasonably could have inferred that the victims' terror would have been increased by the defendant's sexual assaults upon them." Id. If the jury determined that the defendant had not sexually assaulted Leslie S., it "reasonably could have found that she would have been terrified by sitting in the defendant's car, bound hand and foot, and coming to understand that her best friend April B., was being sexually abused and then killed." Id. Although there was evidence that the defendant had not told Leslie S. that he had killed April B., the jury reasonably could have found that, as she waited, bound hand and foot, in the trunk of the defendant's car and listened to April B.'s struggles and protests, Leslie S. knew the fate of her friend without having been informed of it by the defendant.

Finally, as we did in *Ross II*, we reject the defendant's claims that his conduct was not "especially heinous, cruel or depraved," as a matter of law, "because his

---

[66] The inference that the defendant derived satisfaction from this method of killing would not be inconsistent with the jury's determination that the defendant did not suffer from a significant mental impairment. The fact that the defendant enjoyed the suffering of his victims does not necessarily mean that his ability to refrain from inflicting that suffering was significantly impaired.

conduct did not go beyond that which is necessarily encompassed by the capital felonies of which he was convicted." Id. On the basis of the evidence presented at the second penalty phase, "the jury reasonably could have found an aggravating factor for each of these capital felony counts [with respect to Wendy B. and Robyn S.] because of the proof of an added element from the other [capital] felony count. . . . With respect to April B. [and Leslie S., their] sexual assault by the defendant was likewise an aggravating factor above and beyond the kidnapping and the murder that were elements in the capital felony as charged." (Citation omitted.) Id., 264. Even if the jury determined that the defendant had not sexually assaulted Leslie S., it reasonably could have found that "an aggravating factor of special cruelty was the exacerbated psychological anguish inflicted upon her by her own bondage and her fear for the fate of her best friend." Id. Accordingly, we reject this claim.

## VII

## JURY CHARGE ISSUES

The defendant next challenges certain jury charges given by the trial court. As a preliminary matter, we set forth the standard of review governing each of these claims. "The standard of review for constitutional claims of improper jury instructions is well settled. In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so

that no injustice will result." (Internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 182, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001). We address each of the defendant's claims in turn.

### A

The defendant claims that the trial court's jury charge and the language of the special verdict form submitted to the jury pursuant to § 53a-46a (e) deprived him of his constitutional right to a unanimous jury verdict on the mitigating factors. We disagree.

We first address the state's claim that this issue was not preserved for review. The state argues that the defendant conceded at trial that the verdict form conformed to applicable law and was proper. We conclude that we need not determine whether the claim was preserved because, in light of "heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate"; (internal quotation marks omitted) *State* v. *Daniels*, 207 Conn. 374, 389, 542 A.2d 306 (1988); the claim is reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 233. We also conclude, however, that the claim fails under the third prong of the *Golding* analysis.

This court concluded in *State* v. *Daniels*, supra, 207 Conn. 374, that, in light of the "heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate"; (internal quotation marks omitted) id., 389; "the imposition of the death penalty under § 53a-46a (e) must be premised on two unanimous findings by the trier of fact: that the state has proved beyond a reasonable doubt that an aggravating factor exists and that the defendant has not proved by a preponderance of the evidence that a mitigating factor exists." Id., 394. "Thus, the death penalty cannot be imposed under § 53a-46a (e) unless each

and every juror finds that the defendant failed to prove the existence of each and every mitigating factor by a preponderance of the evidence. . . . If one or more of the jurors believe that the defendant has proven a mitigating factor but the other jurors disagree, a hung jury results." (Citation omitted.) *Breton II,* supra, 235 Conn. 236.

In *Breton II,* the defendant challenged a special verdict form that provided, as one of two alternative answers to the question whether the defendant had proved a mitigating factor, *"No,* we the jury do not unanimously agree that the [d]efendant proved this mitigating factor by a preponderance of the evidence." (Emphasis in original; internal quotation marks omitted.) Id., 237. The defendant argued that the language was ambiguous as to whether the jury must unanimously reject each mitigating factor or whether it must reject each factor if it merely was unable to agree as to whether the defendant had proved it. Id., 238. We agreed that the form could have misled the jury to believe that it could reject a mitigating factor even if one or more jurors had concluded that the factor had been proven and, accordingly, we reversed the verdict. Id., 239. We also stated that a special verdict form using the language, " 'No, we unanimously conclude that the defendant has not proved the existence of a mitigating factor,' " would have sufficed to protect the defendant's right to a unanimous finding. Id., 240 n.31.

The special verdict form in the present case provided as follows for each of the six capital felony counts: "DID THE DEFENDANT MICHAEL B. ROSS PROVE BY A PREPONDERANCE OF THE EVIDENCE ANY MITIGATING FACTOR:

"___ YES. After having considered all of the mitigating factors listed by the defendant and any other suggested by the evidence, we, the jury, unanimously find

that the defendant HAS PROVED by a preponderance of the evidence the existence of a mitigating factor.

* * *

"___ NO. After having considered all the mitigating factors listed by the defendant and any others suggested by the evidence, we, the jury, unanimously find that the defendant HAS NOT PROVED by a preponderance of the evidence the existence of any mitigating factors."

The verdict form provided signature lines for each of the twelve jurors after each finding. Each of the jurors signed the form indicating that they unanimously agreed that the defendant had not proved any mitigating factor for each of the six counts.

Inexplicably, the defendant claims that "[t]he special verdict form in this case is phrased identically to the one at issue in *Breton* [*II*]." To the contrary, the verdict form in this case conforms to the language that this court explicitly *endorsed* in *Breton II*. The defendant has not explained, and we cannot conceive, how this language indicating that the jury *unanimously* had agreed that the defendant had not proved *any* mitigating factor could have misled a reasonable jury to believe that, if any of the jurors found that a mitigating factor had been proven, all of the jurors nevertheless should sign the verdict form. Accordingly, we conclude that the form adequately protected the defendant's right to a unanimous jury verdict. Because we conclude that the special verdict form was not defective, we also reject the defendant's claims that the trial court's instructions to the jury on this issue, which essentially reinforced the language of the special verdict form, "exacerbated" the claimed error.[67]

---

[67] The trial court instructed the jury as follows. "I told you earlier when we discussed aggravating factor, that you had to be unanimous. Regardless of what the verdict is, all twelve of you have to agree. Unanimity under mitigating factors is different. The rule of unanimity concerning mitigation is different. However, for each of the claimed mitigating factors, you must each individually decide whether or not the defendant has proven the mitigat-

The defendant also claims that, under *Mills* v. *Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988), and *McKoy* v. *North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990), the trial court was required to instruct the jury that if it was unable to answer "yes" to the question of whether the defendant had proved a mitigating factor, it did not have to answer "no." See *Mills* v. *Maryland*, supra, 378–79 n.11 (noting that trial court had not instructed jury that if it could not reach unanimity to answer "yes" to question whether defendant had established mitigating factor, it could do something other than answer "no"). The verdict form found defective in *Mills* had the same defect as the verdict form in *Breton II*, however, in that it did not unambiguously indicate that the answer "no" had to be predicated on the unanimous finding of the jury that the defendant had not proved any mitigating factor. Instead, the form improperly raised "the probable inference that 'no' is the opposite of 'yes,' and therefore the appropriate answer to reflect an inability to answer a question in the affirmative." Id., 378. Nothing in *Mills* suggests that, if a verdict form unambiguously provides that, in order to answer "no," the jury must unanimously find that the defendant had not proved any mitigating factor, the court is required to instruct the jury that, if it does not unanimously find that no mitigating factor has been proved, it is not required to answer "no." Indeed, merely to state this proposition is to reveal its absurdity. Confronted with such a verdict form, no reasonable jury could believe that it was *permitted*,

---

ing factor by a preponderance of the evidence.

"If after concluding your deliberations about the existence of mitigating factors, you each determine that the defendant has proven at least one mitigating factor, then you have unanimously determined the existence of mitigation. You are not required to agree on the same mitigating factor, as long as a mitigating factor has been proven. To find that no mitigation exists in this case, you must each, individually, unanimously agree that no mitigating factor exists."

much less *required*, to answer "no" in the absence of a unanimous finding that no mitigating factor had been proved. Therefore, having concluded that the special verdict form in this case unambiguously informed the jury of the requirement for unanimity, we reject this claim.

The defendant also appears to claim that the verdict form and jury instructions were defective because they did not inform the jury what would happen in the event that they were unable to come to a unanimous agreement as to whether a mitigating factor had been proved.[68] In the complete absence of any claim that an instruction on what would happen if the jurors were unable to come to a unanimous agreement was necessary because the jury had been misled on that issue, we disagree with the defendant's claim. A requirement that the jury be instructed on the consequences of a deadlock has no basis either in our statutes or in the constitution. See *Jones* v. *United States*, 527 U.S. 373, 381–82, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999) (rejecting claim that eighth amendment requires that jury in capital sentencing proceeding be instructed in consequences of deadlock). Accordingly, we reject this claim.

### B

The defendant claims that the trial court improperly instructed the jury on the meaning of reasonable doubt in violation of his rights to due process and a jury trial under the federal and state constitutions. Specifically, he challenges the trial court's instruction that reasonable doubt is not "a doubt suggested by ingenuity of

---

[68] In *State* v. *Daniels*, supra, 207 Conn. 394–97, this court concluded that § 53a-46a (e) does not require the trial court in a capital sentencing hearing to impose a life sentence if the jury is unable to agree on the existence of a mitigating factor and that the court has the discretion to declare a mistrial. The defendant urges us to overrule *Daniels*. Because the jury did not deadlock in the present case, we see no need to consider this issue.

counsel . . . . [It] is such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. . . . It is . . . a real doubt, an honest doubt . . . a doubt that is honestly entertained and is reasonable in light of the evidence after a careful comparison and careful examination of all the evidence." The state argues that the defendant's challenges to the trial court's instructions on the burden of proof were not preserved because the defendant failed to object to the instructions at trial. The defendant counters that the claims were preserved by his submission of a request to charge on the issue of burden of proof. We agree with the state.

"It is well settled . . . that a party may preserve for appeal a claim that an instruction . . . was . . . defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given." *State* v. *Ramos*, 261 Conn. 156, 170, 801 A.2d 788 (2002); see also Practice Book § 16-20.[69] "[T]he purpose of the [preservation requirement] is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 170; see also *Henderson* v. *Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977) ("[o]rderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error"). Thus, the essence of the preservation requirement is

[69] Practice Book § 16-20 provides in relevant part: "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. . . ."

that *fair notice* be given to the trial court of the party's view of the governing law and of any disagreement that the party may have had with the charge actually given.

We have recognized that "a request to charge addressed to the subject matter generally, but which omits an instruction on a specific component, [does not preserve] a claim that the trial court's instruction regarding that component was defective." *State* v. *Ramos*, supra, 261 Conn. 170–71. Similarly, we now conclude that a request to charge that provides a party's version of generally applicable law, such as the burden of proof, on which the court is bound to instruct the jury regardless of whether a charge is requested, does not necessarily preserve a claim that the instruction actually given on that issue was defective. The trial court should not be required to choose between adopting a party's presumably self-serving version of the law wholesale and relinquishing any expectation that it will be notified by that party of errors in the charge actually given.

We note that the defendant's request to charge in the present case, together with two supplemental requests to charge filed by him, comprised some seventy-two typewritten pages, several pages of which were single spaced, covering virtually every aspect of the case. It would be unfair, unrealistic and counterproductive to conclude that the filing of such a request to charge absolved the defendant of any obligation to take exception to the charge as given in order to preserve an issue for appeal. Accordingly, we conclude that the request to charge, which addressed the applicable burden of proof generally and which alerted the court to specific language that the defendant would find objectionable, but which did not address the language that he now challenges,[70] was not sufficient to preserve this claim.

---

[70] Indeed, the defendant's request to charge included some of the challenged language.

Nor can the defendant prevail under *State* v. *Golding*, supra, 213 Conn. 233, because he cannot demonstrate that the challenged instructions were constitutionally infirm. See *State* v. *Lemoine*, 256 Conn. 193, 201–202, 770 A.2d 491 (2001) (Rejecting constitutional challenge to instruction that "reasonable doubt is a doubt which is something more than a guess or a surmise. It is not a conjecture or a fanciful doubt." [Internal quotation marks omitted.]); *State* v. *Velasco*, 253 Conn. 210, 249, 751 A.2d 800 (2000) (rejecting constitutional challenge to instruction that reasonable doubt is "a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence" [internal quotation marks omitted]); *State* v. *Griffin*, 253 Conn. 195, 204–205, 749 A.2d 1192 (2000) (rejecting constitutional challenge to instruction that reasonable doubt is "such a doubt, as in serious affairs that concern you, you would heed, that is, such a doubt as would cause reasonable men and women to hesitate to act in matters of importance" [internal quotation marks omitted]); *State* v. *Delvalle*, 250 Conn. 466, 475, 736 A.2d 125 (1999) (rejecting claim that "ingenuity of counsel" language is constitutionally infirm); *State* v. *Davis*, 76 Conn. App. 653, 677, 820 A.2d 1122 (2003) (rejecting constitutional challenge to instruction that jury must engage in "fair comparison and careful examination of the entire evidence"). Accordingly, we reject this claim.

C

The defendant claims that the trial court improperly charged the jury that the defendant was required to prove that his "ability to *control* his conduct to the requirements of the law was significantly impaired," rather than "his ability to *conform* his conduct." (Emphasis added.) See General Statutes (Rev. to 1987) § 53a-46a (g) (2). He argues that the instruction unlawfully added to his burden of proof. The state argues that the claim was not preserved because the defendant

did not take exception to this instruction.[71] He did, however, file a specific request to charge on the issue. Accordingly, we conclude that the claim was preserved. We also conclude, however, that it is meritless.

In support of his claim, the defendant points out that Webster's Third New International Dictionary defines "control" as "to exercise restraining or directing influence over . . . have power over"; and defines "conform" as "to be obedient: comply . . . act in accordance with prevailing standard or custom." Thus, the defendant implicitly claims that, under these definitions, it would have been possible for the jury to find that, at the time of the offense, the defendant's ability to "control," i.e., "to exercise restraining or directing influence over," his conduct within the requirements of the law *was not* impaired even though his ability to "conform," his conduct to the requirements of the law, or "to be obedient [to or] comply" with those requirements, *was* impaired.

Although we recognize that the trial court generally should use the language of § 53a-46a (g) (2) in instructing the jury on the statutory mitigating factor, we cannot conclude that it is reasonably possible that the court's minor misstatement, involving such a tenu-

---

[71] The defendant took exception to the trial court's instruction that the "other crimes" evidence was relevant only to the defendant's claim that he "was suffering from a mental impairment and he could not control his behavior" on the ground that "[o]ur position was that it has to do with not control of behavior but whether he was significantly impaired." This is not the issue that he raises on appeal, however. In any event, to the extent that the defendant claims this instruction, taken in isolation, suggested that the defendant had to prove that he could not control his behavior *at all*, we conclude that any such suggestion was corrected when the trial court instructed the jury that he had to prove that his "ability to control his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to the prosecution." To the extent that the defendant claims that this instruction improperly required the jury to find a causal link between his impairment and the offenses, we address that claim in part VII F of this opinion.

ous semantic distinction, could have misled the jury. This is especially so under the circumstances of this case. The defendant's entire theory of mitigation was that his ability to conform his conduct to the governing law was impaired *because* his ability to control his sadistic impulses was impaired. Indeed, defense counsel stated at closing argument that "the question for [the jury], again on the issue of control, is whether or not [the defendant's] ability to control was significantly impaired. . . . But it's not [that] he absolutely had no control, the question was, was his ability to control significantly impaired?" Accordingly, we reject this claim.

### D

The defendant claims that the trial court improperly used a verdict form that did not indicate for each non-statutory mitigating factor whether the jury had found the factual basis for the mitigating factor proved. He argues that the alleged defect rendered the jury's findings unreviewable. We recently rejected an identical claim in *State* v. *Reynolds*, supra, 264 Conn. 138, and see no reason to reconsider that decision here. Accordingly, we reject this claim.

### E

The defendant claims that the trial court improperly failed to give his requested charge that he would never be released from prison if the jury did not return a verdict of death. In support of this claim, he argues that he had a due process right that the jury be informed that it was not necessary to sentence him to death in order to protect society from him. See *Simmons* v. *South Carolina*, 512 U.S. 154, 169, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994) (defendant has due process right to rebut claim of future dangerousness by informing jury that he will be ineligible for parole). We conclude

that, under the circumstances of the present case, this claim fails.

The following facts and procedural history are relevant to our resolution of this claim. The defendant requested a jury charge that "[c]onsecutive life sentences in the present cases may . . . be imposed consecutively to the 120 years[72] for a total of 480 years.[73] As a consequence of consecutive life sentences, [the defendant] will be incarcerated until he dies in prison." As part of its instructions on the aggravating factor, the trial court instructed the jury that, if it failed to find an aggravating factor, "the defendant will be sentenced to life imprisonment without the possibility of release . . . ." On several other occasions, it instructed the jury that a finding that no aggravating factor had been proved or that a mitigating factor had been proved would result in a sentence of "life imprisonment" on the applicable count or counts. The defendant did not take an exception to these instructions.

During jury deliberations, the jury requested that the court reread its instructions on the aggravating factor. After the instructions were read to the jury by the court clerk, the trial court and the parties realized that the court erroneously had instructed the jury that the defendant would be sentenced to "life, without the possibility of release." Defense counsel argued that the court should not correct the instructions. He stated that "[o]ur position would be do nothing for a couple [of] good reasons. The first reason is it's clear throughout the charge that we're talking about life imprisonment, not life without release. The second reason is we all kind

---

[72] The jury had received evidence that the defendant already had been sentenced to two consecutive life sentences totaling 120 years in connection with his plea of nolo contendere in the Windham murder cases.

[73] At the time that the defendant committed the offenses, "life imprisonment" as used in § 53a-46a (f) meant "a definite sentence of sixty years." General Statutes (Rev. to 1983) § 53a-35b.

of agree, it makes no difference, even [the state's attorney] in the postremand transcripts of 1998 indicated life without the possibility of release in this case . . . . I don't think this verdict is going to turn one way or another based on the wording that was isolated in one paragraph that we all forgot to delete. . . . We all know [the defendant] is never going to go home. We all agree with that. I think we should leave it alone."

We conclude that any claim that the jury could have been misled by the court's instructions to believe that the defendant could be released from prison was waived by the defendant when he implicitly conceded that, although the charge actually given was erroneous, it was at least as favorable to him as the charge that he had requested, and, when he expressly declined to request a corrective instruction. Accordingly, we reject this claim.

F

The defendant claims that the trial court improperly failed to instruct the jury that he was not required to establish a causal nexus between his impaired mental capacity and the commission of the offenses.[74] We reject this claim.

Whether § 53a-46a (g) (2) requires a nexus between the mental impairment and the commission of the offense is a question of statutory interpretation over which our review is plenary. See *State* v. *March*, 265 Conn. 697, 705, 830 A.2d 212 (2003). The defendant

---

[74] The defendant submitted a request that the trial court instruct the jury that "[o]ur law does not require that the defendant prove that the significant mental impairment caused the defendant to commit the offense(s). Our law states only that 'at the time of the offense the defendant's mental capacity was significantly impaired or his ability to conform his conduct to the requirements of the law was significantly impaired.' [See General Statutes (Rev. to 1987) § 53a-46a (g) (2).] The law only requires that the mental impairment co-exist at the time of the offenses, not that the mental impairment caused the defendant to act as he did."

argues that the language of § 53a-46a (g) (2) merely requires the defendant to establish that "at the time of the offense . . . his mental capacity was significantly impaired" and does not require a causal nexus between that impairment and the commission of the offense.[75] The state counters that the language and structure of § 53a-46a (g) indicate that the mitigating factor of subdivision (2) must be tied to the commission of the offense. We agree with the state.

First, we note that all of the other statutory mitigating factors set forth in § 53a-46a (g) are predicated on the defendant's reduced moral culpability for committing the offense.[76] We also note that the deterrent purpose of the death penalty statute would not be advanced by imposing the penalty on defendants who can establish any of these factors. See *Atkins* v. *Virginia*, 536 U.S. 304, 320, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) ("the same cognitive and behavioral impairments that make these defendants less morally culpable . . . also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information"). Thus, the general thrust of the statute as a whole persuades us that the legislature intended to recognize as

---

[75] We understand the defendant's claim to be that the jury should have been instructed that, if it found that the defendant suffered from sexual sadism, then it must find that he had established the mitigating factor, even if it also determined that he was capable of refraining from committing the offenses. Under the circumstances of this case, if the jury determined that the defendant suffered from sexual sadism, it could not reasonably have found that that condition had *no* causal relation to the commission of the offenses. At the least, it would have had to find that the condition "caused" the offenses in the same sense that the desire for wealth "causes" theft, without thereby excusing it.

[76] The mitigating factors enumerated in § 53a-46a (g) are by subdivision: (1) young age; (2) impaired ability to conform conduct to requirements of law; (3) unusual or substantial duress; (4) minor participation in offense; and (5) inability reasonably to foresee that conduct would result in another person's death.

mitigating, per se, only those factors that tend to reduce a defendant's moral culpability for the offense and make it unlikely that the threat of execution would serve as an effective deterrent.[77]

Second, § 53a-46a (g) (2) requires that the impairment to the defendant's mental capacity exist "at the time of the offense" and provides that, under both prongs of the subsection, the defendant's mental state need not be "so impaired . . . as to constitute a defense to pros-

[77] This makes sense in light of the constitutional and jurisprudential context in which § 53a-46a (g) (2) was enacted. As the legislative history of § 53a-46a reflects, our death penalty statute was enacted in 1973; Public Acts 1973, No. 73-137; in response to *Furman* v. *Georgia*, supra, 408 U.S. 239–40. See, e.g., 16 H.R. Proc., Pt. 6, 1973 Sess., p. 2928, remarks of Representative James F. Bingham ("[t]his bill was drafted very carefully to comply with [*Furman*]"). In *Furman*, the United States Supreme Court effectively invalidated death penalty statutes throughout the country, including this state's death penalty statute, on the ground that the death penalty constitutionally "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg* v. *Georgia*, 428 U.S. 153, 188, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). The legislative history of § 53a-46a establishes that the legislature's overriding concern in enacting the statute was to meet this minimum constitutional requirement, i.e., to ensure that the statute provided a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman* v. *Georgia*, supra, 313 (White, J., concurring). In this context, we find it likely that, in establishing the category of death-eligible cases in which the death penalty could not be imposed, the legislature was concerned with identifying the specific factual circumstances under which a reasonable person would find the imposition of the death penalty to be *inherently* unfair or disproportionate, not those that *might* be found to merit mercy in light of the specific circumstances of the case. It is also likely that the legislature understood, as has subsequently been recognized in the case law, that the death penalty is inherently inappropriate only in cases where the defendant's moral culpability for the offense is reduced. Compare *Atkins* v. *Virginia*, supra, 536 U.S. 319 (identifying "diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses" as circumstances that inherently reduce moral culpability and make imposition of death penalty constitutionally suspect) with *Lockett* v. *Ohio*, supra, 438 U.S. 604 (sentencer cannot be precluded from considering, but is not constitutionally required to give effect to, any evidence proffered by defendant as basis for sentence less than death).

ecution . . . ." This strongly suggests that both prongs constitute lesser degrees of the types of mental impairment that must be proved in order to establish a complete defense to the prosecution under General Statutes § 53a-13 (a),[78] i.e., that at the time of the offense, the defendant had a substantial cognitive or volitional disability that had a causal nexus to his commission of the offense. In other words, the phrase "mental capacity" as used in § 53a-46a (g) (2) is not an open-ended term referring to any and all types of mental function, but refers specifically to the defendant's ability, at the time of the offense, to understand the wrongful nature and the consequences of his conduct. Accordingly, we conclude that the legislature's intent in enacting § 53a-46a (g) was to specify the factual circumstances under which a defendant's moral culpability for committing the offense is reduced.[79]

---

[78] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[79] Under current law, the defendant may, of course, present mitigating evidence that does not reduce his moral culpability for the offense. In 1985, the legislature amended the statute to include subsection (d) of the applicable version of the statute, which provides guidance to the fact finder in its determination of whether a nonstatutory mitigating factor exists and defines mitigating factors to be "such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense *or to otherwise constitute a basis for a sentence less than death.*" (Emphasis added.) Public Acts 1985, No. 85-366, § 1 (d), codified at General Statutes (Rev. to 1987) § 53a-46a (d). We previously have recognized that "this statutory language codifies the defendant's constitutional right to consideration of [those] compassionate or mitigating factors stemming from the diverse frailties of humankind. *Caldwell* v. *Mississippi,* [472 U.S. 320, 330, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985)]; *Eddings* v. *Oklahoma,* [455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982)]; *Lockett* v. *Ohio,* supra, 438 U.S. 586." (Internal quotation marks omitted.) *Ross II,* supra, 230 Conn. 284. These "frailties of humankind" are not limited to those that reduce moral culpability for committing the offense. See *Lockett* v. *Ohio,* supra, 604 (sentencer cannot be precluded from considering *any* evidence proffered by defendant as basis

In the present case, the defendant asked the trial court to instruct the jury that it could find: (1) that his mental capacity was significantly impaired because he suffered from sexual sadism; (2) that his sexual sadism did not cause him to commit the offenses; and (3) that the sexual sadism was, nevertheless, mitigating per se. In other words, the defendant wished to inform the jury that it could find that: (1) his predilection for kidnapping, raping and strangling vulnerable young women constituted a significant impairment to his mental capacity; (2) this mental impairment did not significantly affect his ability to understand the wrongfulness of his conduct or to refrain from engaging in it; and (3) the impairment, nevertheless, met the requirements of § 53a-46a (g) (2). Even without the foregoing statutory analysis, it is difficult to see how such a result could be anything but bizarre. We cannot conceive in what *possible* sense such a mental condition could be understood as mitigating. In any event, our conclusion that, in order to establish either prong of the mitigating factor of subdivision (2) of § 53a-46a (g), the defendant must show that his mental impairment had a causal nexus with the offense, thereby reducing his moral culpability, leaves no doubt that this claim is meritless. A significant mental impairment that does not affect the defendant's ability to understand the consequences or wrongfulness of his conduct or to refrain from engaging in it does not have a causal connection to or reduce his moral culpability for it and, therefore, does not meet the statutory requirement. Accordingly, we conclude that the trial court properly refused to give the instruction requested by the defendant.

for sentence less than death); see also *Walton* v. *Arizona*, 497 U.S. 639, 663, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (Scalia, J., concurring) (listing types of mitigating evidence that defendant may present), overruled on other grounds, *Ring* v. *Arizona*, 536 U.S. 584, 597–609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

## G

The defendant claims that the trial court improperly instructed the jury that the state and its people looked to the jury to return death sentences if the facts and law required such a verdict. He argues that the law never requires a verdict of death. We disagree. If the jury found an aggravating factor, in accordance with the instructions of the court, and no mitigating factor, again in accordance with the court's instructions, then the law required it to return a verdict of death, and this state and its people were entitled to that verdict. Accordingly, we reject this claim.

## H

The remaining instructional claims of the defendant are addressed in part VI B of this opinion (claim that trial court improperly failed to instruct jury that each component of offense must be aggravated); part VIII A of this opinion (claim that trial court improperly instructed jury on "facts and circumstances" language of statutory mitigating factors); and part VIII C of this opinion (claim that trial court improperly instructed jury on aggravating factor).

## VIII

### CONSTITUTIONAL CLAIMS

The defendant raises several claims that this state's death penalty statute violates the federal and state constitutions. The standard of review for challenges to the constitutionality of a statute is well established. "[T]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . In choosing between two constructions of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction

that reasonably accords with the legislature's underlying intent. . . . We undertake this search for a constitutionally valid construction when confronted with criminal statutes as well as with civil statutes." (Internal quotation marks omitted.) *Ross II*, supra, 230 Conn. 236. We address each of the defendant's constitutional claims in turn.

### A

The defendant claims that the language of § 53a-46a (d)[80] requiring the sentencer to determine whether a claimed mitigating factor "is mitigating in nature, *considering all the facts and circumstances of the case*"; (emphasis added); violates the constitutional principle that the sentencer may not be precluded from considering any evidence presented by the defendant as the basis for a sentence less than death. See *Lockett* v. *Ohio*, supra, 438 U.S. 604. The defendant's arguments are nearly identical to those made in *State* v. *Rizzo*, 266 Conn. 171, 291, 833 A.2d 363 (2003). In *Rizzo*, we rejected the claim that the "facts and circumstances" language of § 53a-46a (d):[81] "(1) screens out mitigating evidence from the weighing process; (2) allows the jury to refuse to consider constitutionally relevant mitigating evidence in the weighing process; and (3) allows the jury to conclude incorrectly that there must be a nexus between the mitigating evidence and the offense committed by the defendant." Id. We decline to reconsider those arguments here.

The defendant also urges us to reconsider our holdings in *Cobb II*, supra, 251 Conn. 494, that the "facts and

---

[80] See footnote 4 of this opinion.

[81] The version of the death penalty statute that we considered in *Rizzo* was the version enacted in 1995, which provides that the sentencer must determine whether the aggravating factor outweighs the mitigating factor. See Public Acts 1995, No. 95-19, § 1, codified in part at General Statutes § 53a-46a (g). Subsection (d) of the 1995 statute is the same as the provision that applies to the defendant in the present case, however, and, therefore, our constitutional analysis of that subsection in *Rizzo* is controlling here.

circumstances" language does not require the sentencer improperly to weigh the aggravating factors against the mitigating factors, and in *Ross II*, supra, 230 Conn. 282–83, that that language applies retroactively. Because the defendant has provided no new authority or argument in support of these claims, we decline to reconsider our previous decisions.

Finally, the defendant argues that, even if the "facts and circumstances" language of § 53a-46a (d) is facially constitutional, the trial court's charge to the jury in this case, taken as a whole, misled the jury to believe that it must find a nexus between the mitigating factor and the crime and to weigh the aggravating factor against the mitigating factor. Specifically, the defendant challenges the following instructions: "Our law . . . demands that the decision to impose the sentence of death or the sentence of life imprisonment must be based on the unique individual nature of the defendant before you and the facts and circumstances of the offense. . . . [I]f a particular factor has been established by the evidence, then . . . you, the jury, shall determine whether that factor is mitigating in nature, considering all the facts and circumstances of the case . . . . [T]he statute provides a mitigating factor may be considered to the extent that they concern the defendant's character, background, and history, or the nature and circumstances of the crime . . . . The procedures provided by our statute require you, as the jury, to consider and focus upon the circumstances of the crime and the background, history, and character of the defendant before you make your findings with regard to the existence or nonexistence of mitigating factors."

The only possible defect in these instructions that we can perceive is that the trial court referred to the facts and circumstances of the "crime" and the "offense," which words arguably are narrower than the word used in the statute, namely, "case." We do not

believe, however, that the use of that language rendered the instructions unconstitutional in light of the entire context in which the words were used. Specifically, we note that, in addition to providing the foregoing instructions that the jury must consider the defendant's character, background and history, the court instructed the jury that "[g]enerally stated, a mitigating factor is any aspect of the defendant's character, background and history, or of the nature and circumstances of his crime which may serve as a basis for your decision that the appropriate sentence to impose is life imprisonment rather than death. . . . [Y]ou are required by law to consider the information you have to determine whether there are any factors which can serve as a basis for a sentence less than death. If you do not fully consider such information, the particularized and individualized sentence determination that our law requires you to make would not be made and society would have no assurance that a just and proper result had been reached in this case. The requirement that you, as the sentencer . . . not simply disregard any mitigating factor, reflects the fundamental reason for humanity which underlies our law. . . . [T]he circumstances of the crime itself, that is only one category or type of mitigating factor. You must then consider whether there are any mitigating factors in the defendant himself, in his character, in his history, or in his background. Obviously, such factors do not relate to the commission of the offense itself, and in no way serve to excuse the offense or to explain why it happened. Rather, these mitigating factors concern the defendant himself, his character, his history and his background. Any aspect of this defendant's character, background, and history may be found by you, in fairness and mercy, to be a mitigating factor." We conclude that there is no reasonable possibility that the instructions, taken as a whole, could have misled the jury to

believe that it was limited to finding a mitigating factor that had a nexus to the crime or that it could weigh the mitigating factor against the aggravating factor. Accordingly, we reject this claim.

B

The defendant claims that the death penalty is cruel and unusual punishment as applied to him because he suffers from a mental disability. We disagree.

In support of his claim that he suffers from a mental disability, the defendant relies on the same evidence that he relied on in support of his claim that, as a matter of law, he established his claimed mitigating factors that, at the time of the offense, he had (1) a significant impairment to his mental capacity and (2) a significant impairment to his ability to conform his conduct to the requirements of the law.[82] We have already concluded that the jury reasonably could have found that the defendant's mental disorder, if any, did not meet the requirements of § 53a-46a (g) (2). Accordingly, we treat the present claim as alleging that, if the defendant established that he had any mental disability, regardless of

[82] The defendant also relies on testimony by one of his expert witnesses, James Merikangas, a physician who is board certified in neurology and psychiatry, that the defendant had congenital developmental brain abnormalities that were a substantial contributing factor to his sexual sadism and impulse control disorders. In addition, he cites an article from a psychiatric journal in support of the general proposition that disorders such as the defendant's are the result of genetics and physical abnormalities. Merikangas gave the testimony at a pretrial hearing, however, and it was never presented to the jury. Nor was the article referred to by the defendant ever placed into evidence. Instead, the defendant presented the jury with Grayson's secondhand account of Merikangas' written report and Grayson's testimony that, although he did not have the expertise to evaluate Merikangas' physical findings, he was bothered by his uncritical acceptance of everything that the defendant told him. Because Merikangas' testimony and the journal article were not before the jury, we do not consider them here.

whether it met the requirements of § 53a-46a (g) (2),[83] it would be unconstitutional to impose the death penalty against him. We assume for the purposes of addressing this issue that the jury found that the defendant suffered from some degree of mental disorder not warranting a finding of mitigation.

As authority for his legal claim that the imposition of the death penalty on a defendant who suffers from any mental disability violates the constitution, the defendant cites a number of scholarly sources for the general proposition that evolving standards of decency require the abolition of the death penalty. This proposition repeatedly has been rejected as a matter of state and federal constitutional doctrine. See *State* v. *Reynolds*, supra, 264 Conn. 236 (citing cases in which this court has rejected state constitutional claim that death penalty is cruel and unusual punishment). The defendant cites no authority for the specific proposition that either the federal or state constitution bars the death penalty in cases in which, although the defendant suffered from some mental disorder, he had no significant cognitive or volitional impairment that reduced his moral culpability for the crime.[84] Nor does he point to any trend in other jurisdictions toward exempting persons with such mental disorders from the death penalty. Cf. *Atkins* v. *Virginia*, supra, 536 U.S. 313–16 (trend in state jurisdictions of banning death penalty for mentally retarded defendants supported determination that imposition of death penalty on such defendants is unconstitutional).

---

[83] We have determined as a matter of statutory interpretation that § 53a-46a (g) (2) requires the defendant to establish that, at the time of the offense, he had a volitional or cognitive impairment that reduced his moral culpability for the crime. See part VII F of this opinion.

[84] The defendant does point out that our constitution prohibits discrimination against persons with mental disabilities. See Conn. Const., art. I, § 20. He provides no authority, however, for the proposition that a person with a mental disorder that amounts to a controllable desire to engage in conduct that violates established social norms falls within the protected class.

We are not persuaded that either the state or federal constitution requires that any mental disability or disorder, regardless of whether it significantly reduced the defendant's moral culpability for committing the crime, must be treated as mitigating. Such a conclusion would be tantamount to declaring that the death penalty, although theoretically constitutional, could never constitutionally be imposed on any person who commits a capital offense. As the state points out, when a defendant has been convicted of a capital offense and the "especially heinous, cruel or depraved" aggravating factor has been established, it necessarily has been established that the defendant's mental status did not conform to socially accepted norms. "We may go further and say that it is difficult to suppose that there are any persons who commit the kind of vicious crime for which the death penalty is now imposed in this [state] who do not possess one or more of the personality disorders or one or more of the neuroses recognized as mental disorders by the American Psychiatric Association. To hold that each of these conditions must be a mitigating factor when the death penalty is considered would be to undermine the death penalty under the guise of acknowledging that what the American Psychiatric Association finds to be a mental disorder must be treated as a factor that calls for less severe punishment than death. We cannot say that the evolving standards of decency that have characterized interpretation of the eighth amendment require a state to conform its scheme of capital punishment to such a norm." *Harris* v. *Pulley*, 885 F.2d 1354, 1383 (9th Cir. 1989) (en banc). Accordingly, we reject this claim.

## C

The defendant challenges the constitutionality of § 53a-46a (h) (4) on the grounds that the statute: (1) fails to make an adequate distinction between defendants who may be sentenced to death and those who

may not; (2) does not require specific intent to inflict extreme physical or psychological pain; (3) allows imposition of the death penalty if the defendant has inflicted extreme psychological pain; and (4) violates due process and the ex post facto clause as applied retroactively. We address each claim in turn.

In support of his claim that § 53a-46a (h) (4) fails to provide a meaningful distinction between those who have been sentenced to death and those who have not, the defendant merely cites the cases in which we have construed this statute and placed a limiting gloss on it; see *Cobb II*, supra, 251 Conn. 442–46; *Ross II*, supra, 230 Conn. 255–56; *Breton I*, supra, 212 Conn. 265–71; and states conclusorily that the statute leaves the sentencer with the type of open-ended discretion held invalid in *Furman* v. *Georgia*, supra, 408 U.S. 239–40. We decline to revisit our holdings in the cases cited and, accordingly, reject this claim.

We next address the defendant's claim that the aggravating factor of subsection (h) (4) is unconstitutional because it does not require the state to prove that the defendant had the specific intent to inflict extreme physical or psychological pain or torture on his victims.[85] Specifically, he challenges the constitutionality of the gloss placed on the statute by this court in *Ross II*, supra, 230 Conn. 262, that the state must prove that "the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain or torture on each of his victims above and beyond that necessarily accompanying the underlying killing. Evidence of the defendant's callousness or indifference to his

---

[85] The defendant also urges this court to overrule our interpretation of the statute in *Ross II*, supra, 230 Conn. 262, that it does not require the state to prove that the defendant intentionally inflicted extreme physical or psychological pain, but evidence of the defendant's callousness or indifference to his victim's suffering would suffice. We declined in *Cobb II*, supra, 251 Conn. 445, to reconsider this holding, and we see no reason to do so here.

victims' suffering would substantiate such a finding, but it would not suffice without some showing of the infliction of extreme pain, suffering or torture on the victims."

Contrary to the defendant's claim, the United States Supreme Court has held that the imposition of the death penalty is constitutional "when the perpetrator 'relishes the murder, evidencing debasement or perversion,' or 'shows an indifference to the suffering of the victim and evidences a sense of pleasure' in the killing." *Walton* v. *Arizona*, 497 U.S. 639, 655, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), overruled on other grounds, *Ring* v. *Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). Thus, there is no federal constitutional requirement that the defendant have the specific intent to inflict suffering before the death penalty may be imposed. The court's decision in *Walton* also disposes of the defendant's claim that the infliction of psychological pain constitutionally cannot provide the basis for a death sentence. See id., 654 (no constitutional infirmity in trial court's instruction that "crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death"). To the extent that the defendant claims that the statute violates the state constitution for these reasons, he has not adequately briefed those claims and, accordingly, we decline to address them. See *State* v. *Rizzo*, supra, 266 Conn. 290 n.69.

Finally, we address the defendant's claim that the application of the gloss placed on the statute by this court in *Ross II* to him violates due process and the ex post facto clause. We rejected an identical claim in *Cobb II*, supra, 251 Conn. 442, and decline to revisit the issue here. Accordingly, we reject this claim.

D

The defendant claims that the death penalty statute is unconstitutional because it does not require the impo-

sition of a life sentence if one or more jurors, but fewer than all of the jurors, find a mitigating factor. We have already concluded, however, that the verdict form in this case made it clear that none of the jurors found a mitigating factor. Accordingly, there is no need to consider this claim.

E

We repeatedly have rejected claims identical to the defendant's claims that the statute is unconstitutional because: (1) it places the burden of proving the mitigating factor on the defendant; see *Cobb II* supra, 251 Conn. 496–97; *Breton II*, supra, 235 Conn. 217–18; *Ross II*, supra, 230 Conn. 254–55; (2) it embodies a presumption of death and imposes a mandatory death sentence; see *Cobb II*, supra, 496–97; *Breton II*, supra, 217–18; *Ross II*, supra, 241–42 n.24; (3) the sentencer's determination of mitigating factors is standardless and unreviewable; *Breton II*, supra, 218; *Ross II*, supra, 281–84; (4) the statute fails to provide for a sentencer who makes an individualized determination that death is the appropriate punishment; see *Cobb II*, supra, 496–97; *State* v. *Webb*, supra, 238 Conn. 412; *Breton II*, supra, 217–18; *Ross II*, supra, 235–41, 252; and (5) it is unconstitutional per se under the state constitution; see *Cobb II*, supra, 496–97; *Breton II*, supra, 217–18; *Ross II*, supra, 254. The defendant has provided no compelling reason to reconsider these decisions here and, accordingly, we decline to do so.

IX

CUMULATIVE ERROR

The defendant claims that, even if we conclude that none of the claims raised by him constitute reversible error when considered separately, the cumulative effect of the many "near errors" or harmless errors requires reversal. We have not concluded that the trial court

committed many near errors or harmless errors. Accordingly, we reject this claim.

## X

## PROPORTIONALITY REVIEW

"Pursuant to . . . § 53a-46b (a), this court is responsible for reviewing [a]ny sentence of death imposed in accordance with the provisions of [§] 53a-46a . . . . In carrying out this function, the legislature has directed us to affirm the sentence of death unless [we determine] that . . . the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant. General Statutes [Rev. to 1987] § 53a-46b (b) (3). Under § 53a-46b (b) (3), therefore, we must engage in what has come to be known as proportionality review of the defendant's death sentence.[86] [*State* v. *Webb*], supra, 238 Conn. 490–91.

---

[86] "In [*State* v. *Webb*], supra, 238 Conn. 389, we explained that comparative proportionality review can be performed in one of two ways: the frequency method, pursuant to which a reviewing court uses a complicated method of statistical analysis that purports to quantify, with something like mathematical precision, the various factors leading to the imposition, or nonimposition, of the death penalty, and the frequency with which the death penalty is imposed in certain circumstances; id., 511; and the precedent seeking approach, pursuant to which a reviewing court compares the case before it to other cases in which defendants were convicted of the same or similar crimes, by examining the facts of the crimes, the defendants, and the aggravating and mitigating factors involved. Id., 511–12. We concluded in *Webb* . . . that our statute contemplates the precedent seeking method of comparative proportionality review. Id., 513; see also [*State* v. *Cobb*, 234 Conn. 735, 741, 663 A.2d 948 (1995)] (proportionality review does not contemplate detailed statistical analysis of pool of comparable cases). Thereafter, in *Cobb II*, supra, 251 Conn. 506, we reaffirmed our adherence to the precedent seeking approach to comparative proportionality review." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 238 n.213. The defendant in the present case, like the defendant in *Reynolds*, urges us to reconsider, once again, our use of the precedent seeking mode of analysis. "We decline to do so because we are satisfied that that method is the correct one." Id.

The defendant also argues that this court should not merely consider the sufficiency of the evidence supporting the mitigating and aggravating factors

"As we previously have stated, our function in undertaking [proportionality review] is to assure that upon consideration of both the crime and the defendant the aggravating and mitigating circumstances present in one capital case will lead to a result similar to that reached under similar circumstances in another capital case, thus identifying the aberrant sentence and avoiding its ultimate imposition. . . . The search, however, is not for a case involving a rough equivalence of moral blameworthiness; the search is, rather, for a gross disparity between the case on review and other cases within the selected pool of similar cases. . . . Thus, proportionality review requires a comparison of the decision to impose a death sentence, made by the fact finder in the case before us on the basis of the presence or absence of aggravating and mitigating factors, with decisions to impose sentences of death or life imprisonment, made by the fact finders in the other relevant cases on the basis of the presence or absence of aggravating and mitigating factors. That process requires us to determine whether, as compared to those cases, this case is an outlier. . . . *Cobb II*, supra, 251 Conn. 509–10. In other words, because [t]he process of proportionality review requires that we canvass a set of similar cases to determine whether the death penalty in the case before us was, with respect to that set of cases, wantonly or freakishly imposed by the fact finder. [*State v. Webb*], supra, 238 Conn. 516. We will not vacate a death sentence as disproportionate under § 53a-46b (b) (3) unless that sentence is truly aberrational with respect to similar cases. See id., 501.[87]

in this case, but should independently compare that evidence with evidence presented in other cases in order to determine whether capital sentencers have treated such evidence consistently. Otherwise, he argues, arbitrariness in the imposition of the death penalty will be unchecked and no death sentence can ever be held to be disproportionate. This is, in essence, the same argument raised by the defendant and rejected by this court in *Cobb II*, supra, 251 Conn. 504–508. We decline to reconsider that decision here.

[87] "We note that neither the state nor the defendant has the burden of persuasion on the ultimate issue of disproportionality under § 53a-46b (b)

"Our first task, therefore, is to determine the universe of cases from which can be culled the pool of cases deemed to be similar cases for purposes of proportionality review under § 53a-46b (b) (3). Id., 513. In accordance with the statutory mandate of § 53a-46b (a) that we review all sentences of death pursuant to [our] rules, we adopted [what is now] Practice Book § [67-6],[88]

(3). See [State v. Webb], supra, 238 Conn. 508." State v. Reynolds, supra, 264 Conn. 239 n.214.

[88] Practice Book § 67-6 provides: "(a) When a sentence of death has been imposed upon a defendant, following a conviction of a capital felony in violation of General Statutes § 53a-54b and the hearing upon imposition of the death penalty pursuant to General Statutes § 53a-46a, the briefs of the parties shall include a discussion of the issues set forth in General Statutes § 53a-46b (b), to wit, whether (1) the sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating circumstance specified in subsection (h) of § 53a-46a; and (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(b) For the purpose of reviewing the issue of disproportionality pursuant to General Statutes § 53a-46b (b), the briefs of the parties shall contain appendices setting forth the circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted and the characters and records of the defendants involved therein so far as these are ascertainable from the transcripts of those trials and hearings on the imposition of the death penalty or may be judicially noticed. Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed, shall be deemed eligible for consideration as 'similar cases,' unless the court, on application of a party claiming that the resulting pool of eligible cases is inadequate for disproportionality review, shall modify this limitation in a particular case. Any such application shall identify the additional case or cases claimed to be similar and set forth, in addition to the circumstances of the crime and the character and record of the defendant involved, the provisions of the applicable statutes pertaining to the imposition of the death penalty with citations of pertinent decisions interpreting such provisions.

"Any such application shall be filed within thirty days after the delivery date of the transcript ordered by the appellant, or, if no transcript is required or the transcript has been received by the appellant prior to the filing of the appeal, such application shall be filed within thirty days after filing the appeal."

"The text of Practice Book § 67-6, with the exception of some technical alterations, was adopted in 1990, and appeared in Practice Book, 1978–97, § 4066A. Section 4066A effectively was transferred to Practice Book, 1978–

under which we defined the universe as follows: Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed, shall be deemed eligible for consideration as similar cases. . . . We allowed for an expansion of this universe in a given case, however, on application of a party claiming that the resulting pool of eligible cases is inadequate for disproportionality review. . . . Id. In the absence of such a showing, the universe of cases from which we cull the ultimate pool of cases deemed similar cases consists only of capital felony convictions in which there was a penalty phase hearing. . . . Id., 528. We have further refined the universe to include cases currently on appeal and, absent exceptional circumstances wholly undermining the fundamental reliability of the fact-finding process, cases that have been reversed on appeal. . . . [I]n the absence of such exceptional circumstances, a reversed finding regarding an aggravating factor in the case on review will be included in the process of proportionality review. Id. Two exceptional circumstances that require the exclusion of an otherwise eligible case from the universe of cases involve: (1) cases in which the capital felony conviction has been reversed on the basis of insufficient evidence; id., 520 n.83, 522; and (2) cases in which the death sentence has been vacated on the basis of insufficient evidence with respect to the existence of the aggravating factor or factors that served as the basis for the imposition of the death penalty. Id., 520 n.83." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 237–41. In *Breton III*, supra, 264 Conn. 425–26, we concluded that prior reversed convictions

97, § 4064E, in 1996. In 1998, § 4064E was transferred to Practice Book § 67-6." *State* v. *Reynolds*, supra, 264 Conn. 240 n.215.

in the same case that is under review must also be excluded from the universe of cases.[89]

In the present case, we granted the defendant's application to expand the universe of similar cases to

[89] We decline the state's invitation to reconsider our holding in *Breton III* here. Although we recognize the tension between that holding and our holding in *Webb* that reversed sentences may "provide valuable insight to this court in aid of our task of determining whether a particular death sentence is aberrational"; *State* v. *Webb*, supra, 238 Conn. 521; we continue to believe that, in providing for proportionality review, the legislature did not envision that a defendant's death sentence would be compared to his own previously reversed death sentence in order to determine whether the second sentence was an outlier. The fact that the reversed sentence is sufficiently *reliable* to be used for comparison purposes in *other* cases does not establish that it meaningfully can be used for comparison in the same case. Similar things can be meaningfully compared; identical things cannot.

Moreover, we are not persuaded by the state's argument that the second penalty phase was not "the same" as the first penalty phase because different evidence was presented to a different jury. The question is not whether the evidence or the identities of the sentencers were identical, but whether the basic underlying facts are identical. If ten separate juries impose the death sentence on the basis of ten slightly different presentations of evidence pertaining to the same facts, that might suggest that the sentence " 'reflect[s] the conscience of the community' "; id.; but it does not mean that there are ten "similar cases." Finally, we note that the logical extension of the state's argument is that prior reversed death sentences in other cases should also be used for comparison purposes. In other words, because two different sentencers imposed the death penalty on the defendant in *Breton III*, supra, 264 Conn. 425, we should consider that case twice for proportionality purposes. Although the state includes *Breton II* in its list of "similar cases," it does not suggest that we should consider the sentence imposed on the defendant in that case twice, and we do not believe that the legislature had any such intention.

We also take this opportunity to point out that, in this case, the defendant was sentenced at the second penalty phase to six separate death sentences on six capital felony counts and that it would be theoretically possible to compare the conduct underlying each of those sentences to the conduct underlying the others. In light of the identical aggravating factor and mitigating factors claimed in connection with each offense, the extreme similarity of the conduct underlying each offense, and the relatively large pool of other similar cases that we cull from the universe of similar cases, we conclude that such a procedure would provide extremely little, if any, additional insight into the ultimate question before us. That question is whether imposing the death penalty on this defendant, in light of all of the facts and

include: (1) his convictions for the two Windham county murders for which consecutive life sentences were imposed; and (2) cases "in which a capital felony conviction has been obtained and the conviction was followed not by a hearing on the imposition of the death penalty but by an imposition of a sentence other than death, either by virtue of a plea agreement or by virtue of the fact that the state did not seek the death penalty." *State* v. *Ross*, 225 Conn. 559, 561, 624 A.2d 886 (1993) (*Ross I*).[90] The state argues, however, that those cases are no longer included in the universe of cases because the defendant's application was granted before this court had had the opportunity to define the contours of the universe within the context of a case in which we actually performed proportionality review. We disagree. If the state desired this court to vacate the order expanding the universe of cases, it should have filed an application requesting that action in a timely manner so as to allow the defendant an opportunity to respond and this court an opportunity to consider the views of both parties. In the absence of any such application, the order stands.

"We next turn to the question of how to go about culling from the universe of eligible cases the ultimate pool of cases deemed to be similar cases for purposes of proportionality review. Having defined and limited the universe of cases, we must determine which particu-

circumstances of the case, is disproportionate with the sentences meted out to other defendants who have engaged in similar conduct.

[90] In *Ross I*, supra, 225 Conn. 563, we denied the defendant's request to expand the universe of similar cases to include those cases prosecuted in Connecticut after October 1, 1973, in which the state clearly could have, but did not, charge the accused with a capital felony and which resulted in a conviction of not less than manslaughter in the first degree following a plea or trial. The defendant now urges us to reconsider that ruling. For the reasons set forth in our decision in *Ross I*, we decline to do so. See also *State* v. *Reynolds*, supra, 264 Conn. 241–42 n.216 (rejecting defendant's request to reconsider denial of similar request to expand universe of similar cases); *State* v. *Webb*, supra, 238 Conn. 514–18.

lar cases within that universe are similar to th[e] [present] case for purposes of deciding whether the death sentence being reviewed is an outlier. . . . What the ultimate pool of similar cases will consist of in any particular case will have to be developed on a case-by-case basis. . . . [The term] similar cases means, in general, cases in which the underlying capital felonies were based on conduct of other defendants that is substantially similar, in its criminal characteristics, to that of the defendant in the case under review. We ask: in the general transaction that underlies the conviction for capital felony in the case under review, in what kind of criminal conduct, in general, did the defendant engage? We then seek to identify other cases in which the defendants engaged in substantially similar conduct. . . . Thus, in ascertaining the pool of similar cases, we are not limited only to those cases involving the same subsections of the capital felony statute. Rather, we look to the characteristics of the criminal conduct underlying the capital felony conviction to determine whether that conduct is sufficiently similar to the conduct underlying the case under review to provide a fair basis for comparison. . . .

"Finally, we do not differentiate, for purposes of defining the pool of similar cases, between aggravating and mitigating factors, because both may implicate the circumstances of the crime, and both may also implicate the character and record of the defendant. . . . [T]herefore . . . both aggravants and mitigants must be viewed together, analytically, although not as part of the definition of similar cases. Rather, they must both be considered in the process of actually comparing the case before us on review with the predetermined pool of similar cases . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 243–44.

With these principles in mind, we now undertake the task of identifying the ultimate pool of similar cases in the present case. The defendant was found guilty of six counts of capital felony involving kidnap-murder and sexual assault-murder. Although the defendant was not charged with this conduct, the defendant also committed a double murder. Accordingly, we cull from the universe of similar cases those cases involving kidnap-murder, sexual assault-murder and multiple murder, or some combination thereof. Cf. *Breton III*, supra, 264 Conn. 427 (*Breton III* and *Ross II* are similar cases even though defendant in *Ross II*, unlike defendant in *Breton III*, was not charged with multiple homicide). The defendant identifies the following cases involving (1) sexual assault murders or sexual assault and kidnap-murders: *State* v. *Usry*, 205 Conn. 298, 533 A.2d 212 (1987); *State* v. *Ross*, Superior Court, judicial district of Windham, Docket No. CR11-49329-8193; *State* v. *Ross*, Superior Court, judicial district of Windham, Docket No. CR11-49330-8194; *Ross II*, supra, 230 Conn. 183 (four murders that are basis for present appeal); *Cobb II*, supra, 251 Conn. 285; *State* v. *Lapointe*, 237 Conn. 694, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); *State* v. *Hafford*, 252 Conn. 274, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000); *State* v. *King*, 249 Conn. 645, 735 A.2d 267 (1999); *State* v. *Whitworth*, Superior Court, judicial district of New London, Docket No. CR97-0236229; *State* v. *Daniels,* supra, 207 Conn. 374;[91] *State* v. *Paradise*, 213 Conn. 388, 567 A.2d 1221 (1990); (2) kidnap-murders or multiple kidnap-murders: *State* v. *Paradise*, Superior Court, judicial district of Hartford, Docket No. 49836; *State* v. *Rodriguez*, Superior Court, judicial district of Hartford, Docket No.

---

[91] The defendant in *Daniels* was convicted of multiple murder capital felony, not sexual assault-murder. See *State* v. *Daniels*, supra, 207 Conn. 377. Because he sexually assaulted one of the victims, however, *Daniels* is similar to three of the convictions under review in the present case.

CR94-456268; *State* v. *Diaz-Marrero* and *State* v. *Ortiz*, 252 Conn. 533, 747 A.2d 487 (2000);[92] *State* v. *Johnson*, Superior Court, judicial district of Hartford, Docket No. CR99-0170353; (3) cases involving multiple murders;[93] *State* v. *Wood*, 208 Conn. 125, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988); *State* v. *Steiger*, supra, 218 Conn. 349; *State* v. *Roseboro*, 221 Conn. 430, 604 A.2d 1286 (1992).[94] The defendant also claims that *State* v. *Hoyesen*, Superior Court, judicial district of Ansonia-Milford, Docket No. CR5-66239, is a similar case because the defendant in that case claimed a mitigating factor identical to one claimed by the defendant here.

---

[92] The defendant argues that *Ortiz* and *Diaz-Marrero* should be treated as two cases because there were two victims. See *State* v. *Webb*, supra, 238 Conn. 539 n.93 (treating *Ross* cases as four cases for purposes of proportionality review because there were four victims). We agree. Because the defendants in *Ortiz* and *Diaz-Marrero* each were convicted of two counts of kidnap-murder, each case should be treated as two separate cases.

[93] The defendant argues that *Steiger* and *Wood* are similar cases because the defendants in each case presented evidence of the statutory mitigating factor that he suffered from a significant mental impairment. As we discuss later in this opinion, that is not a valid basis for finding a case to be similar. We conclude, however, that the cases are similar in that they involve multiple murders.

[94] We note that the defendant appears to assume that other cases are similar to this case only to the extent that those cases involve conduct for which the defendant was charged in this case. In other words, he believes, for example, that other cases involving sexual assault-murders are similar only to his convictions for the sexual assault-murders of Wendy B. and Robyn S., not to his convictions for the kidnap-murder of April B., even though he sexually assaulted her. Similarly, he appears to believe that cases involving multiple murders are not similar to the double murder of Leslie S. and April B. We disagree. Although the charges against the defendant for the sexual assault-murder of April B. and the double murder of Leslie S. and April B. were dismissed for lack of territorial jurisdiction, evidence of the conduct underlying those charges was before the jury and could have been considered as part of the "facts and circumstances of the case" in determining whether there was a mitigating factor. We conclude that the effect of similar conduct on the determination of sentencers in other cases is relevant to our review.

The state does not object to the inclusion of any of these cases[95] and proposes adding the following cases involving (1) multiple murders: *State* v. *Griffin*, supra, 251 Conn. 671; *Breton II*, supra, 235 Conn. 206; *State* v. *Day*, 233 Conn. 813, 661 A.2d 539 (1995); and (2) victims under the age of sixteen: *State* v. *Peeler*, Superior Court, judicial district of Fairfield, Docket No. CR 99-148396; *State* v. *Colon*, Superior Court, judicial district of Waterbury, Docket No. CR 98-270986; *State* v. *West*, Superior Court, judicial district of Hartford, Docket No. CR 98-109471; *State* v. *Rizzo*, Superior Court, judicial district of Waterbury, Docket No. CR 97-262883.

We exclude from the ultimate pool the sentences from which the defendant appeals in the present case because we have concluded that the comparison of each of those sentences to each of the other sentences would provide little or no insight into whether the imposition of the death sentence on the defendant is disproportionate. See footnote 89 of this opinion. Moreover, to the extent that the state suggests that we should compare the defendant's current sentences to his previously reversed sentences, we have concluded that previously reversed sentences in the same case are not "similar cases" for purposes of proportionality review. See id. We exclude *Hoyesen* because the only similarity claimed by the defendant is that the defendants in those

---

[95] The state concedes that *Usry* and *Daniels* are in the universe of similar cases, but suggests that this court should be reluctant to include them in the ultimate pool because life sentences were imposed in those cases only because the sentencer in each case was deadlocked on the mitigating factor. Whether a life sentence may be imposed when the sentencer is deadlocked or, instead, a mistrial must be declared is one of the issues in the state's appeal in *Peeler* that is currently pending before this court. The fact that the jury was deadlocked on the mitigating factor in those cases provides some insight into the conscience of the community, however, regardless of whether a life sentence should be imposed or a mistrial declared. Accordingly, we decline to exclude them from the pool of similar cases.

cases claimed a mitigating factor that he also claimed. As we have noted, aggravating and mitigating factors are not part of the definition of "similar cases." *State* v. *Webb,* supra, 238 Conn. 525. We exclude *Peeler, Colon* and *West,* because the state has not provided an appendix setting forth "the circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted and the characters and records of the defendants involved therein so far as these are ascertainable from the transcripts of those trials and hearings on the imposition of the death penalty or may be judicially noticed," as required by Practice Book § 67-6 (b), and the facts and circumstances of these cases have not previously been subject to review by this court. Finally, we exclude *Rizzo* because murder of a person under the age of sixteen was not a capital felony at the time that the defendant murdered Leslie S. and April B. Accordingly, the ultimate pool of similar cases is *Usry, Ross* (Superior Court Docket No. CR11-49329-8193), *Ross* (Superior Court, Docket No. CR11-49330-8194), *Cobb, Lapointe, Hafford, King, Whitworth, Daniels, Webb, Paradise, Rodriguez, Diaz-Marrero* (treated as two cases), *Ortiz* (treated as two cases), *Johnson, Steiger, Roseboro, Wood, Griffin, Breton* and *Day.*

With respect to the similar cases involving sexual assault-murder or sexual assault-kidnap-murder, we restrict our consideration of those cases to a comparison with the defendant's convictions for the murders of Wendy B., Robyn S. and April B. With respect to the similar cases involving only multiple murder, we restrict our consideration of those cases to a comparison with the defendant's convictions for the murders of Leslie S. and April B.

We first consider the facts and circumstances of each of the similar cases involving kidnap-murder, namely, *Paradise, Rodriguez, Diaz-Marrero, Ortiz* and *John-*

*son.* In *State* v. *Paradise*, supra, 213 Conn. 388, the defendant, along with two other men, Brian Ellis and David Worthington, abducted the victim, who allegedly owed the defendant $6000 to $7000 from a drug deal, and drove him to a secluded area in Enfield. There, the defendant, the victim and Worthington got out of the vehicle. Worthington punched the victim, who fell to the ground, and kicked him. As the victim tried to get to his feet, the defendant stabbed him. The defendant then forced both Worthington and Ellis to stab the victim, who died as a result of the stabbing. Id., 391–92. More than seven years later, the defendant was arrested and charged with capital felony in violation of § 53a-54b (5), the kidnap-murder statute. He waived a preliminary hearing to determine probable cause in exchange for the state's agreement not to seek the death penalty. Id., 390. After a jury trial, he was convicted of capital felony. Id., 391.

In *State* v. *Rodriguez*, supra, Superior Court, Docket No. CR 94-456268, the defendant pleaded guilty to one count of kidnap-murder in violation of § 53a-54b (5). On the morning of February 21, 1994, the victim reported to work at the University Club in Hartford. Later that day, police received a report that she had not been seen since her arrival at work. A search was initiated and at about 8 p.m. her naked body was found in an attic space in the club. The cause of death was blunt trauma to the head and strangulation. The defendant, who was an employee at the club, became a suspect after he failed a polygraph test.

The state indicated at the sentencing hearing that it was willing to forgo seeking the death penalty on the capital felony charge because the evidence supporting the kidnapping and the evidence of sexual assault, with which the defendant had not been charged, was circumstantial, as was the evidence pertaining to the aggravating factor. In addition, the trial court had made several

trial rulings adverse to the state. Accordingly, the defendant was sentenced to life imprisonment without the possibility of release.

The *Ortiz* and *Diaz-Marrero* cases were tried in a consolidated proceeding and each defendant was convicted of, inter alia, one count of capital felony based on multiple murder in violation of § 53a-54b (8), now (7), and two counts of capital felony based on kidnap-murder in violation of § 53a-54b (5). See *State* v. *Ortiz*, supra, 252 Conn. 536. On July 27, 1994, Julio Diaz-Marrero forced the victims, Hector Alvarado and Alvarado's wife, Migdalia Bermudez, at gunpoint into a van driven by Angel Luis Ortiz. Id., 539–40. Ortiz then drove to the apartment building where Alvarado lived. Diaz-Marrero ordered Alvarado to accompany him into the building and, when they emerged a short time later, Diaz-Marrero was carrying a paper bag. Ortiz then drove to another location where Diaz-Marrero ordered the victims out of the van. Id., 540. Several shots were then fired. Diaz-Marrero returned to the van alone and ordered Ortiz to "get out of here." Id. Alavardo died instantly from a gunshot wound to the head. Bermudez suffered severe gunshot wounds to her back, hips and buttocks and died approximately five hours later. Id., 538.

At the penalty phase hearing, the state sought to prove as an aggravating factor that Bermudez' murder had been committed in an especially heinous, cruel and depraved manner within the meaning of § 53a-46a (i) (4), formerly (h) (4). In mitigation, Diaz-Marrero presented evidence that his mother had been sixteen years old when she became pregnant with him and that she never married his father; that his mother had moved to New York and left him in Puerto Rico in the care of his grandmother for an extended period of time; that he had been shuffled between the care of his mother, father and grandmothers throughout his childhood; and that his mother's common-law husband did not like him

and would hit him. Ortiz presented evidence that he was a good husband and father, a good worker and a good provider, that he had no criminal record, that he and Alvarado were friends and that he was married to Alvarado's sister. Toward the end of the hearing, Ortiz also sought to introduce evidence that Diaz-Marrero was a contract killer. As a result, the court bifurcated the cases and continued Ortiz' hearing until a verdict was rendered in Diaz-Marrero's case. In Diaz-Marrero's case, the jury found an aggravating factor and deadlocked on the existence of a mitigating factor. Shortly thereafter, the state indicated that it would not continue to seek the death penalty in Ortiz' case. The court dismissed both penalty hearings and, in each case, imposed an effective sentence of life imprisonment without the possibility of release.

In *State* v. *Johnson,* supra, Superior Court, Docket No. CR99-0170353, the defendant pleaded guilty to one count of kidnap-murder in violation of § 53a-54b (5). On October 15, 1999, the defendant and his codefendant schemed to hijack a car from the parking lot of a bar located in East Hartford. They watched as the victim drove his car into the parking lot, went into the bar and then emerged a short time later. The defendant forced the victim at gunpoint to relinquish his car keys and to get into the backseat of his car. The codefendant got into the backseat with the victim. The defendant then drove the car to an automatic teller machine where he forced the victim to reveal his personal identification number and withdrew money from the victim's bank account. As the victim pleaded to be released, the defendant drove the car to an entrance ramp to Interstate 84. The defendant forced the victim to get out of the car and shot him. The state declined to seek the death penalty against the defendant because the victim's family had indicated that it had no desire to see it imposed and because it believed that, under the circumstances

of the case, the jury might find the fact that the defendant was eighteen years old at the time of the crime to be a mitigating factor. The defendant was sentenced to life in prison without the possibility of release.

We now compare these sentences to the defendant's sentences. We conclude that there exists a meaningful difference between each of these cases and each of the sentences under review in this case. Specifically, in *Paradise*, the defendant was not arrested until more than seven years after the crime had been committed and the state agreed not to seek the death penalty in exchange for the defendant's waiver of a probable cause hearing; in *Rodriguez*, the state declined to seek the death penalty because it was concerned about the strength of the evidence supporting the elements that differentiate murder from a capital felony and the evidence supporting the aggravating factor; in *Ortiz* and *Diaz-Marrero*, each of which is treated as two cases, the defendants introduced mitigating evidence that was not introduced in this case and, after the jury deadlocked in *Diaz-Marrero* and the state indicated that it would no longer pursue the death penalty against Ortiz, the trial court dismissed the sentencing proceeding against both of them; and in *Johnson*, the state declined to seek the death penalty in part because it believed that there was a strong possibility that the jury would find the defendant's young age to be a mitigating factor. We conclude that the differences between each of these cases and each of the sentences under review in this case meaningfully account for the difference in result.

We next consider the facts and circumstances of each of the similar cases involving sexual assault-murder or sexual assault-kidnap-murder, namely, *Usry*, the two *Ross* cases, *Cobb, Lapointe, Hafford, King, Whitworth, Daniels* and *Webb*. As we have noted, we restrict our consideration of these cases to a comparison with the defendant's convictions for the murders of Wendy B.,

Robyn S. and April B. "In the case of *State* v. *Usry*, supra, [205 Conn. 299–300], the defendant was convicted of the capital felony of murder in the course of a sexual assault in the first degree in violation of § 53a-54b (7) [now (6)]. The defendant, who had just reached the age of eighteen at the time of the crime, climbed into the victim's first floor apartment through a window. He forcibly sexually assaulted the victim, put sugar around her vaginal area, and killed her by repeated blows to the head with a brick. The victim survived for approximately ten to twenty minutes after first being disabled by a blow to the head. One of the blows, namely, to her nose, was extremely painful. She may have remained conscious until the last blow.

"The state claimed that the offense had been committed in an especially heinous, cruel or depraved manner. The defendant claimed the following nine mitigating factors: (1) his mental capacity was significantly impaired at the time of the offense; (2) he was emotionally disturbed; (3) he was of youthful age at the time of the offense because it was committed only five weeks after his eighteenth birthday, and § 53a-46a (g) (1) precludes the death penalty for a defendant who was under the age of eighteen at the time of the offense; (4) his mental or emotional development was below his chronological age at the time of the offense; (5) he suffered from an emotionally deprived early childhood; (6) he was the product of a pathological family unit; (7) he did not obtain help for his psychological problems because he was the victim of parental neglect; (8) he suffered from a mental disease or defect, namely, paranoid personality disorder, schizoid personality disorder; and (9) any other mitigating factors suggested by the evidence.

"The jury found that the defendant had committed the crime in an especially heinous, cruel or depraved manner. With respect to mitigating factors, the jury

could not reach a unanimous verdict and, pursuant to the court's instruction, indicated that five jurors found a mitigating factor proven and seven jurors found no mitigating factor proven. The trial court imposed a sentence of life imprisonment without the possibility of release." *State* v. *Webb*, supra, 238 Conn. 547–48.

In *State* v. *Ross*, supra, Superior Court, Docket No. CR11-49329-8193, the defendant abducted the victim as she walked along Route 6 in Brooklyn. He dragged her to his car and then drove to a location a short distance away, where he raped her. He then led her into a nearby wood, forced her to lie face down on the ground, sat on her back and strangled her to death. The defendant entered into a plea agreement with the state whereby he pleaded nolo contendere to the crime in exchange for a sentence of sixty years imprisonment.

In *State* v. *Ross*, supra, Superior Court, Docket No. CR 11-49330-8194, the defendant struck up a conversation with the victim as she sat on the steps of a band shell in Davis Park in Danielson. Eventually, he offered her a ride to her home in Jewett City. Instead of driving her home, however, he took her to a cornfield in Canterbury where he raped her and strangled her to death. The defendant entered into a plea agreement with the state whereby he pleaded nolo contendere to the crime in exchange for a sentence of sixty years imprisonment.

In both of the Windham county murder cases, the state declined to seek the death penalty because it believed that, under the corpus delicti rule,[96] it would be unable, because of the skeletal conditions of the victims' bodies, to establish the sexual assault element

---

[96] The rule states that "a *naked* extrajudicial confession of guilt by one accused of crime is not sufficient to sustain a conviction when unsupported by *any* corroborative evidence. . . . The confession cannot stand alone but must be accompanied by sufficient evidence of the corpus delicti." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Arnold*, 201 Conn. 276, 286, 514 A.2d 330 (1986).

of the capital offense which was necessary to introduce the defendant's confession into evidence.

"In the case of [*Cobb II*, supra, 251 Conn. 285], the defendant was convicted of two capital felonies: (1) murder in the course of a sexual assault in the first degree in violation of § 53a-54b (7) [now (6)]; and (2) murder of a kidnapped person in the course of a kidnapping in violation of § 53a-54b (5) . . . both involving the same victim and the same transaction. The defendant abducted the female victim from a shopping mall parking lot. He forced the victim to drive her car to an isolated area near a dam, where he sexually assaulted her. He then placed a leather glove in her mouth, bound her hands, feet and mouth with tape, and threw her from the top of the dam onto an ice-covered concrete apron that was approximately twenty feet below. The fall injured, but did not kill, the victim. When the defendant realized that the victim had survived, he went to the bottom of the dam and caused her to die by asphyxiation. The defendant later returned to the scene in order to make sure that the victim was dead. With respect to aggravating factors, a three judge panel found that the murder had been committed in an especially heinous and cruel manner. With respect to mitigating factors, the panel also found that the defendant had not proven: (1) that his mental capacity was significantly impaired; (2) that his ability to conform his conduct to the requirements of law was significantly impaired; and (3) with respect to his list of mitigants, 'any factor that can be considered as mitigating.' Accordingly, the panel imposed the death penalty." (Citation omitted.) *State* v. *Webb*, supra, 238 Conn. 542-43.

"In the case of *State* v. *Lapointe*, supra, [237 Conn. 694] the defendant was convicted of the capital felony of murder committed in the course of a sexual assault in the first degree in violation of § 53a-54b (7) [now (6)]. He sexually assaulted his wife's grandmother in

her apartment. When the victim told the defendant that she would tell his wife what he had done, he stabbed her repeatedly in the stomach and back. He then attempted to strangle her, and he set fire to the sofa on which she was lying. Although the victim had been grievously injured by the stabbing and the fire, she died of smoke inhalation. With respect to aggravating factors, the jury found that the defendant had committed the offense in such a way as knowingly to create a grave risk of death to a person other than the victim. The jury found that the state had not proved that the offense had been committed in an especially heinous or depraved manner. The jury reached no verdict concerning whether the crime had been committed in an especially cruel manner.

"The defendant claimed the following fifteen mitigating factors: (1) at the time of the offense, his mental capacity was significantly impaired; (2) at the time of the offense, his mental capacity was impaired such that his innate ability to perform and achieve was compromised by his psychological and intellectual deficiencies; (3) in his youth and adolescence, he suffered from a congenital cranial deformity known as Dandy-Walker syndrome, resulting in hydrocephalus and requiring five cranial operations that left him with permanent injury to the frontal lobe and right side of his brain; (4) in his youth and adolescence, he had been bullied and taunted by his peers, which adversely affected his education and his emotional, psychological and social development; (5) despite his significant intellectual and vocational deficiencies, his formal education had been terminated with the acquiescence and encouragement of his school system; (6) despite his deficiencies, he had a history of steady and reliable employment and positive accomplishments, and worked hard to improve his and his family's socioeconomic situation; (7) he was married, was a loving father to his son, and worked

regularly to provide for his family; (8) he demonstrated appropriate parental concern for the secular and religious education of his son; (9) he is a person with religious beliefs, who believes in God and participates in the Catholic religion; (10) before his marriage in 1978, he had volunteered his time and services for the benefit of a neighborhood center for the blind; (11) he was a well adjusted and adaptable prisoner who should present few, if any, prison discipline problems; (12) he had no prior criminal history, except for a minor incident when he was twenty-one years old; (13) mercy, and concern for his unique life; (14) any other factor concerning his character, background or history, or the nature or circumstances of the crime; and (15) life imprisonment without the possibility of release is the appropriate sentence in the case. The jury found that the defendant had proven a mitigating factor. The jury was not required to, and did not, specify which mitigating factor or factors it found proven. Accordingly, a sentence of life imprisonment without the possibility of release was imposed." *State* v. *Webb*, supra, 238 Conn. 543–44.

"In *State* v. *Hafford*, supra, 252 Conn. 274, the defendant was convicted of capital felony in connection with a murder committed in the course of a sexual assault. Id., 276, 281. The murder and sexual assault occurred during the course of a gas station robbery. Id., 280–81. The defendant, Christopher Hafford, compelled the gas station attendant to hand over the cash from the cash register and, after she complied, Hafford forced her into a back room, where he sexually assaulted her and then killed her with a knife and a shovel. Id. At the conclusion of the penalty phase hearing, the three judge panel found the existence of an aggravating factor, namely, that Hafford had committed the murder in an especially cruel manner. Id., 277–79 and n.3. The panel also found, as a nonstatutory mitigating factor, that, at

the time of the offenses, [Hafford's] mental capacity was impaired and that Hafford's ability to conform his conduct to the requirements of the law [also] was impaired . . . . Id., 279–80 n.4. The panel further found that Hafford gave both oral and written statements to the police shortly after his arrest, fully admitting his guilt. He was remorseful, cooperative, and regretful. . . . Id. The panel thereupon concluded that these factors, when considered in combination with the other mitigating factors found, in fairness and in mercy, constitutes [sic] a mitigating factor. . . . Id. The panel therefore imposed a sentence of life imprisonment without the possibility of release. Id., 279–80." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 246–47.

In *State* v. *King*, supra, 249 Conn. 645, the defendant was convicted of one count of capital felony for kidnap-murder in violation of § 53a-54b (5) and one count of capital felony for sexual-assault murder in violation of § 53a-54b (7), now (6). "[T]he defendant broke into a neighbor's home in the middle of the night, where the fifteen year old female victim was baby-sitting for her two and one-half year old sister. The defendant sexually assaulted, beat, strangled and stabbed the victim, causing her extreme physical pain and terror. The victim was found after 4 a.m., lying face down on the bed, bound with duct tape on her mouth, still alive but unresponsive and bleeding from various wounds. Id., 654. She died several hours later while undergoing surgery for the wounds that the defendant had inflicted on her. Id.

"The state claimed that the crime was committed in an especially heinous, cruel and depraved manner. The defendant claimed fourteen mitigating factors, including the two statutory mitigating factors of significant impairment of his mental capacity and significant impairment of his ability to conform his conduct to the

requirements of the law. His twelve claimed nonstatutory mitigants were: (1) a lesser degree of impairment of mental capacity; (2) a lesser degree of impairment of his ability to conform his conduct to the requirements of the law; (3) his age of twenty years at the time of the offense; (4) his mother's abandonment, emotional neglect and failure to protect him from emotional, sexual and physical abuse adversely affected his childhood development; (5) his moral, psychological, social and educational development was impaired by his early childhood environment; (6) his ability to pursue education and develop friendships was impaired by numerous changes in residence and schools while growing up; (7) at age eight and one-half years, he left his home with his mother's acquiescence to live with another person, in order to escape abuse and neglect at home; (8) his family wants to maintain personal relationships with him and will support him during incarceration; (9) he has done positive things in his life; (10) life imprisonment is the appropriate sentence for him; (11) the catch-all factor; and (12) any or all of the first thirteen factors, in fairness or in mercy, provides a reason for a sentence of less than death.

"The jury returned a special verdict finding that the state had proven the aggravating factor alleged, and that the defendant had proven the existence of a mitigating factor, which the jury did not identify. Accordingly, the defendant was sentenced to life imprisonment without the possibility of release. Id., 650–51." *Cobb II*, supra, 251 Conn. 514–15.

In *State* v. *Whitworth*, supra, Superior Court, Docket No. CR97-0236229, the defendant saw the sixteen year old victim in a telephone booth outside the Dolphin Mart in Groton at about 2:30 a.m. on December 28, 1996. The defendant offered to take the victim to Dunkin Donuts and, when she accepted, drove her to the parking lot located between Dunkin Donuts and the Best

Western Hotel in Groton. He then forced the victim into the bushes behind the parking lot, disrobed her and sexually assaulted her. Fearing that she would report the assault, he retrieved some twine from his car and attempted to strangle her with it. When she managed to remove the twine from her neck, he punched her, knocked her to the ground and struck her in the head multiple times with a large rock, thereby killing her. He then went home. Later, he returned to the body, put it in the back of his car, and moved it to another location where he disposed of it.

The defendant pleaded guilty to capital felony for sexual assault-murder. The state declined to seek the death penalty, citing the facts that the defendant was twenty-five years old at the time of the crime, was married, was the father of a young child, came from a close and loving family, was a very good father, had had a successful naval career, pleaded guilty without seeking a deal, was remorseful and did not attempt to assert any spurious or speculative defenses. In addition, the state noted that it had no reason to believe that the defendant had ever committed a similar offense. The defendant was sentenced to life in prison without the possibility of parole.

"In *State* v. *Daniels*, supra, 207 Conn. 376–78, the defendant was convicted of multiple murder capital felony in violation of § 53a-54b (8) [now (7)], murder in violation of § 53a-54a and sexual assault in the first degree in violation of General Statutes § 53a-71. Late at night, the defendant entered the home of his girlfriend, where he attacked his girlfriend's roommate and the roommate's three year old child. The defendant stabbed the roommate multiple times in the chest. He then proceeded to strangle the child and slit the child's throat. Then, upon hearing the roommate making gurgling noises, he sexually assaulted her and stabbed her again. Id., 378–79.

"At the penalty phase hearing, the jury found that the state had proved the existence of an aggravating factor, that the defendant had committed the murders in an especially heinous, cruel or depraved manner. In mitigation, the defendant 'presented evidence of his deprived home life and mental impairment. According to the defendant's mother, the defendant had grown up in a family atmosphere marked by violence and tragedy. She testified that during his childhood, the defendant had suffered numerous head injuries, had been beaten regularly by his father, who had often been drunk, and had witnessed numerous acts of violence perpetrated by his father on his mother. According to Charles Opsahl, a psychologist, the defendant's childhood difficulties were reflected in current test results that showed his strong depression and his heightened sensitivity to rejection by others. The defendant also presented the testimony of James Merikangus, a psychiatrist, who concluded, after an examination of the defendant, that he suffered from organic brain dysfunction. In addition, the defendant introduced evidence that he had been drinking excessively on the night of the murders and that he had a tendency to get out of control when drinking. On rebuttal, the state called another psychiatrist, Robert Miller, who disagreed with Merikangus' conclusions and diagnosed the defendant as having a mixed personality disorder with antisocial and explosive tendencies.' Id., 379–81. The jury could not agree on the existence of a mitigating factor, and the court sentenced the defendant to a term of life imprisonment. Id., 380." *Breton III*, supra, 264 Conn. 435–36.

"In [*State* v. *Webb*, supra, 238 Conn. 389], the defendant, after kidnapping the victim at gunpoint, drove her nearly four miles to a public golf course, where he forcibly attempted to assault her sexually. When she broke free, he shot her twice in the back and, after she had crawled thirty-three yards away, coughing blood

and in excruciating pain, he stood in front of the conscious and prostate victim. He then shot her in the chest, in the ear, and point blank in the face, with bullets specially enhanced for potency to do damage. [Id.,] 540–41.

"The state claimed two aggravating factors: (1) the offense had been committed during the commission of a sexual assault in the first degree, an offense of which the defendant previously had been convicted; and (2) the offense was committed in an especially cruel and heinous manner. Id., 540. The defendant claimed the following ten mitigating factors: (1) significant impairment of mental capacity; (2) a lesser degree of mental capacity; (3) an emotionally deprived childhood; (4) untreated early mental or emotional disturbance; (5) the defendant had surrendered to the police after learning that he was sought as a suspect; (6) he had maintained positive relationships with various persons; (7) a lingering doubt regarding his guilt; (8) fairness, mercy and humanity; (9) a disparity between the defendant's chronological age and his emotional development; and (10) [a]ny other mitigating factors concerning [the defendant's] character or background, or the nature and circumstances of the case suggested by the evidence. Id., 541. The jury found both of the aggravating factors proven[97] and none of the mitigating factors proven and, accordingly, the death sentence was imposed. Id., 542–43." (Internal quotation marks omitted.) *Cobb II*, supra, 251 Conn. 515–16.

We now compare these cases involving sexual assault-murder and sexual assault-kidnap-murder with the facts of the three sexual assault-kidnap-murders

[97] This court concluded that the trial court improperly had instructed the jury on the heinous, cruel or depraved mitigating factor in *State* v. *Webb*, supra, 238 Conn. 478. We also concluded, however, that the evidence in that case was sufficient to support that factor for purposes of proportionality review.

that the defendant committed in the present case. We first consider the two cases in which the death penalty was imposed, namely, *Webb* and *Cobb*. The defendant argues that "[t]he level of planning, the presence of a weapon, the duration of the kidnapping and the extreme cruelty with which the victims were killed clearly sets these cases apart" from his case. We disagree. As we have noted, even if we assumed, without necessarily agreeing, that the offenses in *Webb* and *Cobb* were somewhat more aggravated than the offenses in the present case because the victims in those cases may have suffered a somewhat more prolonged period of extreme physical and psychological pain, we would not conclude that that difference is meaningful for purposes of this analysis. In performing proportionality review, we do not demand "a rough equivalence of moral blameworthiness" between the case under review and the similar cases in which the death penalty has been imposed. *Cobb II,* supra, 251 Conn. 510. Rather, we look for "a gross disparity between the case on review" and those other cases. Id. We perceive no gross disparity between any of the kidnappings, sexual assaults and murders under review in this case and the kidnappings, sexual assaults and murders in *Webb* and *Cobb*. As to the defendant's claim that his offenses were less blameworthy because the offenses in both *Webb* and *Cobb* were premeditated and, in *Webb*, involved the use of a weapon, we note that those facts could be considered by the respective sentencing juries only as part of "the facts and circumstances of the case" in determining whether a mitigating factor existed. Although those specific facts may not have existed in this case,[98] other equally egregious facts clearly did, i.e., the defendant's atrocious record of repeatedly kidnapping, sexually assaulting

---

[98] We note that the defendant took a steak knife from Leslie S. and used it in the course of his sexual assault and murder of her and April B. We also note that the facts and circumstances of each of the offenses in this case do not rule out premeditation.

and strangling vulnerable young women. Accordingly, we see no disproportionality between the sentences in this case and the sentences in *Webb* and *Cobb*.

We now compare the cases in which a life sentence was imposed, namely, *Usry*, the defendant's two Windham county murders, *Lapointe, Hafford, King, Whitworth* and *Daniels*. We conclude that there exists a meaningful difference between each of these cases and the sentences under review in this case. Specifically, in *Usry*, the defendant claimed as mitigating factors, inter alia, his young age and his lack of mental and emotional development, and the jury was deadlocked on the question of whether a mitigating factor existed; in the two Windham county murders, the state declined to seek the death penalty because it believed that it did not have sufficient evidence to support the sexual assault element of sexual assault-murder; in *Lapointe*, the defendant claimed as mitigating factors, inter alia, his permanent brain injury resulting from cranial operations required by his Dandy-Walker syndrome and no significant prior criminal history and the jury found that the defendant had established an unspecified mitigating factor; in *Hafford*, the panel found as nonstatutory mitigating factors that the defendant had a significant mental impairment and that he was remorseful, cooperative and regretful; in *King*, the defendant claimed as mitigating factors that he had been subject to sexual and physical abuse, that he had been unable to pursue an education and that he had left home at the age of eight and one-half years in order to escape abuse and neglect, and the jury found that one of the claimed fourteen nonstatutory mitigating factors had been proved; in *Whitworth*, the state declined to seek the death penalty citing, among other reasons, that the defendant had, up to the time of the crime, been a good husband and father and had not committed any other offenses; and in *Daniels*, the defendant introduced direct testimony

that the defendant suffered from organic brain dysfunction and had been drinking excessively on the night of the sexual assault-murder and the jury deadlocked on the question of whether there was a mitigating factor. We conclude that the differences between each of these cases and each of the sentences under review in this case meaningfully account for the difference in result.

We now turn to the facts of the similar cases involving multiple murder, namely *Steiger, Roseboro, Wood, Griffin, Breton* and *Day*. "In *State* v. *Steiger*, supra, 218 Conn. 349, the defendant was convicted of multiple murder capital felony in violation of § 53a-54b (8) [now (7)] for the shooting deaths of two individuals. After a verbal altercation with the two victims, which took place near the home of one of the victims, the defendant left the area and proceeded to arm himself with two guns and a knife. He returned to the victim's home, where he shot each victim multiple times and threatened two people standing nearby. Id., 352–56.

"The state claimed two aggravating factors: (1) that the defendant committed the murders in an especially heinous, cruel or depraved manner; and (2) that the defendant committed the murders and in such commission knowingly created a grave risk of death to another person in addition to the victims of the offense pursuant to § 53a-46a (h) (3).

"In mitigation, the defendant offered testimony that: he had suffered from severe paranoid schizophrenia; he had a mental capacity that was significantly impaired; the mental disorder from which he suffered was prone to worsen under the influence of emotionality; he showed paranoid traits such that he tended to over-interpret threats and to respond explosively to threats; he was an individual of immature emotional development and immature impulse control; he had strong conflicting and unresolved emotions concerning

his father and alcoholism; his mental capacity was significantly impaired and he was under substantial duress; he had traumatic childhood experiences that could be characterized as emotional and psychological abuse; and in describing the events of that night, he appeared to be in a great deal of turmoil and pain.

"The three judge panel that conducted the penalty phase hearing unanimously found that the state had proved both aggravating factors. Id., 351. Two of the judges found the existence of a mitigating factor in the defendant's character, background and history and that, at the time of the offense, the defendant's mental capacity was significantly impaired and his ability to conform his conduct to the requirements of the law was significantly impaired. One member of the panel found that the defendant had not proved any mitigating factors. The panel imposed a life sentence without the possibility of parole. Id., 352." *Breton III*, supra, 264 Conn. 433–34.

"In *State* v. *Roseboro*, supra, 221 Conn. 430, the defendant was convicted of multiple murder capital felony in violation of § 53a-54b (8) [now (7)], three counts of murder in violation of [General Statutes] § 53a-54a (a); and one count of first degree burglary in violation of General Statutes § 53a-101 (a) (1) and (2). 'The defendant, armed with a dangerous weapon and intending to commit a larceny, unlawfully entered and remained in a house in Derby owned by Mary Ferrara. In the course of committing this crime, the defendant engaged in a struggle with Mary Ferrara and intentionally killed her. The defendant also intentionally killed her son Joseph Ferrara and her niece Nina Ferrara. Each of the victims died of stab wounds.' Id., 433.

"The three judge panel that conducted the penalty phase hearing unanimously found that the state had proved that the crimes were committed in an especially

heinous manner. The panel further found a mitigating factor, specifically that the defendant had adjusted well to incarceration, and imposed a life sentence." *Breton III,* supra, 264 Conn. 432.

"In *State* v. *Wood,* supra, 208 Conn. 125, the defendant was convicted of three counts of murder in violation of § 53a-54a and one count of multiple murder capital felony in violation of § 53a-54b (8) [now (7)]. '[O]n the evening of April 16, 1982, the defendant shot and killed his former wife, Rosa Wood, and her boyfriend, George Troie, on Farmington Avenue in West Hartford. The defendant then proceeded to the home on White Pine Lane he had shared with his former wife. Once there he shot and killed his former mother-in-law, Patricia Voli. The defendant then shot and killed his fifteen year old daughter, Elisa Wood.' Id., 128.

"At the penalty phase hearing, the state sought to prove two aggravating factors: (1) that the defendant committed the murders and in committing them knowingly created a grave risk of death to another person in addition to the victims of the murders; and (2) that the defendant committed the murders in an especially heinous, cruel or depraved manner.

"In mitigation, the defendant offered testimony that: he suffered from explosive disorder, major depression and antisocial personality disorder; he suffered from borderline personality disorder with atypical psychosis; he suffered from a paranoid schizophrenic process; he had a potential for transient psychotic states; he was a good boss, kind man, a good neighbor and was very patient with children; his brother went to see him in prison and would continue to do so; his father was never around; and he became despondent after his separation from his wife.

"The jury found that the state had not proved the first aggravating factor, knowingly causing grave risk

of death to another. The jury further found that the state had proved that the defendant committed the murders of Voli and Elisa Wood in an especially heinous, cruel or depraved manner. Finally, the jury found that the defendant had proved the mitigating factor that the defendant's mental capacity was significantly impaired or his ability to conform his conduct to the requirements of the law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution. The defendant was sentenced to 120 years in prison. Id." *Breton III*, supra, 264 Conn. 434–35.

"In *State* v. *Griffin*, supra, 251 Conn. 671, the defendant was convicted of one count of capital felony in violation of § 53a-54b (8) [now (7)] and two counts of murder in violation of § 53a-54a. On November 1, 1993, the defendant and another individual, Gordon 'Butch' Fruean, Jr., entered the home of the defendant's former girlfriend. Id., 678. While there, the defendant and Fruean attacked two individuals. The defendant shot each victim, one of them multiple times. Upon realizing that the victims were still alive, the defendant stabbed them both multiple times. Id., 679. Again realizing that the victims were still alive, the defendant smashed a glass mason jar over one victim's head and a ceramic lamp over the other victim's head. Id.

"The state, at the defendant's penalty phase hearing, sought to prove the aggravating factor that the defendant had committed the murders in an especially heinous, cruel or depraved manner. The defendant claimed twenty mitigating factors.[99]

---

[99] "These were: (1) the role and actions of Fruean remain uncertain; (2) the defendant had no record of criminal activity other than a juvenile matter; (3) there was no evidence that the defendant had a violent nature other than the crime for which she was convicted; (4) the defendant had been a productive member of society for thirty years; (5) the defendant was an active and involved mother; (6) the defendant was a loving and devoted grandmother; (7) the defendant took handicapped children into her home for visits; (8) the defendant took care of a profoundly retarded child, making the child part of the defendant's family; (9) the defendant welcomed her

"The jury returned a special verdict finding that the state had proved the aggravating factor beyond a reasonable doubt for both of the murders. Id., 681–82. The jury further found that the defendant had proved the existence of an unspecified mitigating factor or factors. Id., 682. The trial court imposed a sentence of life imprisonment without the possibility of release. Id." *Breton III*, supra, 264 Conn. 429–30.

In *Breton III*, supra, 264 Conn. 327, the defendant "was found guilty of multiple murder capital felony in violation of § 53a-54b (8) [now (7)] for the deaths of his former wife and his son. Following the penalty phase hearing before a three judge panel, the defendant was sentenced to death. The panel found that the state had proved its aggravating factor, that the murders were committed in an especially cruel manner. See General Statutes (Rev. to 1995) § 53a-46a (h) (4). This finding was based on evidence demonstrating that the defendant had engaged in a prolonged and violent assault on his former wife, during which he beat her severely and stabbed her multiple times, ignoring her anguished cries that he was hurting her and begging for help. The defen-

children's friends into her home when they were in need; (10) the defendant was a hard worker and provided financial support to her family; (11) the quality of the defendant's work with the handicapped; (12) the defendant went back to school to earn her high school degree and attend college after raising her children; (13) the defendant's voluntary involvement in community activities; (14) the defendant's generous dealings with others; (15) the defendant's background, character and history suggest that she is unlikely ever to be a violent threat to others in the future; (16) the defendant provides positive contributions to the lives of her children, grandchildren and friends; (17) the nature of the defendant's crimes is so out of character that a death sentence would be inappropriate; (18) a factor concerning the nature of the crime that in fairness or mercy constitutes a basis for a life sentence; (19) a factor concerning the defendant's character, history or background that in fairness or mercy constitutes a basis for a life sentence; and (20) the combination of any or all of the factors, in fairness or mercy, provides a reason for sentencing the defendant to life in prison." *Breton III*, supra, 264 Conn. 429–30 n.62.

dant then turned on his son, chased him down as he attempted to escape and repeatedly stabbed him.

"The defendant claimed the two statutory mitigating factors of significant impairment of his mental capacity and significant impairment of his ability to conform his conduct to the requirements of the law as well as twenty-five nonstatutory mitigating factors.[100] . . .

---

[100] "The defendant claimed as nonstatutory mitigating factors that: (1) at the time of the offense, his mental capacity was impaired, but not so impaired as to constitute a statutory mitigating factor; (2) at the time of the offense, his ability to conform his conduct to the requirements of the law was impaired, but not so impaired as to constitute a statutory mitigating factor; (3) at the time of the offense, he was suffering from an extreme emotional disturbance; (4) at the time of the offense, his mental capacity was significantly impaired, and he suffered from an extreme emotional disturbance that constituted a defense to the prosecution, which, although not presented in the guilt phase, the court could consider as a nonstatutory mitigating factor; (5) he was under the influence of alcohol and prescription medication at the time of the offense; (6) his mother gave him up to live at an orphanage as well as other homes because he was in the way and she could not or would not properly care for him; (7) his mother herself was the product of a broken home, was abandoned by her own parents, lived in an orphanage and was ill-prepared to raise him properly; (8) upon his return from the orphanage it was readily apparent that the defendant had suffered severe and traumatic abuse at the orphanage; (9) he was significantly and traumatically affected by his abandonment by his parents; (10) he was raised in a pathological, alcoholic and abusive family unit; (11) his mother was an alcoholic and she lacked the necessary mothering skills to raise her son properly; (12) his father almost never worked or supported his family and drank excessively on a daily basis; (13) the defendant was subjected to verbal, physical and emotional abuse at the hands of both of his parents; (14) he was the product of a broken home that lacked the necessary love, affection, support and nurturing that is critical to proper social and childhood development; (15) his formal education ended before completion of the eighth grade; (16) despite his low level of education, he has a long history of steady employment and has led a productive life; (17) as a teenager, he worked and contributed to the household; (18) he worked hard to support his family for nineteen years; (19) he has been a model prisoner; (20) mercy; (21) considerations of fairness and mercy constitute a basis for a sentence of life without the possibility of release; (22) there exists a factor concerning the facts and circumstances of the case that has not been specifically mentioned in this list that the court can consider in fairness and mercy as constituting a basis for imposing on him a sentence of life imprisonment with no possibility of release rather than sentencing him to death; (23) there exists a factor in

[T]he panel found that the defendant had proved the factual underpinnings of four nonstatutory mitigating factors. They were: (1) that the defendant was neglected, abandoned and the product of an abusive family unit during his childhood; (2) that the defendant had been a model prisoner at all times since his incarceration for the murders; (3) that he dropped out of school at age sixteen; and (4) that he was a good employee and a productive worker. The panel further found, however, that none of the nonstatutory mitigating factors, alone or in combination, constituted a mitigating factor considering all of the facts and circumstances of the case. Accordingly, the panel sentenced the defendant to death." *Breton III*, supra, 264 Conn. 428.

"In *State* v. *Day*, supra, 233 Conn. 813, 815–16, the defendant was convicted of four counts of murder in violation of § 53a-54a and one count of multiple murder capital felony in violation of § 53a-54b (8) [now (7)] for the shooting deaths of four individuals, one of whom was a five year old child. Id.

"The state sought to prove the aggravating factor that the defendant had committed the crime in an especially heinous, cruel or depraved manner. The state presented testimony that one of the adult victims died from multiple gunshot wounds to the head, all fired at close range, and evidence from the trial indicated that the defendant repeatedly kicked that individual, probably while he was unconscious. The state offered further testimony indicating that the cause of death for a second adult

his character, history and/or background that has not been specifically mentioned in this list that the court can consider in fairness and mercy as constituting a basis for a sentence of life without the possibility of release; (24) any of the previously listed factors taken either individually or in combination with any other factor, although not an excuse for the offense, in fairness or mercy provides a reason for a sentence of life without the possibility of release; and (25) death is not the appropriate sentence for the defendant." *Breton III*, supra, 264 Conn. 335–36 n.7.

victim was multiple gunshot wounds to the head and chest, any one of which could have caused her death. The state offered testimony regarding the third adult victim indicating that she was killed by two gunshot wounds to the head, both fired at close range and capable of causing her death. There was additional evidence suggesting that that victim had been strangled and struck in the head with a shovel, most likely after she was unconscious or dead. Finally, the state offered testimony indicating that the child victim was murdered by a single gunshot wound to the back of the head, killing him almost instantly.

"At the close of state's evidence, the defendant moved to dismiss the penalty phase hearing and moved for imposition of a life sentence. The trial court found that the state had not presented a prima facie case from which the jury reasonably could infer that the aggravating factor had been proved by the state, and it granted the defendant's motion to dismiss and motion for imposition of a life sentence." *Breton III*, supra, 264 Conn. 431–32.

As we have noted, we limit our comparison of the cases involving multiple murder to the murders of April B. and Leslie S. We first consider the case in which the sentencer imposed the death penalty, namely, *Breton III*. In *Breton III*, supra, 264 Conn. 336, the sentencer found that the defendant had committed each of the two murders in an especially cruel manner and rejected all of his claimed mitigating factors, including the statutory mitigating factors raised by the defendant in the present case. We perceive no gross disparity between the conduct underlying this offense and the conduct underlying the defendant's murders of April B. and Leslie S. or in the sentencers' treatment of aggravating and mitigating factors.

We next compare the defendant's sentences for the murders of Leslie S. and April B. to those cases involving

multiple murder in which a life sentence was imposed, namely, *Steiger, Roseboro, Wood, Griffin* and *Day.* We conclude that there exists a meaningful difference between each of these cases and the murders of Leslie S. and April B. Specifically, in *Steiger*, the defendant claimed, inter alia, that he had suffered from severe paranoid schizophrenia, and two members of the three judge panel concluded that he suffered from a significant mental impairment; in *Roseboro*, the three judge panel found the mitigating factor that the defendant had adjusted well to incarceration;[101] in *Wood*, the defendant presented evidence that he suffered from severe personality disorders, atypical psychosis and paranoid schizophrenic process, and the jury determined that he had established the statutory mitigating factor of mental impairment; in *Griffin*, the defendant presented evidence that the role of her codefendant in the murders remained uncertain, that she had no record of criminal activity, that she was unlikely ever to be a violent threat in the future and other mitigating circumstances not claimed by the defendant in the present case, and the jury found an unspecified mitigating factor; and in *Day*, the trial court found that the state had not established a prima facie case in support of the aggravating factor. We conclude that the differences between each of these cases and the sentences for the murders of Leslie S. and April B. meaningfully account for the difference in result.

"On the basis of this analysis, of our scrupulous examination of all of the material presented to us regarding the imposition of the death penalty in the present case, and of our careful review of the material presented to us regarding the imposition of the sentences in the other

---

[101] We noted in *Breton III*, supra, 264 Conn. 443, that the panel's determination that this circumstance was mitigating may have been based on a misunderstanding of the governing law and did not require this court to conclude that a finding that a defendant behaved well in prison is always mitigating.

[twenty-three] similar cases,[102] we conclude that the death sentence is not 'excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.' General Statutes § 53a-46b (b) (3). There is nothing freakish, arbitrary, wanton or aberrational about the sentence in this case. There is no pattern or trend evident in similar cases with respect to which this sentence is inconsistent. This case is not an outlier. The various sentencers' evaluations of similar aggravants and claimed mitigants in the other similar cases is reasonably consistent with the [panel's] evaluation of the aggravants and claimed mitigants in this case. The death sentence in this case is reasonably consistent with the sentences of death imposed in the [three cases] in which that sentence was imposed, considering the aggravants found and the mitigants claimed. The death sentence in this case is reasonably consistent with the sentences of life imprisonment in the [twenty] similar cases in which that sentence was imposed, considering the aggravants found and the mitigants claimed; there is nothing freakish, aberrational or arbitrary in [the jury's] having imposed the death penalty in this case and [the sentencers'] having declined to do so in the other [twenty] cases. The sentence in this case is reasonably consistent with the sentences imposed in the pool of similar cases." *State v. Webb*, supra, 238 Conn. 550–51.

The judgments are affirmed.

In this opinion VERTEFEUILLE, ZARELLA, LAVERY, FOTI and DRANGINIS, Js., concurred.

NORCOTT, J., dissenting. I respectfully dissent because I maintain my position that the death penalty

---

[102] The pool of similar cases is comprised of twenty-one docketed cases. As we have noted, however, *Diaz-Marrero* and *Ortiz* each count as two cases for purposes of proportionality review.

has no place in the jurisprudence of the state of Connecticut. See *State* v. *Breton,* 264 Conn. 327, 446, 824 A.2d 778 (2003) (*Norcott, J.,* dissenting). I continue to respect the position of the majority of this court regarding this matter, but briefly I write again to supplement my reasoning that the death penalty should be abolished in this state.

On a national scale, statistical evidence continues to mount showing that "the number of executions and death sentences, the size of death row and public support for capital punishment all fell during 2003, according to the Death Penalty Information Center . . . ." R. Dieter, "Political Report: Death Row Verdicts and Population Drop," 32 FOCUS/Joint Center for Political and Economic Studies, January/February 2004, p. 5. In addition, there seems to be a growing discontent among the states and Congress with the issues of unfairness and inaccuracy that has resulted in more of a regional isolation of the death penalty.[1] Id.

Further, the specter of executing an innocent person will always shadow the debate over capital punishment. In this regard, it is noteworthy that the year 2003 experienced a record setting number of death row exonerations because of innocence. Indeed, as a result, legislative reform initiatives to reduce the possibility of executing an innocent defendant have taken place in the states of Illinois, North Carolina and New Jersey.[2]

While capital punishment remains the law in the state of Connecticut, a law the constitutionality of which has

---

[1] "Of the executions that did take place, only three were conducted outside of the South, which accounted for almost 90 percent of the 65 executions in 2003." R. Dieter, supra, p. 5.

[2] Congress also has begun to address this concern. The United States House of Representatives recently passed a judicial reform package that addresses funding for DNA testing and more sophisticated legal representation in capital cases. See Advancing Justice Through DNA Technology Act of 2003, H.R. Rep. No. 3214, 108th Cong. (2003).

been upheld by a majority of this court, I, as one justice who disagrees with that position, believe that we, as a nation, will soon abandon this incredibly costly, frustratingly lengthy and emotionally draining part of our criminal jurisprudence.

Accordingly, and more specifically for the reasons set forth in my dissents in previous capital cases, I dissent again.